# In the United States Court of Federal Claims

No. 05-914C
(Filed: August 30, 2012)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| K-CON BUILDING SYSTEMS, INC., | \* | |
| | \* | Motion for Sanctions; Failure to Produce |
| Plaintiff, | \* | Documents During Discovery; Destruction |
| | \* | of Undisclosed Documents Caused by a |
| v. | \* | Defense Witness After His Trial Testimony; |
| | \* | RCFC 37; Inherent Authority; Prohibition |
| THE UNITED STATES, | \* | Against Use of Documents; Exclusion of |
| | \* | Trial Testimony; Costs |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

William A. Scott, Charleston, SC, for plaintiff.

Daniel B. Volk, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

During trial in this government contract case, counsel for defendant discovered that his client, the United States Coast Guard ("Coast Guard"), possessed three boxes of documents relevant to the case that had not been identified or produced to plaintiff during discovery. Then, before plaintiff had an opportunity to review most of the documents, one of the government's witnesses caused the documents to be destroyed. Plaintiff moves the court to sanction the government for this inauspicious conduct. For the reasons set forth below, the court finds that sanctions are warranted.

## I. BACKGROUND

In 2005, plaintiff filed three suits in this court concerning its contracts with the Coast Guard for the design and construction of prefabricated metal buildings in Elizabeth City, North Carolina, St. Petersburg, Florida, and Port Huron, Michigan. The parties conducted discovery in the three cases contemporaneously.[1] Accordingly, the initial scheduling order in each case

---

[1]  When the cases were first filed, the only one assigned to the undersigned was the St. Petersburg case. This case and the Port Huron case, both originally assigned to another judge of this court, were transferred to the undersigned on April 30, 2010, the same date that discovery in the three cases concluded.

indicated that the parties were to exchange initial disclosures by April 28, 2006, and conclude all discovery by June 1, 2007.

Regretfully, however, discovery in the three cases became somewhat contentious.[2] Plaintiff filed numerous motions to compel and the government filed a motion for a protective order.  In the motions to compel filed in this case, which concerns the Elizabeth City project, plaintiff averred that it served two requests for production of documents on the government: the first on October 5, 2006, and the second on February 1, 2007.  In the second request, plaintiff expressly sought "[a]ny and all documents of any type whatsoever relating to" the contract.  Ultimately, in a November 17, 2008 joint status report, the government represented that it would "make all non-privileged documents relating to the contract available for inspection and copying by January 31, 2009, including documents maintained at Government offices other than the Coast Guard offices in Norfolk, VA."  The parties reiterated this representation during a status conference in the St. Petersburg case aimed at resolving the discovery disputes, and the court memorialized it in a subsequent order.[3]  See K-Con Bldg. Sys., Inc. v. United States, No. 05-981, Order 1, Jan. 14, 2009 ("During the status conference, the parties represented that . . . defendant would make the documents related to the contract available for plaintiff's review by the end of January 2009.").

Fact discovery concluded on November 16, 2009, and expert discovery closed on April 30, 2010, after which plaintiff filed a motion for partial summary judgment.  After ruling on plaintiff's motion in January 2011, the court set the case for trial.  After a brief delay related to the disclosure of expert reports and potential witnesses, the court held a two-week trial in December 2011 in Charleston, South Carolina.

On the sixth day of trial, the government opened its case with the testimony of Richard Anderson, a contract inspector working for the Coast Guard as the contracting officer's

---

[2]  Present government counsel, Daniel B. Volk, entered an appearance in this case on June 26, 2012, after the attorney who tried the case and briefed and argued the motion for sanctions, Jacob A. Schunk, left the Civil Division of the United States Department of Justice ("DOJ") for the United States Attorney's Office.  Mr. Schunk, in turn, entered his appearance in this case on March 30, 2011, shortly after the court set the case for trial and well after the conclusion of discovery.  Prior to March 30, 2011, three different attorneys represented the government in this matter.

[3]  No similar order was issued in this case.  Prior to this case being transferred to the undersigned, all of the discovery orders were in the form of docket entries, and none contained any language memorializing the government's representation that it would make available to plaintiff all nonprivileged documents related to the contract.

representative.[4]  Trial Tr. 1930:21-25, Dec. 12, 2011; Trial Tr. 2022:25-2023:7, Dec. 13, 2011.
The next morning, while Mr. Anderson was seated in the gallery but before he returned to the
witness stand to continue his testimony, government counsel informed the court that Mr.
Anderson had given him a compact disc ("CD") containing copies of documents related to the
Elizabeth City project.  Trial Tr. 2203:7-16, Dec. 13, 2011.  The documents originated from prior
litigation between plaintiff and one of its subcontractors, HEPACS, Inc. ("HEPACS");[5] counsel
explained that HEPACS provided the Coast Guard with its litigation file after that litigation
concluded.[6]  Id. at 2203:19-24.

     Government counsel indicated that he had never seen some of the documents on the CD
and that the documents appeared to be responsive to plaintiff's earlier discovery requests.  Id. at
2203:17-19.  He also acknowledged the existence of boxes containing other documents from the
HEPACS litigation that he had not yet seen.  Id. at 2206:7-19.  With respect to the documents on
the CD, counsel explained that the government was in the process of printing those documents to
provide them to plaintiff.  Id. at 2204:8-9.  And, with respect to the boxes, counsel stated that he
wanted to review their contents before providing them to plaintiff.  Id. at 2206:19-22.  The court
assured government counsel that he would be permitted to review all of the documents prior to
providing them to plaintiff to ascertain whether they were duplicative of documents already
produced, irrelevant, or privileged.  Id. at 2206:2-4, 13-18, 23-25.  It also assured plaintiff's
counsel that once he had the opportunity to review the HEPACS documents produced by the
government, it would, if necessary, reopen the case after trial.  Id. at 2204:18-21.

     In fact, the parties contemplated that after they reviewed the HEPACS documents, it
might be necessary to elicit additional testimony from Mr. Anderson.  Id. at 2205:15-23.  Thus, at
the close of Mr. Anderson's testimony, government counsel indicated that he would keep Mr.
Anderson on call.  Id. at 2273:24-25.  The court instructed Mr. Anderson not to discuss the case
or his testimony with anyone other than government counsel.  Id. at 2274:23-2275:12.

---

     [4] In a declaration submitted by defendant, Coast Guard contracting officer Cathy
Broussard explained that the Coast Guard had a contract with a Cooperative Administrative
Support Unit ("CASU"), which in turn had a contract with a private inspection company.
Broussard Decl. ¶¶ 3-4.  She stated that Mr. Anderson was employed by the private inspection
company, and not the CASU or the Coast Guard.  Id. ¶ 4.

     [5] Plaintiff's counsel later indicated, in a sworn affidavit, that HEPACS had sued
plaintiff's surety, not plaintiff.  Scott Aff. ¶ 7.  Because the parties and the declarants otherwise
identify plaintiff as the opposing party in that litigation, the court will do so as well.

     [6] All further references to the "HEPACS documents" are to those documents that
HEPACS supplied to the Coast Guard as part of its litigation file.  As explained below, some of
the HEPACS documents contain handwritten notes that distinguish them from otherwise
identical documents the government produced to plaintiff during discovery.

At the end of the tenth and last day of trial, the court revisited the issue of the HEPACS documents.  Government counsel had produced some of the documents to plaintiff, but plaintiff's counsel had not yet reviewed them.  Trial Tr. 3661:1-10, Dec. 16, 2011.  In addition, there were other documents located in Norfolk, Virginia, that government counsel intended to produce to plaintiff before the upcoming holidays.[7]  Id. at 3662:21-3663:2.  The court directed plaintiff to file a status report by the end of January 2012 indicating whether its counsel had concluded his review of the HEPACS documents and, if so, what additional proceedings might be necessary. Id. at 3663:8-13.

As reflected in the status report filed by plaintiff and the responsive status report filed by the government, plaintiff only received a portion of the HEPACS documents: 3,192 pages,[8] approximately one quarter of the documents.  To explain its failure to produce the full complement of HEPACS documents, as well as how the documents came into the Coast Guard's possession in the first place, the government submitted declarations from Michael Paul, the owner of HEPACS; Donna Miller, a Coast Guard employee; and Mr. Anderson.

Mr. Paul, in his unsworn declaration, averred that he provided the HEPACS documents to the Coast Guard after HEPACS settled its suit against plaintiff.  Paul Decl. ¶¶ 8-9.  He had begun to save electronic-mail messages and documents when "problems starting cropping up on the job" with plaintiff.  Id. ¶ 3.  Plaintiff ultimately terminated its contract with HEPACS and HEPACS, in turn, sued plaintiff for the amount it believed was due on the contract.  Id. ¶¶ 4-7. After the parties exchanged an unspecified number of documents during discovery, they entered mediation.[9]  Id. ¶¶ 7-8; Def.'s Ex. D at 1-2.  According to plaintiff's counsel, the parties settled the suit on March 10, 2006.  Scott Aff. ¶ 7.

Mr. Paul then asserted that the documents he provided to the Coast Guard included electronic-mail messages between the Coast Guard and plaintiff, electronic-mail messages

---

[7]  As explained below, it was later revealed that these documents were in Mr. Anderson's possession at his home in Virginia Beach, Virginia, at the time of the trial, and not at the Coast Guard facility in Norfolk, Virginia.

[8]  This page count represents the number of pages provided to the government, and then to plaintiff, from Mr. Paul.

[9]  According to an exchange of electronic-mail messages in December 2005 and January 2006, plaintiff's attorney estimated that plaintiff had "3, 4 or more bankers boxes" worth of documents related to the contract and HEPACS's attorney estimated that HEPACS had one box of documents.  Def.'s Ex. D at 1-2.  Further, during oral argument on plaintiff's motion for sanctions, the government indicated that plaintiff billed HEPACS for photocopying 6,416 pages of documents that it provided to HEPACS during discovery.  However, the record does not reveal precisely how many documents were actually exchanged by the parties; in particular, there is no precise information regarding how many documents HEPACS provided plaintiff.

between plaintiff and HEPACS, internal electronic-mail messages from plaintiff, photographs taken by HEPACS, contract documents between plaintiff and HEPACS, specification sheets, audio recordings of voice-mail messages from plaintiff, communications between plaintiff and the metal building supplier, notes between plaintiff and HEPACS, and other documents.  Paul Decl. ¶ 10.  He indicated that some of these documents bore handwritten notes and other markings he made during the course of his company's litigation with plaintiff.  Id. ¶ 14.  Mr. Paul believed that plaintiff had a copy of every document that he gave to the Coast Guard, id. ¶ 12, and estimated that aside from the photographs, ninety percent of the documents he provided to the Coast Guard originated from plaintiff, seven percent originated from HEPACS, and the remainder originated from the Coast Guard, id. ¶ 11.  He also indicated that prior to providing the documents to the Coast Guard, he made electronic copies of those documents he believed were important for his company's lawsuit, estimating that he made electronic copies of all of the photographs and less than twenty-five percent of the documents.  Id. ¶ 13.  At the request of the government's trial counsel, Mr. Paul provided the government with copies of his electronically stored documents.  Id. ¶¶ 15-17.  Government counsel subsequently provided those documents to plaintiff.

Ms. Miller, in her declaration, indicated that she has worked for the Coast Guard since 1996, first as a contract specialist and then, beginning in March 2009, as a contracting officer.  Miller Decl. ¶ 1.  She stated that five or six years ago, while she was a contract specialist, a woman from HEPACS, Wanda, delivered three boxes to the Coast Guard, explaining to Ms. Miller that the boxes contained documents gathered by HEPACS during its litigation with plaintiff.  Id. ¶ 3.  Wanda placed the boxes under Ms. Miller's desk, but Ms. Miller averred that she never opened the boxes or looked inside of them.  Id.  She indicated that during discovery in this case, she assembled an appeal file containing the official contract documents that were in her possession.  Id. ¶ 4.  Then, in November or December 2011, Mr. Anderson approached her and asked whether he could look at the HEPACS documents under her desk and take them with him.  Id. ¶ 5.  Ms. Miller allowed Mr. Anderson to take the boxes.  Id.  Finally, she stated that during the time that the boxes were under her desk, i.e., between the time they were delivered by Wanda and the time Mr. Anderson took them, she was "not aware of anyone from the Government looking at the documents or even opening the boxes," that she "never told anyone about the documents," and that as far as she knew, she was the only person at the Coast Guard who knew about the boxes.  Id. ¶ 6.  She did not know how Mr. Anderson knew about the boxes.  Id. ¶ 5.

Mr. Anderson did not explain the source of his knowledge in his declaration.  He merely stated that approximately five or six years prior, Mr. Paul delivered documents generated during HEPACS's lawsuit against plaintiff to the Coast Guard facility in Norfolk, Virginia.  Anderson Decl. ¶ 4.  He stated that prior to traveling to Charleston, South Carolina, to testify in this lawsuit, he took those documents to his house and made a copy of portions of a CD he found with the documents.  Id. ¶ 5.  He then explained that after testifying, he "did not understand there was any additional need for the documents provided by HEPACS" and therefore, as part of a move from his home in Virginia Beach, Virginia, during the two days following his trial testimony, he discarded the remaining HEPACS documents.  Id. ¶ 7.

Upon reviewing the HEPACS documents produced by the government during and after trial–those from the CD supplied by Mr. Anderson and those from Mr. Paul–plaintiff made two discoveries.  One, both plaintiff's chief operating officer, Eric Combs, and plaintiff's counsel determined that they had never seen any of the photographs taken by HEPACS or most of the documents containing Mr. Paul's handwritten notations.  Combs Aff. ¶ 4; Scott Aff. ¶ 7.  In addition, plaintiff was able to identify only nine documents that had been previously produced by the government.[10]  The parties subsequently determined that these nine documents were produced to plaintiff during discovery as part of the work papers of the government's expert witness.  The government explained that Mr. Paul had sent the nine documents to the Coast Guard via electronic mail in February 2006.[11]  Indeed, Mr. Paul claimed in those messages that he was sending the documents to the Coast Guard to assist it in its litigation with plaintiff, opining that he believed that plaintiff was "playing everyone" and committing "fraud."  Pl.'s Ex. 1 at 1-2; Def.'s Ex. C at 1.  In sum, based on the parties' representations, the nine documents identified by plaintiff that the government produced or used prior to trial were not HEPACS documents, i.e., documents from the boxes under Ms. Miller's desk, even though copies of those documents were included among the HEPACS documents.

To summarize the facts set forth above, HEPACS provided the Coast Guard with three boxes of documents from its litigation with plaintiff approximately five or six years prior to trial in this case; the government had the HEPACS documents in its possession during the pendency of this case; the government did not produce the HEPACS documents to plaintiff during discovery (except for the nine documents that Mr. Paul separately sent to the Coast Guard via electronic mail); the government, just prior to trial, gave the HEPACS documents to Mr.

---

[10]  Two of the documents were introduced during the October 30, 2009 deposition of Butch Clayton, one of plaintiff's project managers, and were subsequently designated as defense trial exhibits no later than October 11, 2011.  Four of the documents were designated as joint trial exhibits no later than November 30, 2011.  And, three of the documents were designated as defense trial exhibits no later than October 11, 2011.

[11]  The government produced copies of two of Mr. Paul's electronic-mail messages to plaintiff during fact discovery, but the names of the ten attachments were redacted and the attachments themselves were not produced.  See Pl.'s Ex. 1 at 1-2.  The government then provided the nine documents at issue during expert discovery, but the documents bore no indication that they were the attachments redacted from the electronic-mail messages previously produced.  In support of its opposition to the motion for sanctions, the government submitted copies of the two electronic-mail messages and the documents purportedly attached to them.  See Def.'s Ex. C.  However, defendant's copies of the messages do not bear any indication of what documents were attached to them.  Accordingly, there is no documentary evidence that the nine documents at issue were actually attached to these messages.  Further, it is unclear why the government considered the attachments to be privileged during fact discovery, but not during expert discovery or at the present time.  It is reasonable to ask whether the government deemed other documents to be privileged during discovery that were not actually privileged.

Anderson, who discarded them after he testified; only a portion of the HEPACS documents–those contained on the CD in Mr. Anderson's possession and those retained in an electronic form by Mr. Paul–were produced to plaintiff during and after trial; and the remaining documents, constituting at least seventy-five percent of the HEPACS documents by Mr. Paul's estimate, were never seen by the government's trial counsel and were never produced to plaintiff.

Because the government did not produce the HEPACS documents during discovery and because Mr. Anderson's disposal of a large quantity of the HEPACS documents after trial prevented plaintiff from ever knowing their contents, plaintiff moves for sanctions against the government. Plaintiff requests that the following be stricken from the record: Mr. Anderson's testimony, exhibits prepared by or commented on by Mr. Anderson, testimony and evidence based on documents prepared by Mr. Anderson, HEPACS documents used as exhibits, documents relating or referring to HEPACS, and testimony concerning documents relating or referring to HEPACS. Plaintiff also requests an award of attorney's fees related to the motion for sanctions and prior motions to compel, as well as other appropriate sanctions, such as the striking of the government's entire case. The court heard argument on plaintiff's motion on June 14, 2012.

## II. DISCUSSION

Plaintiff seeks sanctions for the government's failure to produce the HEPACS documents during discovery and the subsequent destruction of the HEPACS documents before plaintiff had an opportunity to review them. Although both actions relate to the same documents, each can constitute sanctionable conduct independent of the other. Accordingly, the court addresses each action separately.

### A. The Failure to Produce the HEPACS Documents During Discovery

Rule 37 of the United States Court of Federal Claims ("RCFC") describes the remedies available for a violation of the rules of discovery. Subsection (b) of the rule addresses the failure to comply with a court order, subsection (c) concerns the failure to disclose information or supplement an earlier discovery response, and subsection (d) relates to the failure to respond to a request for inspection.[12] Plaintiff premises its motion for sanctions on RCFC 37(c), but a brief discussion of the other two potentially relevant subsections is appropriate.

RCFC 37(b) permits a court to sanction a party that "fails to obey an order to provide or permit discovery . . . ." In the St. Petersburg case, the undersigned issued an order memorializing the government's representation that it would make all nonprivileged documents relating to the contract available to plaintiff by January 31, 2009. However, no similar order was filed by the judge assigned to this case. Thus, even though the parties were conducting discovery in all three

---

[12] Because the HEPACS documents have been discarded, subsection (a) of RCFC 37, dealing with motions to compel discovery, is inapplicable.

cases simultaneously and in a coordinated fashion, the government did not, strictly speaking, violate a court order by failing to disclose the HEPACS documents during discovery in this case.

RCFC 37(d) provides for sanctions when, among other things, a party fails to object or respond to a request for the production of documents under RCFC 34.  Courts are split as to what constitutes sanctionable conduct under this rule; some require a complete failure to respond or object to a discovery request to support a motion for sanctions, while others will sanction a response that is evasive or incomplete.  See Badalamenti v. Dunham's, Inc., 896 F.2d 1359, 1363 (Fed. Cir. 1990) (citing decisions on both sides).  The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has not, in a decision binding on this court, defined the scope of sanctionable conduct under RCFC 37(b) or its equivalent under the Federal Rules of Civil Procedure.[13]  However, in a patent case in which it was interpreting the law of the United States Court of Appeals for the Sixth Circuit,[14] the Federal Circuit took the former position, holding that if a party responds to a document request, even if the sole purpose of the response is to object, sanctions under Rule 37(d) are not appropriate.  Id. at 1362.  The court will follow the same path taken by the Federal Circuit in Badalamenti.  Thus, if a party responds to a document production request, albeit incompletely, as the government did in this case, the court will not sanction that party for failure to respond under RCFC 37(d).

In contrast, the government can be sanctioned under RCFC 37(c), which provides for sanctions when a party fails to make a required disclosure under RCFC 26(a) or fails to

---

[13]  The RCFC mirror, to the extent practicable, the Federal Rules of Civil Procedure.  See RCFC, 2005 Rules Committee Note; RCFC, 2002 Rules Committee Note.  The court's analysis of a particular rule in the RCFC is therefore guided by the case law construing that rule and the case law construing the equivalent federal rule.  See RCFC, 2002 Rules Committee Note.

[14]  When the Federal Circuit decides an issue in a patent case that does not involve patent law, it typically applies the law of the circuit in which the patent case arose.  Midwest Indus., Inc. v. Karavan Trailers, Inc., 175 F.3d 1356, 1359 (Fed. Cir. 1999) (en banc in relevant part), abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc., 532 U.S. 23, 28 (2001); Sun-Tek Indus., Inc. v. Kennedy Sky Lites, Inc., 856 F.2d 173, 175-76 (Fed. Cir. 1988).  Normally, the Federal Circuit's rulings on nonpatent issues in patent cases are not binding on the United States Court of Federal Claims ("Court of Federal Claims") because they are not considered to be the law of the Federal Circuit.  United Med. Supply Co. v. United States, 77 Fed. Cl. 257, 265 (2007); cf. Exxon Corp. v. United States, 931 F.2d 874, 877 n.4 (Fed. Cir. 1991) (noting that while it applied regional circuit law regarding a procedural issue in a decision in a patent case, the regional circuit law it applied was "commonly accepted in federal jurisprudence, and should be considered the law of the Federal Circuit as well").

supplement a disclosure or discovery response under RCFC 26(e).[15]  It is unclear which rule the government violated–RCFC 26(a) or RCFC 26(e)–because the record does not reflect precisely when Wanda delivered the HEPACS documents to the Coast Guard; the litigation between plaintiff and HEPACS settled on March 10, 2006, and Mr. Paul indicates that the documents were delivered to the Coast Guard after the settlement.  However, the exact delivery date is irrelevant to the court's analysis.  Either the Coast Guard possessed the documents prior to the exchange of initial disclosures on April 28, 2006, making the government responsible for providing or describing those documents under RCFC 26(a)(1)(A)(ii), or the Coast Guard obtained the documents after either the exchange of initial disclosures or plaintiff's service of its document production requests, making the government responsible for supplementing its disclosures or discovery responses under RCFC 26(e)(1)(A).

Because there is no question that the government failed to provide plaintiff with the HEPACS documents during discovery in violation of RCFC 37(c), the court proceeds to determine whether a sanction for that failure is appropriate.  RCFC 37(c) sets forth a default sanction, which, as applied in this case, would be the inability to use the nondisclosed information as evidence at trial unless the nondisclosure was substantially justified or harmless.  Instead of or in addition to this default sanction, a court "may order the payment of reasonable expenses, including attorney's fees," that were incurred as a result of the nondisclosure or issue an order:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;

---

[15]  The relevant portion of RCFC 37(c) provides:

> (1) Failure to Disclose or Supplement.  If a party fails to provide information or identify a witness as required by RCFC 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) [not used]; and
> (C) may impose other appropriate sanctions, including any of the orders listed in RCFC 37(b)(2)(A)(i)-(vi).

(v) dismissing the action or proceeding in whole or in part; [and/or]
(vi) rendering a default judgment against the disobedient party[.]

RCFC 37(b)(2)(A), cited in RCFC 37(c)(1)(C).

Turning first to the default sanction, the court must address whether the government's failure to provide plaintiff with the HEPACS documents was either substantially justified or harmless.  The government, as the offending party, bears the burden of establishing substantial justification or harmlessness.  Scott Timber, Inc. v. United States, 93 Fed. Cl. 221, 226 (2010); Zoltek Corp. v. United States, 71 Fed. Cl. 160, 167 (2006).

The substantial justification exception is readily disposed of in this case.  "Substantial justification is justification sufficient to satisfy a reasonable person that parties could disagree as to whether compliance with the disclosure requirement was required."  Zoltek Corp., 71 Fed. Cl. at 170.  The government does not argue that there was any justification for its failure to produce the HEPACS documents to plaintiff during discovery.  Indeed, it cannot make such an argument.  If the recitation of events in her declaration are accepted as true, (1) Ms. Miller accepted three boxes of documents from one of plaintiff's subcontractors and allowed them to be placed under her desk without examining their contents or informing her superiors, agency counsel, or DOJ counsel that she received them; (2) these three boxes remained under Ms. Miller's desk for several years, during which time Ms. Miller never opened them or advised others of their existence; and (3) despite having received the boxes while the instant suit was pending, knowing that the boxes were from one of plaintiff's subcontractors, and assembling an appeal file that included other relevant documents in her possession, it did not occur to Ms. Miller to give the boxes to the government's attorneys.  Given that Ms. Miller was in sole possession of the boxes and her inexplicable, yet manifest, failure to examine the contents of the boxes or recognize their significance, any proffered justification based on her actions would be incredible on its face.

The government, however, does contend that its failure to provide the HEPACS documents to plaintiff during discovery was harmless.  In light of the facts of this case, the court finds this remarkable argument unconvincing.  In determining whether a failure to disclose documents during discovery is harmless, courts generally consider "(1) the importance of the information withheld; (2) the prejudice or surprise to the party against whom the evidence is offered; (3) the likelihood of disruption of the trial; [and] (4) the possibility of curing the prejudice."[16]  Id. at 168.  The harmlessness inquiry in this case is complicated by the fact that

---

[16]  As noted by the court in Zoltek Corp., although some courts interpreting Rule 37(c)(1) "have included bad faith or willfulness as a factor, . . . [t]he plain language of the rule does not impose a requirement of a finding of bad faith" before approving the default sanction.  71 Fed. Cl. at 168; cf. United Med. Supply Co., 77 Fed. Cl. at 268 (noting, in a case addressing the award of sanctions for spoliation under RCFC 37(b) and RCFC 37(d), that neither rule "requires a showing of bad faith as a precondition to the imposition of sanctions").  Accordingly, the court

most of the documents that the government failed to disclose during discovery were destroyed before the attorneys for either party were able to examine them.  If the court does not know precisely what documents were not disclosed to plaintiff, it becomes more difficult to determine what effect the government's failure to disclose those documents may have had on plaintiff and the proceedings.

Nevertheless, the government contends that the contents of the boxes delivered by HEPACS can be readily inferred from other information.  Relying on Mr. Paul's declaration, it asserts that the documents included electronic-mail messages and other communications prepared by or sent to plaintiff, contract documents between plaintiff and HEPACS, and photographs of the Elizabeth City project taken by HEPACS.  Further relying on Mr. Paul's declaration, as well as on the fact that the documents that HEPACS delivered to the Coast Guard concerned HEPACS's litigation with plaintiff, the government avers that plaintiff would have seen all of the documents during discovery in that prior suit.  Thus, from the government's point of view, the court can perform the standard harmlessness inquiry.

While the government's suggestion that the identity of some of the HEPACS documents can be inferred from how those documents came to be in the Coast Guard's possession is accurate, other aspects of the government's position are problematic.  As an initial matter, the statements in Mr. Paul's declaration are necessarily colored by his animosity towards plaintiff.  In his declaration, he noted that he saw problems on the job site and that his company sued plaintiff for allegedly not paying the balance due on their contract.  Additionally, he had one of his employees hand deliver three boxes to the Coast Guard containing documents that he believed would be damaging to plaintiff and suggested to the Coast Guard that plaintiff had committed fraud.  Given the adversarial nature of Mr. Paul's relationship with plaintiff, his representations about the contents of the boxes, which were not made under the penalty of perjury, should be approached with some skepticism.  Moreover, even if Mr. Paul's description of the boxes' contents are taken at face value, Mr. Paul stated that the boxes contained unspecified "other documents," leaving open the possibility that he included documents that plaintiff had not been privy to during their litigation.[17]  Indeed, although Mr. Paul avers that plaintiff possessed every document that he provided to the Coast Guard, plaintiff had not seen most of the documents with Mr. Paul's handwritten notations or any of the photographs of the Elizabeth City project taken by HEPACS.  Accordingly, the contents of the boxes that HEPACS gave to the Coast Guard cannot be determined with a sufficient level of certainty.

With this uncertainty in mind, the court proceeds, to the extent possible, with its harmlessness analysis.  It looks first to the importance of the HEPACS documents to the

_____

will not address whether any Coast Guard employees intended–either maliciously or willfully–to withhold the documents from plaintiff during discovery.

[17]  For example, it is possible that Mr. Paul included in the boxes documents that would have been protected by some type of privilege during HEPACS's litigation with plaintiff.

development and presentation of plaintiff's case.  In support of its contention that these documents were important, plaintiff refers to two groups of documents it received from the government after trial: the documents with Mr. Paul's handwritten notations and the photographs taken by HEPACS of the project site.  It contends that the notations on some of the documents supported its position on government-caused delays and that some of the photographs could have been used to rebut testimony at trial concerning the equipment in the hydraulic test lab.  In response, the government argues that if plaintiff believed that documents from HEPACS were important to its case, it could have sought to depose Mr. Paul or obtain the documents directly from HEPACS during discovery.  The government's blame-the-victim stance is absurd.  The very documents that plaintiff contends would have been helpful to its case were in the Coast Guard's possession.  The government had the affirmative obligation to produce those documents to plaintiff; plaintiff had no obligation whatsoever to seek evidence from third parties.

The government also generally argues that none of the HEPACS documents was relevant to the contentions made by plaintiff in its pretrial brief.  The focus on plaintiff's trial contentions is misplaced, however; it is not the contentions that plaintiff actually tried to the court that are important, but how plaintiff could have developed its case before trial.  Plaintiff lacked access to the HEPACS documents prior to trial.  It is certainly possible that plaintiff's litigation position or strategy would have been affected by the documents with Mr. Paul's handwritten notations and the photographs taken by HEPACS.  Moreover, the court cannot exclude the possibility that some of the HEPACS documents that were eventually discarded by Mr. Anderson would have provided plaintiff with additional avenues of inquiry.  Accordingly, the government has not shown that the HEPACS documents were unimportant to plaintiff's case.

For similar reasons, the court concludes that plaintiff was prejudiced by the government's failure to produce the HEPACS documents during discovery.  Some of the documents that were not discarded would have affected plaintiff's development of its case, and the possibility exists that the same thing is true with respect to the discarded documents.  Moreover, the prejudice to plaintiff cannot be cured.  The fact that the government did not produce the HEPACS documents to plaintiff during discovery was not discovered by the parties until the sixth day of trial–years after the close of discovery and over ten months after the court ruled on plaintiff's motion for partial summary judgment.  The advanced stage of proceedings renders plaintiff's ability to adjust its litigation position a practical impossibility.  Further, because some of the HEPACS documents have been discarded, the government is unable to make plaintiff whole by producing them.

Finally, the last-minute disclosure of a portion of the HEPACS documents has been, and would continue to be, highly disruptive to the proceedings.  The parties and the court have been required to devote their resources to resolving the issue of sanctions, delaying resolution of the case.  And, if the court found that the government's discovery failure amounted to harmless error, thereby allowing the HEPACS documents and testimony based on the HEPACS documents to be used as evidence in this case, it would be compelled to reopen the record and allow plaintiff to

pursue the avenues of inquiry implicated by the HEPACS documents. As a result, additional discovery (including document requests and depositions) and trial testimony might be necessary.

Because the government has not sustained its burden to demonstrate that its failure to disclose the HEPACS documents during discovery was harmless, the default sanction described in RCFC 37(c)(1) is appropriate. Accordingly, the government may not use the HEPACS documents–with the exception of the nine documents that were produced to plaintiff during expert discovery–as evidence in this case. Of course, as it turns out, the government did not offer any of the HEPACS documents as evidence during trial because its trial counsel was unaware of their existence. However, one of its witnesses–Mr. Anderson–used the HEPACS documents to prepare for his testimony. Neither the court nor the parties can know with any certainty how much of Mr. Anderson's testimony was based on his personal recollection and how much was based on the information he gleaned from the HEPACS documents that were not made available to plaintiff (such as the photographs and Mr. Paul's handwritten notations). Thus, the court strikes Mr. Anderson's trial testimony.

Additionally, as noted above, the court may award, at its discretion, other sanctions for the government's violation of RCFC 37(c). Among the other available sanctions is the payment of plaintiff's reasonable expenses, including attorney's fees, caused by the government's violation. Indeed, the court has even greater discretion to award costs than it does to award the default sanction because the former is not limited to discovery violations that lack substantial justification or cause harm to the opposing party. The court concludes that an award of costs is appropriate here. There would have been no need for plaintiff to pursue sanctions in this case had the government produced the HEPACS documents during discovery as required by the RCFC. The government's failure to produce the documents hampered plaintiff's development and presentation of its case, providing ample justification for plaintiff's pursuit of sanctions. Thus, the court directs the government to reimburse plaintiff for all of the costs that plaintiff incurred in pursuing sanctions, including, but not limited to, attorney's fees and travel expenses.

### B. The Disposal of the HEPACS Documents

The problems associated with the government's failure to produce the HEPACS documents to plaintiff during discovery were compounded by Mr. Anderson's deliberate disposal of those documents before plaintiff had the opportunity to examine most of them. Mr. Anderson's actions raise the issue of spoliation, which "'is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Micron Tech., Inc. v. Rambus Inc., 645 F.3d 1311, 1320 (Fed. Cir. 2011) (quoting Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001)).[18]

---

[18] Micron Technology, Inc. is a patent case. As noted above, when ruling on issues not involving patent law in patent cases, the Federal Circuit's typical practice is to apply the law of the circuit in which the patent case arose, rendering such rulings nonbinding on the Court of Federal Claims. See supra note 14. However, in Micron Technology, Inc., an appeal from the

The court's ability to sanction litigants for spoliation arises from its inherent power to manage its affairs and ensure that the judicial process is not abused. Chambers v. NASCO, Inc., 501 U.S. 32, 43-44 (1991); United Med. Supply Co., 77 Fed. Cl. at 263. In general, sanctions for spoliation are proper when "the party having control over the evidence had an obligation to preserve it at the time it was destroyed," the evidence was "destroyed with a culpable state of mind," and "the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."[19] Jandreau, 492

---

United States District Court for the District of Delaware, the Federal Circuit did not limit itself to discussing case law on spoliation arising from the United States Court of Appeals for the Third Circuit ("Third Circuit"). Rather, it relied on decisions from the First, Second, Third, Fourth, Seventh, Ninth, and D.C. Circuits. Moreover, it did not expressly state that it was attempting to reach the result that the Third Circuit would reach. Thus, while the decision in Micron Technology, Inc. might not be binding on this court, it provides persuasive guidance on the Federal Circuit's interpretation of the case law from other circuits regarding spoliation and how the Federal Circuit might apply that case law to an appeal arising from the Court of Federal Claims.

[19] The Federal Circuit articulated these requirements as the test for determining whether a specific type of sanction–an adverse inference–could be imposed for the destruction of documents. Jandreau v. Nicholson, 492 F.3d 1372, 1375 (Fed. Cir. 2007). It did not comment on what level of culpability was required for the imposition of an adverse inference or other sanctions. In a later decision, the Federal Circuit opined that "[a] determination of bad faith is normally a prerequisite to the imposition of dispositive sanctions for spoliation . . . ." Micron Tech., Inc., 645 F.3d at 1327 (emphasis added). Nevertheless, it generally remains an "open question in this circuit" as to what level of culpability is required to impose spoliation sanctions. United Med. Supply Co., 77 Fed. Cl. at 266. As the court in United Medical Supply Co. remarked:

> There is, in fact, a division of authority among the circuits on this issue. . . . On one end of [the] spectrum, actually representing a distinct minority, are courts that require a showing of bad faith before any form of sanction is applied. Other courts expect such a showing, but only for the imposition of certain more serious sanctions, such as the application of an adverse inference or the entry of a default judgment. Further relaxing the scienter requirement, some courts do not require a showing of bad faith, but do require proof of purposeful, willful or intentional conduct, at least as to certain sanctions, so as not to impose sanctions based solely upon negligent conduct. On the other side of the spectrum, we find courts that do not require a showing of purposeful conduct, at all, but instead require merely that there be a showing of fault, with the degree of fault, ranging from mere negligence to bad faith, impacting the severity of the sanction. If this continuum were not complicated enough, some circuits initially appear to have adopted universal rules, only to later shade their precedents with caveats. Other times, the difference

-14-

F.3d at 1375 (internal quotation marks omitted).  The party seeking the sanction bears the burden of establishing that the prerequisites to the imposition of sanctions have been satisfied.  See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002), cited in Jandreau, 492 F.3d at 1375.

As a preliminary matter, the government disclaims any responsibility for the disposal of the HEPACS documents because the person who discarded the documents, Mr. Anderson, was not a Coast Guard employee.  This contention lacks any merit.  In determining whether a party bears responsibility for the spoliation of evidence, the key inquiry is identifying who had control over the evidence.  If a party having control over evidence allows that evidence to be discarded, then the disposal of that evidence is attributable to that party, regardless of who actually discarded the evidence.  See Townsend v. Am. Insulated Panel Co., 174 F.R.D. 1, 5 (D. Mass. 1997) (requiring "control over the evidence which is in the possession of a nonparty"); see also Grant v. Salius, No. 3:09cv21(JBA), 2011 WL 5826041, at *3 (D. Conn. Nov. 18, 2011) (noting that a party must have had "responsibilities related to the maintenance, preservation, or destruction of the evidence at issue" to be liable for spoliation); United Cent. Bank v. Kanan Fashions, Inc., No. 10 C 331, 2011 WL 4396856, at *3 (N.D. Ill. Sept. 21, 2011) (noting that "control" does not mean "physical possession," but rather the "legal right to control or obtain" (internal quotation marks omitted)).  The HEPACS documents were in the custody and control of the Coast Guard beginning the moment that Wanda gave the boxes to Ms. Miller in the spring of 2006.  There is no dispute that the documents were relevant to this case, which had been filed the previous year.  Thus, the Coast Guard had the duty to preserve those documents immediately upon receipt.  Micron Tech., Inc., 645 F.3d at 1320.  And, so long as the government failed to provide plaintiff with the opportunity to inspect the documents, its duty to preserve the documents persisted.  Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., 769 F. Supp. 2d 269, 291 (S.D.N.Y. 2011).  Therefore, the government neither forfeited control over the documents nor extinguished its legal obligation to preserve the documents when Ms. Miller allowed Mr. Anderson to remove the documents from the Coast Guard's office.

The court's rejection of the government's attempt to distance itself from Mr. Anderson's actions disposes of the threshold issue concerning spoliation–the Coast Guard had the affirmative duty to preserve the HEPACS documents at the time Mr. Anderson discarded them.[20]

_____

between decisions appear to be more a matter of semantics, perhaps driven by state law, with some courts, for example, identifying as "bad faith" what others would call "recklessness" or even "gross negligence."

Id. at 266-67 (footnotes omitted).

[20]  This is the only issue upon which the court assigns fault to the government's trial counsel.  Although previously assigned government counsel should have ensured that the HEPACS documents were disclosed to plaintiff during discovery, and trial counsel persuasively asserts that he was unaware until after trial that the documents were at Mr. Anderson's residence

Furthermore, there can be no doubt that the documents were discarded "with a culpable state of mind[.]" Jandreau, 492 F.3d at 1375.  To be culpable merely means to be blameworthy or responsible for the conduct at issue.  See, e.g., Foltice v. Guardsman Prods., Inc., 98 F.3d 933, 940 (6th Cir. 1996).  The government is certainly responsible for not policing Mr. Anderson's handling of the HEPACS documents.  And, Mr. Anderson is to blame for discarding the documents despite being informed by the court that he might be recalled to testify further in light of the newly disclosed documents.  Finally, based on the contents of the HEPACS documents that the government ultimately produced to plaintiff, it is reasonable to surmise that the discarded documents were relevant to plaintiff's case.  Thus, the prerequisites to the imposition of spoliation sanctions, as set forth in Jandreau, have been satisfied.

In Micron Technology, Inc., the Federal Circuit suggested a fourth element that a party asserting spoliation must satisfy to obtain sanctions: prejudice. 645 F.3d at 1328.  "Prejudice to the opposing party requires a showing that the spoliation 'materially affect[s] the substantial rights of the adverse party and is prejudicial to the presentation of his case.'"  Id. (quoting Wilson v. Volkswagen of Am., Inc., 561 F.2d 494, 504 (4th Cir. 1977) (internal quotation marks omitted)).  The court previously found that plaintiff was prejudiced by the government's failure to disclose the HEPACS documents during discovery.  It follows that Mr. Anderson's disposal of a large portion of those same documents before plaintiff was able to examine them–a much more serious and definitive action than the initial failure to disclose–also prejudiced plaintiff.

The government attempts to minimize the damage done to plaintiff, arguing that plaintiff had, or could have had, access to most of the documents through other means.  In particular, the government asserts that plaintiff had access to documents identical to the HEPACS documents, albeit without Mr. Paul's handwritten notations, during its litigation with HEPACS and its litigation with the Coast Guard.  It also notes that plaintiff was provided copies of many of the HEPACS documents–all of the photographs and the documents that Mr. Paul considered to be important to his company's suit against plaintiff–during and after trial.  And, the government avers that plaintiff could have had access to the HEPACS documents if it directed discovery requests in this case to HEPACS and Mr. Paul.

The court has already explained why some of the government's claims are problematic, and the remaining claims fare no better.  First, the court reiterates that it will not punish plaintiff for failing to seek discovery from a third party when the documents at issue were in the Coast Guard's possession.  Additionally, Mr. Paul is clearly hostile to plaintiff: his company sued plaintiff; during that suit, he sent multiple electronic-mail messages to the Coast Guard

---

rather than at the Coast Guard office, it remained incumbent on trial counsel to ensure that the documents–wherever they were located–were preserved for plaintiff's inspection.  Had counsel properly instructed his witness, Mr. Anderson, the documents may not have been destroyed.  The court stresses its use of "may not" rather than "would not" because it strains credulity that Mr. Anderson did not appreciate the importance of preserving the documents for plaintiff's review and use.

containing documents he obtained during discovery that he believed were harmful to plaintiff; in one of those messages, he accused plaintiff of fraud; and after his company's suit against plaintiff settled, he supplied three boxes of documents to the Coast Guard to assist the government's defense of this suit.  Mr. Paul's conduct suggests animus towards plaintiff.  Thus, the court is highly skeptical of Mr. Paul's self-serving representation that plaintiff had already seen all of the documents in the boxes Wanda delivered to the Coast Guard.  Similarly, while there is no dispute that plaintiff ultimately received some of the HEPACS documents during and after trial, the court is hesitant to rely on Mr. Paul's averments to deduce how many of those documents were ultimately disclosed and the disclosed documents' importance.[21]  Indeed, from Mr. Paul's statement that he only saved copies of the documents that he thought would be important to his suit against plaintiff, it is reasonable to infer that he did not save copies of documents that would have been helpful to plaintiff.  Finally, because they have been discarded, there is no way to determine how many of the HEPACS documents were never disclosed, what subjects those documents concerned, or the precise extent to which the documents would have assisted plaintiff's case.

---

[21]  During oral argument, the government indicated that it reviewed the HEPACS documents actually produced during and after trial and determined that of the 3,192 pages produced, 819 pages were photographs and 742 pages were duplicates.  It therefore determined that only 1,617 pages of documents were produced.  Based on this fact and Mr. Paul's representation that he had made electronic copies of no more than twenty-five percent of the documents, it calculated that the HEPACS documents discarded by Mr. Anderson included 6,468 pages of documents.  It then argued that because plaintiff invoiced HEPACS for 6,416 copies during discovery in their litigation, plaintiff had seen almost all of the HEPACS documents prior to their disposal.  The government's argument is flawed in at least two respects.

First, the government assumes, without any supporting evidence, that the twenty-five-percent figure used by Mr. Paul does not include duplicates.  Indeed, the duplicates that the government discovered during its review all came from Mr. Paul.  Thus, it is possible that the 2,373 nonphotograph pages produced by the government during and after trial constitutes twenty-five percent of the HEPACS documents, making the total number of nonphotograph pages discarded by Mr. Anderson equal to 9,492, and not 6,468.

Second, the government assumes, again without any supporting evidence, that the boxes of documents that Wanda delivered to the Coast Guard contained only those documents that plaintiff purportedly turned over to HEPACS during their litigation.  More specifically, by the government's calculations, all but fifty-two of the HEPACS documents (6,468 minus 6,416) were supplied by plaintiff.  In other words, 99.2 percent of the HEPACS documents came from plaintiff.  However, Mr. Paul avers that only ninety percent of the HEPACS documents came from plaintiff.  The government has made no attempt to reconcile its calculations with the declaration of its witness.

Plaintiff never had the opportunity to review the complete set of HEPACS documents. Given that some of the documents eventually produced were relevant to plaintiff's case, and that the documents that were ultimately produced to plaintiff consisted of documents that Mr. Paul believed were favorable to HEPACS and not plaintiff, an assumption that the discarded documents included relevant materials favorable to plaintiff is neither speculative nor theoretical. See Micron Tech., Inc., 645 F.3d at 1328 (noting that the injured party bears the burden of showing prejudice, but "[i]n satisfying that burden, a party must only 'come forward with plausible, concrete suggestions as to what [the discarded] evidence might have been.'" (quoting Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 80 (3d Cir. 1994)) (emphases added)). Rather, it is a reasonable inference. Thus, plaintiff was prejudiced by the documents' disposal.

Having concluded that all of the prerequisites to spoliation sanctions have been satisfied, the next question is what is the appropriate sanction, if any? To answer this question, the court must consider the degree of culpability attributable to the government, the amount of prejudice to plaintiff, and the court's need to manage its docket and maintain the integrity of the judicial process. See Micron Tech., Inc., 645 F.3d at 1329 (describing what factors a trial court contemplating sanctions must consider and citing Schmid, 13 F.3d at 79, and Leon v. IDX Systems Corp., 464 F.3d 951, 958 (9th Cir. 2006)). Further, although the choice of sanction is within the court's discretion, id. at 1326, it must select a sanction that is proportionate to the conduct being punished and the harm that conduct caused, id. at 1329; Consol. Edison Co. of N.Y. v. United States, 90 Fed. Cl. 228, 256 (2009); United Med. Supply Co., 77 Fed. Cl. at 270-71.

The court begins, therefore, by considering the level of culpability associated with the disposal of the HEPACS documents. It first examines the government's conduct related to the preservation of the documents. The Coast Guard obtained evidence relevant to pending litigation, but allowed it to sit for years, undisturbed, under the desk of Ms. Miller, the contract specialist involved in the contract underlying the litigation. Then, when Mr. Anderson, who was not a government employee, requested access to those documents, Ms. Miller handed them over without, apparently, inquiring whether it was proper for Mr. Anderson to take the documents or instructing Mr. Anderson regarding the documents' safekeeping. It also appears that when Mr. Anderson asked to review the HEPACS documents (a request that should have caused Ms. Miller to realize that she possessed other documents related to the case beyond the contract appeal file), Ms. Miller did not inform government counsel of the existence of those documents.

It strains credulity to attribute the government's actions to mere negligence, as the government suggests. First, the court does not believe that an employee of an agency under the United States Department of Homeland Security could accept three boxes from a third party and allow the boxes to be placed under her desk without looking inside them to verify their contents. Nor does the court believe that such an employee would not tell others about the boxes or allow those boxes to remain under her desk for years without looking inside of them. In addition, to believe Ms. Miller's factual recitation, the court would have to presume that at least one of the following unflattering statements is accurate: (1) government counsel asked Ms. Miller for all

documents related to the Elizabeth City project but she forgot about the three boxes sitting under her desk; (2) government counsel asked Ms. Miller for all documents related to the Elizabeth City project but she intentionally opted not to hand over the boxes; or (3) government counsel did not ask Ms. Miller for all documents related to the Elizabeth City contract. Further, Mr. Anderson's request to review the HEPACS documents should have reminded Ms. Miller that she possessed other documents related to the ongoing litigation and caused her to inform her superiors or government counsel about the existence of those documents. Finally, it is apparent that the government did not take any action to protect the HEPACS documents or make any effort to ensure that Mr. Anderson would safeguard the HEPACS documents so that plaintiff would have the opportunity to review them.[22] In sum, no one from the government took the necessary actions to preserve and protect the HEPACS documents, despite Ms. Miller's awareness of both the documents sitting under her desk and the pending litigation. The government's mishandling of the HEPACS documents permitted their destruction, and therefore constituted, at a bare minimum, willful and grossly reckless conduct.

Mr. Anderson's conduct, which is attributable to the government, was not much better. He was in the courtroom while the parties and the court discussed the HEPACS documents in his possession. It is unclear whether Mr. Anderson heard that discussion. However, there is no question that while he was on the witness stand, government counsel informed him that he might be recalled to testify further and the court directed him not to discuss the case or his testimony

---

[22] Federal government agencies typically have procedures in place for handling and preserving documents. See, e.g., Kirkendall v. Dep't of the Army, 573 F.3d 1318, 1325-26 (Fed. Cir. 2009) (discussing the destruction of materials submitted to the agency by third parties even though those documents were subject to a discovery request, and noting that such destruction was in violation of the agency's document retention program, which specifically required the "retention of documents that are 'under litigation'"); Armstrong v. Exec. Office of the President, Office of Admin., 1 F.3d 1274, 1278 (D.C. Cir. 1993) (per curiam) ("Federal agencies' records creation, management, and disposal duties are set out in a collection of statutes known collectively as the Federal Records Act. . . . For these purposes, 'records' are defined as 'all books, papers, maps, photographs, machine readable [i.e., electronic] materials, or other documentary materials, regardless of physical form or characteristics, made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them.'"). It is shocking that the Coast Guard was so incompetent in its document handling procedures that it would provide a witness with original boxes of documents related to pending litigation and permit that witness to remove the documents from its possession. While it is not atypical for a witness to obtain permission to review documents at an agency's office, agencies do not give witnesses original documents related to pending litigation and allow those witnesses to leave the premises with the original documents in tow. Plaintiff should not be penalized for the Coast Guard's egregious mishandling of the HEPACS documents.

with anyone other than government counsel.  Despite these instructions, Mr. Anderson returned to his house and discarded the HEPACS documents.  At a minimum, Mr. Anderson's disposal of the documents constitutes grossly negligent conduct.

In addition to demonstrating a high degree of culpability, the government's mishandling of the HEPACS documents evinces an abuse of the judicial process.  The government failed to fully cooperate in discovery in defiance of the RCFC.  It failed to produce the documents during pretrial proceedings even after Ms. Miller was reminded of their existence by Mr. Anderson's inquiry.  And, it failed to preserve the documents, creating the circumstances in which Mr. Anderson had the opportunity to dispose of them.  All of these failures have affected plaintiff's prosecution of its case and the court's ability to conduct an orderly trial on the merits.

The serious nature of the government's culpability, coupled with the prejudice to plaintiff described above and the court's need to maintain the integrity of the judicial process, supports the following sanctions: the exclusion of the HEPACS documents–with the exception of the nine documents that were produced to plaintiff during expert discovery–from the trial record; the exclusion of Mr. Anderson's trial testimony, which was based, to an unknown extent, on the HEPACS documents; and the costs plaintiff incurred in pursuing sanctions against the government.  These sanctions "'vindicate the trifold aims of: (1) deterring future spoliation of evidence; (2) protecting the [plaintiff's] interests; and (3) remedying the prejudice [plaintiff] suffered as a result of [the government's] actions.'"  Micron Tech., Inc., 645 F.3d at 1329 (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 780 (2d Cir. 1999)) (alterations added).  No lesser sanction would accomplish these goals.

### III.  CONCLUSION

For the reasons set forth above, the court concludes that sanctions are appropriate in this case for the government's failure to produce relevant documents during discovery and the disposal of those documents before plaintiff had the opportunity to review them.  It further concludes that the government deserves the same sanctions for both the discovery violation and the spoliation.  It therefore **GRANTS** plaintiff's motion and sanctions the government as follows:

- The government may not use the HEPACS documents–with the exception of the nine documents that were produced to plaintiff during expert discovery–as evidence in this case.

- Mr. Anderson's trial testimony is stricken from the record.

- The government shall reimburse plaintiff for all of the costs that plaintiff incurred in pursuing sanctions, including, but not limited to, attorney's fees and travel expenses.

Plaintiff shall prepare a statement of its costs, including expenses and attorney's fees, related to its motion for sanctions.  Then, by **no later than Wednesday, October  31, 2012**, it shall file its statement, along with any necessary explanation or supporting documentation.  Defendant shall then file any objections to the reasonableness or accuracy of plaintiff's claimed costs **no later than Friday, November 30, 2012**.  Based on prior communications with the parties, the court intends to stay proceedings in this case pending the resolution of the dispositive motions in the St. Petersburg case.  By **no later than Friday, September 14, 2012**, the parties shall file a joint status report indicating whether they believe that a stay is appropriate and, if not, suggesting further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge