# In the United States Court of Federal Claims

No. 05-914C
(Filed: February 26, 2014)

| | |
|---|---|
| ************************************* | Posttrial Motions; Recharacterizing an |
| K-CON BUILDING SYSTEMS, INC., * | RCFC 12(b)(1) Motion to Dismiss as a |
| * | Motion for Summary Judgment; Agency's |
| Plaintiff, * | Authority to Terminate a Contract for |
| * | Default When Its Order Was Placed Under |
| v. * | a Federal Supply Schedule Contract; |
| * | Excusable Delay; Counterclaim for |
| THE UNITED STATES, * | Liquidated Damages; Motion to Amend |
| * | the Complaint; RCFC 15(b)(2); Implied |
| Defendant. * | Consent |
| ************************************* | |

William A. Scott, Charleston, SC, for plaintiff.

Daniel B. Volk, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff K-Con Building Systems, Inc. filed three suits in this court concerning its contracts with the United States Coast Guard ("Coast Guard") for the design and construction of prefabricated metal buildings in Elizabeth City, North Carolina, St. Petersburg, Florida, and Port Huron, Michigan.  After the court issued summary judgment rulings in each case and held trial in this case, the parties engaged in settlement discussions.  Those discussions revealed several issues that required resolution prior to any settlement.  Accordingly, the parties have filed the relevant motions in all three cases.

In this case, which concerns the building in Elizabeth City, plaintiff seeks to invalidate the Coast Guard's termination of its contract for default.  Plaintiff also seeks to amend its complaint to allege an affirmative claim for an equitable adjustment.  For the reasons set forth below, the court invalidates the Coast Guard's default termination, dismisses those claims premised on the default termination for lack of jurisdiction, concludes that it possesses jurisdiction to entertain both parties' liquidated damages claims, and grants plaintiff's motion to amend its complaint.

## I. BACKGROUND

In April 2001, the United States General Services Administration ("GSA") awarded plaintiff a Federal Supply Schedule contract for Prefabricated Structures and Outdoor Smoking Shelters.[1]  Subsequently, in September 2003, the Coast Guard solicited proposals for the design and construction of a prefabricated building to house a component repair shop at the Coast Guard Support Center in Elizabeth City.  Plaintiff responded to the solicitation and, on September 23, 2003, the Coast Guard placed an order under plaintiff's GSA contract for the solicited building. The initial value of the order was $513,520 and the initial completion date was June 17, 2004.

### A.  Contract Performance

As set forth in the contract, the Coast Guard contemplated that plaintiff would design the building based on the contract specifications, submit the design to the Coast Guard in two phases (a "100% design" and a "final design"), and then, upon the Coast Guard's approval of the final design, begin construction.  The design and construction of the building were to be completed no more than 262 days after contract award.

One aspect of the work to be performed by plaintiff was the design and installation of heating, ventilation, and air conditioning ("HVAC") systems "to accommodate all building operations."  Among the HVAC work required was the provision of air conditioning in the building's test labs, including a room to house existing, identified hydraulic test equipment ("hydraulic test lab").  In addition, plaintiff was required to disconnect an existing chiller from hydraulic test equipment situated in another building, relocate the chiller and the equipment to the new building, reconnect the chiller to the equipment, and run new distribution piping.

Work on the project did not begin within the time anticipated in the contract.  The Coast Guard postponed the postaward kickoff meeting, which should have occurred between fourteen and twenty-eight days after contract award, to December 4, 2003.  In addition, plaintiff encountered delays in the delivery of the building due to worldwide steel shortages.  Plaintiff also required additional time in which to coordinate the connection of government-owned equipment, some of which was different from the equipment listed in the contract specifications.  Plaintiff asserted that this latter problem delayed its mechanical and electrical designs.  In an April 15,

---

[1]  Although a trial has been held in this case, for the purposes of ruling on plaintiff's present motions, the court derives most of the facts in this section from its January 24, 2011 Opinion and Order, K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. 41 (2011).  The balance of the facts are derived from the appendix filed with plaintiff's motion for partial summary judgment ("Pl.'s App."), and the appendix attached to plaintiff's present motions ("JX"); citations to those documents are set out in footnotes.  Only the facts relevant to plaintiff's present motions are included.  A more comprehensive recitation of the factual background, with citations to the record, can be found in the court's prior decision.

2004 bilateral contract modification, the contract completion date was extended by 126 days to October 21, 2004.

On May 6, 2004, one of the contracting officers involved with the contract,[2] Marion E. Hundley, sent plaintiff a cure letter warning that plaintiff's "failure to submit a proper progress schedule and failure to perform any work on site was endangering the performance of [the] contract." Plaintiff responded to the cure letter on May 16, 2004, describing its progress in various aspects of the project. It explained that it was "refining [its] construction schedule with supplies and subcontractors and would submit the schedule on May 20, 2004." It further indicated that it had "completed the layout of the building" and was "coordinating" with the Coast Guard regarding the "the location of existing utilities." In addition, plaintiff asserted that it "planned to start site work and installation of the building pad on May 18, 2004," and that, "once the foundation design was revised and approved," it was prepared to install the foundation. Finally, it stated that it was "inspecting the existing equipment to be relocated . . . and . . . holding on site discussions with the base personnel to evaluate the impact of the planned move."

One month later, in a June 18, 2004 letter, Ms. Hundley advised plaintiff that its "mechanical design submittal had significant comments that had to be addressed prior to a re-submittal of the document." Despite this design issue, the Coast Guard permitted plaintiff to proceed with construction after accepting plaintiff's structural foundation drawings on July 6, 2004. Plaintiff began to erect the building's steel structure on July 30, 2004.

At around the same time, plaintiff sent its 100% design package to the Coast Guard. On July 23, 2004, a second contracting officer, Victoria W. Worrell, forwarded the Coast Guard's comments on the package to plaintiff. She indicated that once plaintiff had incorporated the Coast Guard's comments and submitted its final design, it could "proceed with all work other than that related to the HVAC system," and that once the design requirements of the HVAC system were resolved, the mechanical drawings could be incorporated into the final design.

More than one month later, the parties agreed to a contract modification, effective September 9, 2004, increasing the contract price to $551,155.35 to compensate plaintiff for its installation of sound attenuation blankets above three of the rooms in the building. But, as of September 10, 2004, the issues with the hydraulic test lab's HVAC system had not been resolved.

On September 20, 2004, plaintiff sent a progress schedule to the Coast Guard indicating a completion date of December 8, 2004, forty-three days beyond the then-contract completion date of October 26, 2004. Ms. Hundley noted the discrepancy in a September 22, 2004 forbearance letter. Subsequently, in a November 10, 2004 bilateral contract modification, the completion date was extended, for the final time, to November 9, 2004, due to a supplier's shipping delay.

---

[2] It appears that three individuals acted as the contracting officer for this project at various times: Marion E. Hundley, Cathy Broussard, and Victoria W. Worrell.

Given that plaintiff had previously anticipated completing the building on December 8, 2004, it remained unable to meet the contract completion date.  Nevertheless, despite noting plaintiff's "failure to make progress and . . . inability to complete the contract by the bilaterally agreed completion date," the Coast Guard "determined it was in the best interest of the Government to forbear from terminating [plaintiff's] contract for default . . . ."  The Coast Guard permitted plaintiff to continue work on the project, but indicated its intention to assess liquidated damages at the contract rate of $551 per day for "any delay beyond the contract completion date . . . ."  Indeed, the Coast Guard began to withhold liquidated damages from its payments to plaintiff in December 2004, and as of February 28, 2005, the Coast Guard had assessed liquidated damages for 111 days of delay in the amount of $56,721.[3]

In the meantime, by November 19, 2004, plaintiff had erected the building's steel structure.  It began installing the wall panels and insulation three days later.  It also began to hang sprinkler pipe in the building.  However, on December 9, 2004, the Coast Guard sent plaintiff a show cause letter, noting that plaintiff's "failure to submit the final design documents within the time frame allowed and failure to provide adequate manpower for performing the work prevented [plaintiff] from completing" the project by the November 9, 2004 completion date.  Plaintiff responded to this letter on December 22, 2004, asserting that the Coast Guard contract requirements differed materially from the standard GSA Design/Build requirements and that its subcontractors would resume work on January 3, 2005.  Plaintiff then submitted a progress schedule to the Coast Guard on January 5, 2005, reflecting an anticipated completion date of March 19, 2005.  The Coast Guard noted "corrections to three line items" on the schedule that changed the anticipated completion date to April 26, 2005, and then, on January 12, 2005, sent plaintiff another forbearance letter.

Plaintiff finished installing the wall panels and insulation on January 12, 2005, and began installing the roof the next day.  It then started the electrical, mechanical, and plumbing rough-ins on January 17, 2005.  However, on February 2, 2005, Ms. Hundley issued a second show cause letter to plaintiff, remarking that plaintiff's "failure to submit the final design documents by January 21, 2005, failure to complete the roofing installation by January 19, 2005, failure to remove the rejected wet insulation, and failure to provide adequate manpower" would prevent plaintiff from meeting its anticipated completion date of April 26, 2005.  Plaintiff responded to this show cause letter on February 7, 2005,[4] describing its reasons for not installing the roof, as well as another reason for the delay in construction:

> [T]he Simple Saver Roofing System can not be installed in temperatures less than 40 degrees due to the adhesive and membrane material. . . . [R]oofing is scheduled to be complete by the end of this week (weather permitting).  All other task[s] are currently on schedule with the exception of utility tie-ins. . . . The

---

[3]  See JX 403; JX 492.

[4]  See JX 433.

[site/civil drawings] must be acknowledged or approved [by the Coast Guard]
prior to excavation.

Plaintiff further averred that it would deliver the final design documents by February 10, 2005.

However, plaintiff did not deliver the design documents to the Coast Guard until
February 18, 2005.  In a February 25, 2005 letter signed by Ms. Hundley, the Coast Guard
provided its comments to plaintiff regarding its mechanical design.  Ms. Hundley informed
plaintiff that it could proceed with the work, provided that the comments were addressed and that
sealed drawings were submitted to the Coast Guard.

That same day–February 25, 2005–plaintiff sent the Coast Guard four letters.[5]  In the first
letter, plaintiff requested a noncompensable time extension of thirty days due to the Coast
Guard's alleged improper review of its design drawings.  In the second letter, plaintiff sought a
noncompensable time extension of thirty days to account for job site disturbances and its inability
to contract with local trades, both purportedly caused by comments made by the Coast Guard's
inspector.  Then, in its third letter, plaintiff requested a noncompensable time extension of
twenty-seven days due to weather delays.  The fourth letter provided, in its entirety:  "This letter
serves as our request for cost modification in the amount of $50,325.00 for extended overhead
due to delays outlined in our request for time extension letters dated 25 February 2005."  An
exhibit attached to that letter contained a table breaking out the components of the extended
overhead that plaintiff was requesting.  On March 8, 2005, Ms. Hundley denied the three time
extension requests.[6]  However, a Coast Guard contracting officer never responded to plaintiff's
request for a contract price adjustment.

Ultimately, on March 17, 2005, the Coast Guard issued a Notice of Termination for
Default, which was signed by Ms. Hundley.[7]  Ms. Hundley wrote:

We have determined that it is no longer in the best interest of the Government to
forbear termination for default for your failure to complete within the established
completion date. . . .  [Y]our performance in the forbearance period continually
fell well behind any completion schedule you had submitted.  Your continued
failure to make progress has made it clear that it is no longer in the best interest of
the Government to forbear termination for default.  In accordance with contract
clause FAR 52.249-10, Termination for Default (Fixed-Price Construction) (APR

---

[5] See JX 451; JX 452; JX 454; JX 455.

[6] See JX 470; JX 472; JX 473.

[7] See JX 481.

1984),[8] you are hereby notified that this contract is terminated for default for failure to make progress and failure to prosecute the work with the diligence that will insure its completion within the time specified in the contract including any extensions.  Therefore, your right to proceed with work under this contract is terminated AS OF THIS DATE.  The Government may cause the contract to be completed by others in accordance with the above clause and you will be held liable for any increased costs occasioned thereby.  These costs will include liquidated damages in the amount specified in the contract that will accrue from the current contract completion date to actual completion of work.  The Government reserves all rights and remedies provided by law or under the contract in addition to charging excess costs occasioned by completion of the defaulted contract.

In closing, Ms. Hundley indicated that the termination notice was "a final decision of the Contracting Officer" and described plaintiff's right to appeal.  Rather than immediately appealing, plaintiff sent the Coast Guard a letter on March 18, 2005, challenging the propriety of the default termination and requesting that the Coast Guard rescind its notice.[9]  In particular, citing FAR 52.249-10(b), which precludes the termination of a contract for default if the contractor was not responsible for the delay in contract performance, plaintiff enumerated several phases of contract performance where it encountered delays for which it was not responsible, referring the Coast Guard to its previous correspondence describing those delays.  In a March 21, 2005 letter, a third contracting officer, Cathy Broussard, rejected plaintiff's claims of excusable delay and denied plaintiff's request for the rescission of the default termination.[10]

### B.  Reprocurement

At the time of the default termination, the Coast Guard had paid $287,551.39 to plaintiff.  In two October 2005 contract modifications reflecting the default termination, both signed by Ms. Hundley,[11] the Coast Guard indicated its intent to use the unpaid balance of the contract–$263,603.96–to fund the reprocurement of the project, and reiterated that it reserved its right to claim any costs incurred in excess of the unpaid balance from plaintiff.  It also reiterated that it reserved its right to recover liquidated damages, which would accrue until the building was substantially complete.

---

[8]  "FAR" refers to the Federal Acquisition Regulation.

[9]  See JX 484.

[10]  See JX 487.

[11]  See Pl.'s App. 139, 142.

On November 7, 2005, almost eight months after it terminated its contract with plaintiff, the Coast Guard entered into an agreement with Viteri Construction Management Incorporated ("Viteri") to complete the building.  In the new contract's scope of work section, the Coast Guard represented to Viteri that the building design was ninety-five percent complete.  The initial contract price was $721,431, and the initial completion date was March 19, 2006.  Through bilateral contract modifications, the contract price was ultimately increased to $814,619 and the completion date was ultimately extended to August 26, 2006.  The Coast Guard determined that Viteri substantially completed the building as of September 20, 2006.

### C.  Procedural History

Plaintiff filed suit in this court on August 25, 2005, seeking to convert the default termination into a termination for the government's convenience and the remission of liquidated damages.  Defendant filed a counterclaim, alleging that the Coast Guard had withheld approximately $10,220 from payments to plaintiff as liquidated damages, and seeking the balance of liquidated damages as measured from the November 9, 2004 contract completion date to the date that the building was completed.

Upon the close of discovery, plaintiff moved for summary judgment on the issue of liquidated damages, arguing first that the rate of liquidated damages specified in its contract with the Coast Guard constituted an unenforceable penalty, and second, in the alternative, that it was entitled to a remission of liquidated damages due to excusable delay.  The court denied plaintiff's motion in a January 24, 2011 Opinion and Order, concluding that the liquidated damages rate was not an unenforceable penalty, and that plaintiff had not established an excusable delay that would lead to the remission of some or all of the liquidated damages.  Thus, in December 2011, the court held a two-week trial.  Then, after trial, it was necessary for the court to consider and rule on plaintiff's motion for sanctions.  K-Con Bldg. Sys., Inc. v. United States, 106 Fed. Cl. 652 (2012).

As noted above, this is one of three breach-of-contract cases before the court involving plaintiff and the Coast Guard.  The court issued a summary judgment ruling in the Port Huron case in August 2011, K-Con Bldg. Sys., Inc. v. United States, 100 Fed. Cl. 8 (2011), and a summary judgment ruling in the St. Petersburg case in November 2012, K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. 571 (2012).  After the court issued the latter decision, the parties engaged in settlement discussions through the court's alternative dispute resolution program.  Those discussions revealed several issues that required resolution prior to any settlement, leading the parties to file the relevant motions in each case.  In this case, plaintiff filed a combined motion to dismiss and motion to amend its complaint.  The parties have completed briefing on plaintiff's motions and, finding oral argument unnecessary, the court is prepared to rule.

## II.  PLAINTIFF'S MOTION TO DISMISS

### A.  Recharacterization of Plaintiff's Motion as a Motion for Summary Judgment

Plaintiff first "moves to dismiss the Government's claim for termination for default for lack of subject matter jurisdiction" pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  Mot. 1.  However, an RCFC 12(b)(1) motion to dismiss is not the proper vehicle for plaintiff to obtain the result it seeks.  A party filing a motion under RCFC 12(b) must assert a "defense to a claim for relief in [a] pleading," but defendant in this case did not assert a claim for default termination in its sole pleading, its answer and counterclaim.

Fortunately for plaintiff, the court is not constrained by the label that plaintiff attached to its motion.  Instead, the court is guided by the motion's substance.  Plaintiff contends in its motion that contractually, the Coast Guard could not terminate its contract with plaintiff without first referring plaintiff's allegations of excusable delay to the GSA.  Because the Coast Guard did not make such a referral, plaintiff asserts, the Coast Guard's default termination was invalid, depriving the court of jurisdiction to consider any claims arising from the default termination.[12] In support of its contentions, plaintiff relies on the provisions of the two contracts at issue–its Federal Supply Schedule contract with the GSA and its contract with the Coast Guard–and the contents of several letters it exchanged with the Coast Guard.  Defendant does not dispute the contents of the letters relied upon by plaintiff; rather, it contends that the letters were insufficient under the relevant contractual provisions to require a referral to the GSA.

Given the substance of plaintiff's motion and defendant's response, it is clear that plaintiff's request can be considered under the summary judgment rubric.  Plaintiff is challenging the validity of a contracting officer decision as a matter of law on the basis of undisputed facts, and defendant has fully responded to plaintiff's contentions.  See RCFC 56(a) (noting that summary judgment is appropriate if the material facts are undisputed and "the movant is entitled to judgment as a matter of law").  Moreover, because plaintiff filed its motion after trial, the parties had the opportunity to support their positions using the complete universe of documents and testimony admitted at trial.  As neither party would be prejudiced, the court recharacterizes plaintiff's motion as a motion for summary judgment under RCFC 56.  See RCFC 56(f)(3) (noting that the court may "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute"); Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986) (agreeing that trial courts "possess the power to enter summary judgments sua

---

[12]  It is unclear why plaintiff did not raise this issue until after trial.  For its part, the court was unable to raise the issue sua sponte before trial because the relevant portions of the GSA contract had not been provided to the court.  Nevertheless, because the issue implicates the court's jurisdiction, the court must address it at this time.  See Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006) (reflecting that the parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time).

sponte, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence"); Rothe Dev. Corp. v. Dep't of Def., 413 F.3d 1327, 1336 (Fed. Cir. 2005) (extending the notice requirement to the prevailing party); see also RCFC 1 (stating that the court's procedural rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding").

## B.  The Coast Guard's Default Termination

Having determined that plaintiff's motion should be treated as a motion for summary judgment, the court turns to the merits of that motion.  As previously noted, plaintiff contends that contractually, the Coast Guard had no authority to terminate its contract with plaintiff prior to referring plaintiff's excusable delay allegations to the GSA.  Thus, the court must examine the relevant contractual provisions.

The GSA awarded plaintiff a Federal Supply Schedule contract in April 2001, and the Coast Guard placed an order with plaintiff under that contract on September 23, 2003.  Plaintiff's Federal Supply Schedule contract contained the following clause:  FAR 52.212-4, Contract Terms and Conditions–Commercial Items (May 1999).  Paragraph (m) of that clause provided:

> Termination for cause.  The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.  In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law.  If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

In addition, paragraph (h) of that clause incorporated by reference clause I-FSS-249-B, Default (May 2000), which provided:

> In addition to any other clause contained herein related to termination, the following is applicable to orders placed under Federal Supply Schedule contracts.

> Any ordering office may, with respect to any one or more orders placed by it under the contract, exercise the same right of termination, acceptance of inferior articles or services, and assessment of excess costs as might the Contracting Officer, except that when failure to deliver articles or services is alleged by the Contractor to be excusable, the determination of whether the failure is excusable shall be made only by the Contracting Officer of the General Services Administration, to whom such allegation shall be referred by the ordering office

and from whose determination appeal may be taken as provided in the clause of this contract entitled "Disputes."

Similarly, the portion of the FAR pertaining to the Federal Supply Schedule in effect at the time plaintiff was awarded its Federal Supply Schedule contract included the following provision regarding termination of an order for default:

> (1)  An ordering office may terminate any one or more orders for default in accordance with Part 49, Termination of Contracts.  The schedule contracting office shall be notified of all cases where an ordering office has declared a Federal Supply Schedule contractor in default or fraud is suspected.

> (2)  Should the contractor claim that the failure was excusable, the ordering office shall promptly refer the matter to the schedule contracting office. In the absence of a decision by the schedule contracting office (or by the head of the schedule contracting agency, on appeal) excusing the failure, the ordering office may charge the contractor with excess costs resulting from repurchase.

FAR 8.405-5(a).  Taken together, these provisions indicate that the Coast Guard was entitled to terminate its contract with plaintiff for default unless plaintiff had alleged that its failure to complete work under the contract was excusable.  In those circumstances, the Coast Guard was required to refer plaintiff's allegation to the GSA for a determination of whether plaintiff's failure was excusable.

Neither party disputes that the Coast Guard was required to refer any allegations of excusable delay to the GSA prior to terminating its contract with plaintiff for default.  Instead, the parties disagree as to whether plaintiff alleged excusable delay.  Plaintiff contends that its letters to the Coast Guard dated December 22, 2004, and February 7, 2005, both sent in response to letters requesting that plaintiff show cause why its contract should not be terminated, contained allegations of excusable delay.  Plaintiff further contends that the three letters it sent to the Coast Guard on February 25, 2005, to request time extensions also included allegations of excusable delay.  These allegations of excusable delay, plaintiff argues, should have been referred to the GSA prior to the Coast Guard's termination of its contract with plaintiff for default.  The court agrees.

The pertinent provision of the Federal Supply Schedule contract indicates that referral to the GSA is required "when failure to deliver articles or services is <u>alleged</u> by the Contractor to be excusable . . . ."  In other words, a mere allegation by the contractor is a sufficient trigger.  In its December 22, 2004 letter, plaintiff claimed that its failure to submit the final design documents was due to the conflict between the Coast Guard's specifications and standard GSA Design/Build requirements.  In its February 7, 2005 letter, plaintiff asserted that the cold weather prevented it from installing the roof and that it was unable to complete the utility tie-ins due to the Coast Guard's failure to acknowledge or approve the relevant drawings.  And, in its February 25, 2005

letters, plaintiff sought time extensions to compensate for the Coast Guard's alleged improper review of its design drawings, the purported negative effects of comments made by the Coast Guard's inspector, and weather-related delays.  All of these letters contained allegations of excusable delay;[13] thus, the Coast Guard should not have terminated its contract with plaintiff for default prior to referring these allegations to the GSA.

Defendant's arguments to the contrary are not persuasive.  Its first argument is based on the decision of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in M. Maropakis Carpentry, Inc. v. United States ("Maropakis"), 609 F.3d 1323 (Fed. Cir. 2010). In that case, the Federal Circuit held that when facing a government counterclaim for liquidated damages, a contractor cannot assert an affirmative defense that would result in the modification of contract terms (e.g., an increase in the contract price or an extension of the time for contract performance) unless that contractor had filed a claim with the contracting officer pursuant to the Contract Disputes Act of 1978 ("CDA").  Id. at 1331.  Applying that holding to the facts of this case, defendant contends that because plaintiff never filed a claim for excusable delay with a contracting officer pursuant to the CDA, it has not properly alleged excusable delay under clause I-FSS-249-B of plaintiff's Federal Supply Schedule contract.

Defendant's attempt to apply the holding of Maropakis to the facts in this case cannot be sustained.  In Maropakis, the Federal Circuit held that a CDA claim alleging excusable delay was a jurisdictional prerequisite to asserting an affirmative defense of excusable delay against a government counterclaim for liquidated damages in a suit before the United States Court of Federal Claims ("Court of Federal Claims").  The Federal Circuit's holding has no bearing on what qualifies as an allegation of excusable delay for the purpose of a procuring agency's referral of such an allegation to the GSA under a Federal Supply Schedule contract.  For one, a dispute between a procuring agency and a contractor concerning whether a contract should be terminated for default occurs prior to litigation.  Thus, unlike in Maropakis, the jurisdiction of the Court of Federal Claims would not be at issue.  Moreover, there is nothing in the plain language of clause I-FSS-249-B requiring an allegation of excusable delay to be in the form of a CDA claim. Indeed, the clause does not use the word "claim"; rather, it merely requires the contractor to "allege[]" an excusable delay.

---

[13]  Defendant's suggestion that plaintiff was merely explaining the reasons for the delays, and was not asserting that those delays were excusable, is nonsensical, and therefore does not raise a genuine issue of material fact.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (indicating that an issue is genuine if it "may reasonably be resolved in favor of either party").  In this correspondence, plaintiff explained that the reasons for the delays were not its own actions, but the actions or inaction of the Coast Guard, or the weather.  By disclaiming responsibility for these delays, it is logical to infer that plaintiff felt that these delays were excusable.  See also FAR 52.249-10(b)(1) (indicating that delay is excusable if it "arises from unforeseeable causes," such as acts of the government or delays of subcontractors or suppliers, that are "beyond the control and without the fault or negligence of the Contractor").

Defendant next argues that the three referenced February 25, 2005 letters are insufficient to constitute allegations of excusable delay because the cumulative time extension plaintiff requested in these letters–eighty-seven days–is not enough to excuse the entire 128-day delay between the date contract performance was due, November 9, 2004, and the date of the default termination, March 17, 2005.  This argument also fails.  First, plaintiff's allegations of excusable delay were not limited to the circumstances alleged in the February 25, 2005 letters.  In its December 22, 2004 letter, plaintiff contended that it was delayed in submitting its final design documents for an unspecified length of time due to the Coast Guard's purported deviation from the standard GSA Design/Build requirements.  And, plaintiff's February 7, 2005 letter described a delay of an unspecified duration due to poor weather conditions.  Thus, the excusable delay alleged by plaintiff likely amounted to more than eighty-seven days.  More importantly, even if the alleged delay was less than 128 days and thus could not cover the entire time between the contract completion date and the contract termination date, the length of the alleged delay is irrelevant to whether plaintiff alleged excusable delay in the first instance.  Clause I-FSS-249-B does not condition the referral of an excusable delay allegation to the GSA on whether the contractor has alleged delay sufficient to extend the deadline for contract performance to the date of the show cause letter, the date of contract termination, or any other date.  Instead, under the plain language of the clause, the procuring agency is merely required to refer an allegation of excusable delay to the GSA upon receiving it.

Defendant's final argument is that because the Coast Guard denied plaintiff's February 25, 2005 requests for time extensions on March 8, 2005, there was no reason for the Coast Guard to believe that there were any outstanding, unresolved allegations of excusable delay when it terminated its contract with plaintiff for default on March 17, 2005.  This argument, like the first two, lacks merit.  As clause I-FSS-249-B clearly provides, if a procuring agency is contemplating the termination of a contract for default, any allegation of excusable delay must be referred to the GSA for a determination on the merits of the excusable delay allegation.  In other words, only the GSA possessed the authority to reject plaintiff's allegations of excusable delay.  Thus, the Coast Guard's March 8, 2005 letters are irrelevant.

In sum, under the terms of plaintiff's Federal Supply Schedule contract, the Coast Guard lacked the authority to terminate its contract with plaintiff for default because it did not refer plaintiff's allegations of excusable delay to the GSA.  Accordingly, the Coast Guard's termination of its contract with plaintiff for default is invalid, and the court therefore lacks jurisdiction to entertain any claims premised solely on the default termination.  Accord BearingPoint, Inc. v. United States, 77 Fed. Cl. 189 (2007).  Plaintiff is entitled to summary judgment on this issue.  However, because plaintiff's complaint contains allegations regarding the Coast Guard's assessment of liquidated damages that are not premised on the default termination, the court's grant of summary judgment does not dispose of plaintiff's entire complaint.

### C.  The Parties' Liquidated Damages Claims

Although the Coast Guard lacked the authority to terminate its contract with plaintiff for default, plaintiff contends that the Coast Guard's assessment of liquidated damages within the default termination notice is a valid government claim, and that the court can therefore entertain its claim for the remission of liquidated damages due to the excusable delays it alleged in its February 25 and March 18, 2005 letters to the Coast Guard, as well as defendant's counterclaim for liquidated damages.  Defendant agrees with plaintiff that the Coast Guard's notice contained a valid claim for liquidated damages and that the court therefore possesses jurisdiction over its counterclaim.  However, defendant contends that under the holding of Maropakis, the court cannot entertain plaintiff's allegations of excusable delay because plaintiff did not first file a proper CDA claim with the contracting officer seeking an equitable adjustment for excusable delay.

As an initial matter, the court agrees with the parties that the Coast Guard's default termination notice contained a valid government claim for liquidated damages.  Pursuant to the disputes clause incorporated into the Coast Guard's contract with plaintiff, the Coast Guard's contracting officer was required to issue a written decision on any claim by the Coast Guard against plaintiff.  FAR 52.233-1(d)(1).  And, in that clause, "claim" was defined as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract."  FAR 52.233-1(c).  Although Ms. Hundley did not indicate the precise amount of liquidated damages that the Coast Guard was assessing against plaintiff in the default termination notice, she did indicate that liquidated damages, at the rate set forth in the contract, would "accrue from the current contract completion date to actual completion of work."  Thus, even though work had not yet been completed, plaintiff had sufficient information by which to calculate the sum certain claimed by the Coast Guard.  See Metric Constr. Co. v. United States, 14 Cl. Ct. 177, 179 (1988) ("[A] claim in which the amount in dispute can be easily determined by a simple mathematical calculation . . . is sufficient for purposes of the Act."); accord N. Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 184 (2007), appeal dismissed, 226 F. App'x 1004 (Fed. Cir. 2007) (unpublished order); CPS Mech. Contractors, Inc. v. United States, 59 Fed. Cl. 760, 764 (2004); Exec. Court Reporters, Inc. v. United States, 29 Fed. Cl. 769, 775 (1993), appeal dismissed, 22 F.3d 1106 (Fed. Cir. 1994) (unpublished table order).  Indeed, Ms. Hundley subsequently advised plaintiff in writing that as of February 28, 2005, the Coast Guard had assessed liquidated damages for 111 days of delay, in the amount of $56,721.  Furthermore, the fact that liquidated damages continued to accrue thereafter does not invalidate the Coast Guard's claim.  Cf. Placeway Constr. Corp. v. United States, 920 F.2d 903, 906-07 (Fed. Cir. 1990) (holding that although the contracting officer had not determined the precise amount of the government's set off against the contract price, the finality of the contracting officer's decision was not affected).[14]

---

[14]  The Court of Federal Claims Technical and Procedural Improvements Act of 1992 superseded a portion of the decision in Placeway Construction Corp. not relevant to this case.

Having determined that the Coast Guard asserted a valid claim for liquidated damages, the court must next determine whether plaintiff asserted a valid claim for excusable delay. Plaintiff avers that three of its February 25, 2005 letters–those that sought a contract extension–and its March 18, 2005 letter challenging the default termination satisfy the requirements of a valid claim under the CDA.  The court need not address whether plaintiff's March 18, 2005 letter constituted a valid claim because it has concluded that the action plaintiff sought to overturn in that letter–the Coast Guard's purported default termination–was unauthorized.  The invalidity of the default termination renders plaintiff's subsequent merits-based challenge to it a nullity.

On the other hand, the three February 25, 2005 letters identified by plaintiff were valid CDA claims.  In each letter, plaintiff described the nature of the delay, explained that it was not the cause of the delay, specified the length of the delay, and requested an equitable adjustment of the contract–a time extension–to compensate for the delay.  These letters clearly were written demands seeking, as a matter of right, the adjustment of contract terms, see FAR 52.233-1(c), that gave the contracting officer adequate notice of the basis of plaintiff's claim and the relief plaintiff sought, see Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987) ("All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis . . . of the claim.").  Indeed, the March 8, 2005 letters containing the Coast Guard's rejections of plaintiff's time extension requests reflect that the contracting officer understood the basis of plaintiff's claims and the relief plaintiff sought.

In sum, the court possesses jurisdiction to entertain plaintiff's claim for the remission of liquidated damages to the extent that the claim is premised on the excusable delays alleged in the three identified February 25, 2005 letters, but not to the extent that it is premised on the excusable delays alleged in plaintiff's March 18, 2005 letter.  The court also possesses jurisdiction to entertain defendant's counterclaim for liquidated damages.  Accordingly, the court grants in part and denies in part plaintiff's motion for summary judgment on this issue.

### III.  PLAINTIFF'S MOTION TO AMEND ITS COMPLAINT

In addition to challenging the validity of the Coast Guard's termination of its contract for default, plaintiff seeks to amend its complaint to allege a claim based on its February 25, 2005 letter to the Coast Guard requesting a $50,325 price increase resulting from the excusable delays it alleged in its other February 25, 2005 letters.  Under RCFC 15(b),[15] the court may permit the posttrial amendment of pleadings if the proposed amendment is based on an objection at trial or

_____

See Pub. L. No. 102-572, § 907(b), 106 Stat. 4506, 4519 (permitting the Court of Federal Claims to render judgment in nonmonetary disputes arising under the CDA).

[15]  Plaintiff erroneously bases its motion on RCFC 15(a), which governs pretrial amendment to pleadings.

on an issue tried by consent.  The latter basis for amendment, the only one relevant here, provides:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move–at any time, even after judgment–to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue.

RCFC 15(b)(2).  From the plain language of the rule, it is apparent that an amendment is not necessary for the court to try and rule on an unpleaded issue; so long as an issue is tried by the consent of the parties, the court must treat the issue as if it were pleaded.  Accord 3 James Wm. Moore et al., Moore's Federal Practice ¶ 15.18[1] (3d ed. 2012).  Nevertheless, it is generally accepted that trial courts should be liberal in allowing posttrial amendments under Rule 15(b)(2) so long as the requisite consent was demonstrated.  Id.  Thus, to determine whether plaintiff should be permitted to amend its complaint to add a claim for a $50,325 price increase, the court must examine whether defendant consented to the trial of that issue.

As noted above, the letter containing plaintiff's request for a price increase provided, in its entirety:  "This letter serves as our request for cost modification in the amount of $50,325.00 for extended overhead due to delays outlined in our request for time extension letters dated 25 February 2005."  And, the requests for time extensions referenced in this letter concerned the Coast Guard's review of plaintiff's design drawings, the consequences of comments made by the Coast Guard's inspector, and the weather.  Plaintiff asserts that one of the issues at trial was whether some of the delays that it encountered were the result of the Coast Guard's instructions pertaining to the HVAC design and the Coast Guard preventing plaintiff from beginning construction without an approved design.  Accordingly, plaintiff argues, its proposed amendment would conform its complaint to the evidence admitted at trial.  Defendant disagrees, averring that plaintiff never suggested at trial that it was entitled to extended overhead, and that no evidence was offered at trial on the issue.

After reviewing the parties' submissions, the court concludes that defendant's consent to try the issue of plaintiff's entitlement to extended overhead should be implied.  As defendant correctly suggests, for the court to decide whether plaintiff is entitled to extended overhead, evidence must have been presented at trial on that issue (such as how plaintiff calculated the amount of extended overhead owed by the Coast Guard or the components of the extended overhead it requested).  Such evidence was admitted at trial.  Joint Exhibit 455.2, the attachment to plaintiff's February 25, 2005 letter, contains a table breaking out all of the elements of the extended overhead claimed by plaintiff.  And, for each item of extended overhead, the table identifies the unit, unit cost, and total cost.  The court admitted this joint exhibit into evidence on the first day of trial, with no objection from defendant; indeed, the fact that it was a joint exhibit indicates that defendant was jointly responsible for proposing its admission into the trial record.  When a party "knowingly acquiesces in the introduction of evidence relating to issues that are

beyond the pleadings," either by failing to object to its introduction or by "actually produc[ing] evidence bearing on the new issue," it "is in no position to contest a motion to conform." 6A Charles Alan Wright et al., Federal Practice and Procedure § 1493 (3d ed. 2013). Accordingly, the court grants plaintiff's motion to amend its complaint.

In granting plaintiff's motion, the court rejects defendant's contention that the court lacks jurisdiction over plaintiff's proposed claim. Specifically, defendant argues that plaintiff's February 25, 2005 request for a price adjustment cannot constitute a valid claim under the CDA because plaintiff did not, in its letter, make a demand or indicate that it was seeking a final decision from the contracting officer. Defendant's interpretation of the CDA's requirements is too narrow. According to binding Federal Circuit precedent, there is "no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording." Contract Cleaning Maint., Inc., 811 F.2d at 592; see also Transam. Ins. Corp. v. United States, 973 F.2d 1572, 1578 (Fed. Cir. 1992) (noting that "certain 'magic words' need not be used and that the intent of the 'claim' governs"). "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." Contract Cleaning Maint., Inc., 811 F.2d at 592. Thus, the contractor's request for a decision from the contracting officer need not be explicit; it may be implied. James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1543 (Fed. Cir. 1996); see also Transam. Ins. Corp., 973 F.2d at 1576 ("The statute's broad language demonstrates that as long as what the contractor desires by its submissions is a final decision, that prong of the CDA claim test is met."). Although plaintiff's February 25, 2005 letter is terse, plaintiff clearly indicates that it is a "request" for extended overhead based on the delays it alleged in its other three February 25, 2005 letters. Not only is plaintiff's "request" tantamount to a demand, but any reasonable contracting officer receiving plaintiff's letter would have interpreted it as a request for a decision regarding plaintiff's entitlement to extended overhead. In fact, it bears noting that Ms. Hundley rendered decisions in response to plaintiff's other three February 25, 2005 letters, all of which contained language similar to the letter at issue (each of the three letters began, "[t]his letter serves as our request for time extension," and each concluded, "[t]herefore [plaintiff is] requesting a non-compensable time extension" ).

Plaintiff has also satisfied the CDA's remaining jurisdictional requirements. First, the requirement of a contracting officer's decision is satisfied despite the failure of a Coast Guard contracting officer to issue a decision on plaintiff's claim because under the CDA, such a failure results in the deemed denial of a claim. See 41 U.S.C. § 605(c); Paragon Energy Corp. v. United States, 645 F.2d 966, 971 (Ct. Cl. 1981) ("[T]o invoke the jurisdiction of this court . . . there must first be a 'decision' (or failure to decide) by the contracting officer."). And, the requirement of a timely appeal of the contracting officer's decision or deemed denial is satisfied because plaintiff filed its complaint on August 22, 2005, well within the year allowed for appeals, see 41 U.S.C. § 609(a); James M. Ellett Constr. Co., 93 F.3d at 1541 ("The CDA grants the court jurisdiction over actions brought on claims within twelve months of a contracting officer's final decision."), and under RCFC 15(c)(1)(B), plaintiff's amendment to its complaint relates back to the filing of the original complaint.

In sum, because plaintiff's February 25, 2005 request for a $50,325 price increase constitutes a valid CDA claim, because the contracting officer is deemed to have denied plaintiff's claim due to her failure to issue a decision, and because plaintiff timely appealed the contracting officer's deemed denial of its claim, the court possesses jurisdiction to entertain plaintiff's proposed claim.

## IV.  CONCLUSION

As set forth above, the court recharacterizes plaintiff's motion to dismiss as a motion for summary judgment.  Because the Coast Guard lacked the authority to terminate its contract with plaintiff for default, its default termination is invalid, and the court **GRANTS** plaintiff's motion for summary judgment on that issue.  Further, the court concludes that it possesses jurisdiction to entertain plaintiff's claim for the remission of liquidated damages, but only to the extent that the claim is premised on the excusable delays alleged in the three pertinent February 25, 2005 letters. It also possesses jurisdiction to consider defendant's counterclaim for liquidated damages.  Thus, the court **GRANTS IN PART** and **DENIES IN PART** the remainder of plaintiff's motion for summary judgment.  Finally, the court **GRANTS** plaintiff's motion to amend its complaint.

By **no later than Friday, March 14, 2014**, plaintiff shall file an amended complaint setting forth its new claim as described above.  Defendant shall file its responsive pleading no later than **Friday, March 28, 2014**, and plaintiff shall file a response to any counterclaim asserted by defendant no later than **Friday, April 4, 2014**.  Then, by **no later than Friday, April 11, 2014**, the parties shall file a joint status report suggesting a schedule for further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge