# In the United States Court of Federal Claims

No. 05-914C
(Filed: April 18, 2017)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| K-CON BUILDING SYSTEMS, INC., | * | Trial; Contract to Design and Build |
| | * | Prefabricated Metal Building; RCFC 15; |
| Plaintiff, | * | Futility of Supplemental Complaint; |
| | * | Contract Disputes Act of 1978; Remission |
| v. | * | of Liquidated Damages; Counterclaim |
| | * | for Liquidated Damages; Contractual |
| THE UNITED STATES, | * | Notice Requirement; Abandoned Claim; |
| | * | Excusable Delay; Critical Path; |
| Defendant. | * | Affirmative Defenses |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

William A. Scott, Charleston, SC, for plaintiff.

Daniel B. Volk, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff K-Con Building Systems, Inc. contracted with the United States Coast Guard ("Coast Guard") to design and construct a prefabricated metal building in Elizabeth City, North Carolina. Because plaintiff did not complete construction by the contract completion date, the Coast Guard assessed liquidated damages and, eventually, terminated the contract for default. Plaintiff filed suit challenging the default termination and the liquidated damages assessment, and defendant filed a counterclaim to recover the liquidated damages still owed by plaintiff. After the court held a trial, the parties attempted–unsuccessfully–to reach a settlement. Plaintiff then filed a motion seeking to resolve certain issues raised during the settlement discussions. The court ruled on that motion, dismissing plaintiff's challenge to the default termination for lack of jurisdiction. The parties thereafter submitted posttrial briefs, and plaintiff filed a motion for leave to amend its complaint. As set forth below, the court denies plaintiff's motion for leave to amend its complaint, and concludes that defendant is entitled to recover liquidated damages in the amount of $199,611.

# I.  FACTS

This section contains the court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims ("RCFC").[1]

## A.  The Contracts

### 1.  The Federal Supply Schedule Contract

Plaintiff is a "design-build general contractor" headquartered in Charleston, South Carolina whose business is focused on the federal government.  Tr. 86 (Reitmeier); accord Tr. 1268-69 (Combs).  Specifically, plaintiff has fulfilled over 4000 delivery orders for the federal government throughout the United States and its territories.  Id. at 1268, 1271 (Combs); see also id. at 3643 (Kiernan) (indicating that plaintiff has "had over 3000 delivery orders from the federal government and over 400 of those have been specifically for pre-engineered metal buildings").

In April 2001, the United States General Services Administration ("GSA") awarded plaintiff a Federal Supply Schedule contract for Prefabricated Structures and Outdoor Smoking Shelters.  Jt. Stip. ¶ 1; JX 2.  That contract contained a number of clauses from the Federal Acquisition Regulation ("FAR"), including FAR 52.212-4, Contract Terms and Conditions–Commercial Items (May 1999).[2]  JX 2.9; Pl.'s App. SJ0001-90.  Several paragraphs from that clause are relevant here.  First, paragraph (d) provided:

> Disputes.  This contract is subject to the Contract Disputes Act of 1978, as amended . . . .  Failure of the parties to this contract to reach agreement on any request for equitable adjustment, claim, appeal or action arising under or relating

---

[1]  The court derives these facts from the parties' Joint Stipulation of Facts ("Jt. Stip."), the transcript of testimony elicited at trial ("Tr."), the exhibits admitted into evidence during trial ("PX," "DX," or "JX"), and, as explained below, see infra note 2, plaintiff's appendix to its posttrial motion to dismiss ("Pl.'s App.").  Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness.

[2]  The trial record contains a portion of the Federal Supply Schedule contract, and only includes the first eight paragraphs of FAR 52.212-4.  Plaintiff submitted the entire Federal Supply Schedule contract with its posttrial motion to dismiss, described in more detail below.  The court included quotations from the remaining paragraphs of FAR 52.212-4 in its February 26, 2014 Opinion and Order.  See K-Con Bldg. Sys., Inc. v. United States, 114 Fed. Cl. 722, 729-30 (2014).  Neither party disputes the contents of these paragraphs or the applicability of these paragraphs to this case.  Id. at 730.  Accordingly, the court treats those paragraphs as if they were included in the trial record, and cites plaintiff's appendix to its posttrial motion to dismiss as the source of those paragraphs.

to this contract shall be a dispute to be resolved in accordance with the clause of FAR 52.233-1, Disputes, which is incorporated herein by reference.

JX 2.9. Second, paragraph (f) provided:

> Excusable delays.  The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.  The Contractor shall notify the Contracting Officer in writing as soon as it is reasonably possible after the commencement of any excusable delay, setting forth the full particulars in connection therewith, shall remedy such occurrence with all reasonable dispatch, and shall promptly give written notice to the Contracting Officer of the cessation of such occurrence.

Id.  Third, paragraph (m) provided:

> Termination for cause.  The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.  In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law.  If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

Pl.'s App. SJ0014.  Finally, paragraph (t) incorporated by reference Federal Supply Schedule contract clause I-FSS-249-B, Default (May 2000), id., which provided:[3]

> In addition to any other clause contained herein related to termination, the following is applicable to orders placed under Federal Supply Schedule contracts.

> Any ordering office may, with respect to any one or more orders placed by it under the contract, exercise the same right of termination, acceptance of inferior

---

[3]  Plaintiff provided the full text this provision in its posttrial motion to dismiss.  Mot. to Dismiss 8 (quoting BearingPoint, Inc. v. United States, 77 Fed. Cl. 189, 192 (2007)).  The court reproduced this text in its February 26, 2014 Opinion and Order, K-Con Bldg. Sys., Inc., 114 Fed. Cl. at 730, and as noted above, see supra note 2, neither party disputes the contents of this provision or the applicability of this provision to this case.

articles or services, and assessment of excess costs as might the Contracting Officer, except that when failure to deliver articles or services is alleged by the Contractor to be excusable, the determination of whether the failure is excusable shall be made only by the Contracting Officer of the General Services Administration, to whom such allegation shall be referred by the ordering office and from whose determination appeal may be taken as provided in the clause of this contract entitled "Disputes."

## 2. The Coast Guard's Solicitation

On September 2, 2003, the Coast Guard, through its Facilities, Design, and Construction Center (Atlantic) ("FDCC LANT"),[4] solicited proposals under the Federal Supply Schedule for Prefabricated Structures and Outdoor Smoking Shelters for the design and construction of a prefabricated metal building to house an Aviation Repair and Supply Center ("AR&SC") component repair shop at the Coast Guard Support Center in Elizabeth City, North Carolina.  Jt. Stip. ¶¶ 3-4, 10; JX 1.1; JX 2.1; JX 20.3; see also Tr. 2454 (Schmitt) (explaining that the AR&SC is a command that maintains and repairs aircraft).  Specifically, the Coast Guard sought a 4700-square-foot building to house a hydraulic test lab, a workshop, office space, and storage space.  Jt. Stip. ¶¶ 4-5.  The contractor was to design the building based on the drawings and specifications included in the request for proposals ("RFP").  JX 1.3, .10-.11, .140; accord JX 1.47 ("[Specification] Section 01158, 'GSA Procurement Design/Build Criteria,' and Drawings contain abbreviated minimum facility requirements."), .48 ("The design and design data indicated on the drawings are the minimum requirements, i.e., baseline drawing requirements, to be used by the Contractor to develop the project design.  The Contractor shall add to, supplement, and complete these drawings to fully comply with this GSA Procurement . . . .").  The contractor would then use that design to construct the building.  JX 1.79.  Additionally, the contractor was required to "[d]isconnect, dismantle if necessary, remove, relocate, reinstall, connect, and test" certain government-furnished equipment.  JX 1.40; accord JX 1.58 (listing "existing and/or new equipment" that the Coast Guard intended to install in the new building, and providing that the contractor was required to "coordinate the design and provide support[] and utilities for" that equipment).  Among the government-furnished equipment were three pieces of hydraulic test equipment–an HPTS-1000 with a 25-horsepower motor, an HA-60VM with a 40-horsepower motor, and an HS-25 with a 75-horsepower motor.  JX 1.58; accord JX 1.15.  The motor for each piece of equipment was separate from the equipment's hydraulic testing system, and in the case of the HS-25, the motor was mounted to the equipment's exterior.  Tr. 2813-17 (Fedei).  The government-furnished equipment also included a chiller.  JX 1.58; accord JX 1.15.  The chiller was connected to each of the three pieces of hydraulic test equipment by a pair of pipes, one that supplied chilled water to collect the heat generated inside of the equipment and another that returned the heated water to the chiller to be rechilled.  PX 332.18-.19, .22; Tr. 201-02 (Ramsey), 2813, 2815, 3075-76 (Fedei); accord id. at 501-03

---

[4]  The FDCC LANT was located in Norfolk, Virginia.  JX 1.1.

(Tempel) (explaining that the chiller removed heat that was generated in the equipment, preventing the heat from being rejected into the room).

In rendering design services, the contractor was required to provide the Coast Guard with civil, site, geotechnical, landscaping, architectural, structural, fire protection, plumbing, mechanical, electrical, and telecommunications designs, as well as with all "specified" calculations pertinent to the designs. JX 1.49-.74, .78; see also Tr. 229 (Ramsey) (admitting that the contract required plaintiff to submit mechanical calculations with its design). Of particular importance in this case is the mechanical design, in other words, the design for the building's heating, ventilation, and air conditioning ("HVAC") system. The pertinent specification provided:

1.13.2  System Description

The HVAC systems shall be designed to accommodate all building operations. Use of Carrier Air-conditioning Mfg. equipment is desired to match equipment currently being installed throughout AR&SC to minimize training and repair parts.

. . . .

1.13.3  HVAC Systems

The HVAC systems shall be designed to meet the following design conditions:

| Space | Winter (FDB) | Summer (FDB/FWB[]) |
|---|---|---|
| Outside | 19 | 93/78 |
| Inside | 70 | 76/50%RH (typical)* |

*Spaces shall not exceed 60% RH during any occupied hours at full or partial load.

(F = Degrees Fahrenheit)
(FDB = Degrees Fahrenheit Dry Bulb)
(FWB = Degrees Fahrenheit Wet Bulb)
(FDP = Degrees Fahrenheit Dew Point)
(RH = Relative Humidity)

1.13.4  System Description

1.13.4.1  Heating and air conditioning shall be provided by split system heat pump air conditioners. Ductless split system air conditioners with electric resistance heat or heat pumps may be provided for isolated spaces where appropriate. . . .

Provide air conditioning in all normally occupied spaces including offices, telecommunications rooms, test labs, work shops, corridors and toilets.  . . .

. . . .

1.13.9  Existing hydraulic test equipment chiller:  Disconnect chiller from existing equipment (HA-60, HPTS-1000, and HS-25) in Hangar 75 Annex, relocate chiller to new location, and run new distribution piping to the relocated equipment (HA-60, HPTS-1000, and HS-25), as shown on sheet A102.  Use piping materials, insulation, and connections equivalent to the existing.

JX 1.64-.66; accord JX 1.15 (indicating, on sheet A102, that the contractor was to "provide insulated chilled water piping between relocated chiller . . . & hydraulic test consoles HA-60, HPTS-1000, & HS-25" and "match valving & connections that exist[] in Shop 241 in Hangar 75"); see also Tr. 497-99 (Tempel) (noting that the design parameters for the HVAC system were located in paragraphs 1.13.3 and 1.13.4.1 of the specification).

Proposals were due by September 17, 2003.  JX 1.1.

### 3.  Plaintiff's Proposal

On August 28, 2003, prior to issuing its RFP, the Coast Guard conducted a prebid meeting at the Coast Guard Support Center in Elizabeth City.  JX 5.1; Tr. 102-04 (Reitmeier). Attending the meeting were a number of Coast Guard employees, plaintiff's sales manager George Reitmeier, and representatives of another prospective offeror.  JX 5.1; accord Tr. 102 (Reitmeier).  The Coast Guard presented "Conceptual Design Site and Floor Plans" and answered questions.  JX 5.1; accord Tr. 103 (Reitmeier).  Thereafter, the "attendees walked . . . the proposed building site" and "toured existing Shop 241."  JX 5.1; accord Tr. 103 (Reitmeier). During the tour of Shop 241, the attendees were told that some of the equipment in that room would be relocated to the new building.  Tr. 103, 140 (Reitmeier); see also JX 1.15 (reflecting that the existing government-furnished equipment was located in Shop 241).

In preparing its proposal, plaintiff solicited quotations from other contractors to provide and install the HVAC system.  See, e.g., JX 14; JX 510; see also Tr. 120 (Reitmeier) (noting that another company would actually design the HVAC system).  At least one contractor, Ward & Son, Inc., investigated the government-furnished equipment that would be placed in the building, the number and size of the rooms in the building, the location of the air handlers, and how the building would be insulated.  JX 14.1-.2; Tr. 120 (Reitmeier); Tr. 504-05 (Tempel).  During that investigation, Ward & Son, Inc. "was told that the shop never operates but one test station at [a] time and the duration is no longer than four hours."  JX 14.9.  Based on the information it gathered, Ward & Son, Inc., calculated thermal loads, JX 14.3-.8, and then proposed an HVAC system with two heat pumps and two air handlers, JX 14.9.  One heat pump and air handler unit would be used solely for the hydraulic test lab, and the other heat pump and air handler unit

would be used for the entire building and would "keep [the] 'hydraulic test room' within the design specifications when test equipment [was] not being used." Id.; see also JX 15 (reflecting that Ward & Son, Inc. proposed using a 7.5-ton unit for the hydraulic test lab and a 10-ton unit for the entire building). On September 16, 2003, Ward & Son, Inc. provided plaintiff with a quotation of $50,557 to install the proposed HVAC system, JX 14.9, and plaintiff used that amount in preparing its cost estimate, JX 18.4; Tr. 118 (Reitmeier).

### 4. The Coast Guard's Contract With Plaintiff

Plaintiff responded to the solicitation and, on September 23, 2003, the Coast Guard placed an order under plaintiff's Federal Supply Schedule contract for the solicited building. Jt. Stip. ¶¶ 21-22. The initial value of the order was $513,520 and the initial completion date was June 17, 2004. Id. ¶ 22. Ultimately, through bilateral contract modifications, the value of the order was increased to $551,155.35 and the completion date was extended to November 9, 2004.[5] See JX 3.1-.10. From plaintiff's perspective, its contract with the Coast Guard was typical of its contracts with the federal government, both in type and amount. Tr. 1270, 1279 (Combs).

Plaintiff's contract with the Coast Guard included and incorporated by reference a number of provisions relevant to the issues in this case. For example, the contract included FAR 52.211-12, Liquidated Damages - Construction (September 2000), which provided:

(a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of $551.00 for each calendar day of delay until the work is completed or accepted.

(b) If the Government terminates the Contractor's right to proceed, liquidated damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess costs of repurchase under the Termination clause.

JX 1.30. In addition, the contract incorporated by reference four other relevant FAR provisions. One is FAR 52.233-1, Disputes (December 1998), which provided:

(a) This contract is subject to the Contract Disputes Act of 1978, as amended . . . .

---

[5] Specifically, a January 13, 2004 modification resulted in a contract price increase to $516,571.46, JX 3.1-.2; an April 15, 2004 modification resulted in a contract price increase to $549,602.46 and a time extension to October 21, 2004, JX 3.3-.4; an August 20, 2004 modification resulted in a time extension to October 26, 2004, JX 3.6-.7; a September 9, 2004 modification resulted in a contract price increase to $551,155.35, JX 3.7-.8; and a November 10, 2004 modification resulted in a time extension to November 9, 2004, JX 3.9-.10.

(b)  Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

(c)  "Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract.  . . .

(d)(1)  A claim by the Contractor shall be made in writing and, unless otherwise stated in this contract, submitted within 6 years after accrual of the claim to the Contracting Officer for a written decision.  A claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer.

FAR 52.233-1, cited in JX 1.37.  The second is FAR 52.243-4, Changes (August 1987), which provided:

(a)  The Contracting Officer may, at any time, . . . by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract . . . .

(b)  Any other written or oral order (which, as used in this paragraph (b), includes direction, instruction, interpretation, or determination) from the Contracting Officer that causes a change shall be treated as a change order under this clause; Provided, that the Contractor gives the Contracting Officer written notice stating–

(1)  The date, circumstances, and source of the order; and

(2)  That the Contractor regards the order as a change order.

. . . .

(d)  If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.  However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required.

FAR 52.243-4, <u>cited in</u> JX 1.38.  The third is FAR 52.249-2, Termination for Convenience of the Government (Fixed Price) (September 1996), which provided:

> The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest.  The Contracting Officer shall terminate by delivering to the Contractor a Notice of Termination specifying the extent of termination and the effective date.

FAR 52.249-2(a), <u>cited in</u> JX 1.38.  And, the final relevant FAR provision incorporated into the contract by reference is FAR 52.249-10, Default (Fixed-Price Construction) (April 1984), which provided:

> (a)  If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed. In this event, the Government may take over the work and complete it by contract or otherwise . . . .  The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time, whether or not the Contractor's right to proceed with the work is terminated.  This liability includes any increased costs incurred by the Government in completing the work.

> (b)  The Contractor's right to proceed shall not be terminated nor the Contractor charged with damages under this clause, if–

>> (1)  The delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor.  Examples of such causes include [acts of the Government in either its sovereign or contractual capacity, or unusually severe weather,] and

>> (2)  The Contractor, within 10 days from the beginning of any delay (unless extended by the Contracting Officer), notifies the Contracting Officer in writing of the causes of delay.  The Contracting Officer shall ascertain the facts and the extent of delay.  If, in the judgment of the Contracting Officer, the findings of fact warrant such action, the time for completing the work shall be extended.  The findings of the Contracting Officer shall be final and conclusive on the parties, but subject to appeal under the Disputes clause.

(c)  If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

(d)  The rights and remedies of the Government in this clause are in addition to any other rights and remedies provided by law or under this contract.

FAR 52.249-10, cited in JX 1.38.

Pursuant to other contract provisions, plaintiff was to commence work within fourteen days of contract award; meet with the Coast Guard for a postaward kickoff meeting within fourteen to twenty-eight days of contract award, but prior to the commencement of work;[6] submit a "practicable schedule" either within fifteen days of the commencement of work or another time period designated by the Coast Guard's contracting officer; and complete work no more than 262 days after contract award.  JX 1.24, .74.  In addition, plaintiff was to submit the design to the Coast Guard in two phases–a "100% design" and a "final design"; the Coast Guard would have twenty-one days to provide comments on the 100% design and fourteen days to provide comments on the final design.  Jt. Stip. ¶ 14; see also JX 1.80 (containing specification section 01160, paragraph 2.2.3, which provided:  "The Contracting Officer's review team shall review each design submittal and provide comments regarding the submitted documents.").  Within fourteen days of receiving the Coast Guard's comments, plaintiff was to confer with the Coast Guard via telephone to "resolve design review comments and design issues."  JX 1.79.  Plaintiff was required to "acceptably address all comments on the design submittals and subsequently correct the submittals for review."  JX 1.80; accord id. (containing specification section 01160, paragraph 2.2.4, which provided:  "When a design submittal is considered unacceptable to the Contracting Officer's review team, the Contractor shall be so advised and required to provide a resubmittal for that particular design phase.").

If plaintiff "determine[d] that some portion of the drawings, specifications, or other contract documents require[d] clarification or interpretation," it could submit a request for information ("RFI") to the Coast Guard.  JX 1.105.  The Coast Guard was required to respond to the RFI within ten days unless it "determine[d] that a longer period of time [was] necessary to provide an adequate response"; in such circumstances, the Coast Guard was obligated, within ten days of receiving the request, to "notify [plaintiff] of the anticipated response time."  JX 1.106.  If the Coast Guard's response constituted a change to the contract requirements, the Coast Guard would "issue either a no-cost field Adjustment or formal modification under the Changes clause of the contract."  Id.  If the Coast Guard failed to take such action, and plaintiff believed that the response would "cause a change to the requirements of the contract documents," plaintiff was

---

[6]  The requirements for the commencement of work and the postaward kickoff meeting cannot be reconciled; however, the discrepancy has no relevance to the remaining issues in this case.

required to "give written notice to the Contracting Officer stating that [it] consider[ed] the response to be a change order. Failure to give such written notice immediately . . . waive[d plaintiff's] right to seek additional time or cost under the Changes clause of the contract." Id.

Plaintiff could not begin construction until the final design was approved by the Coast Guard. JX 1.79.

## B. Contract Performance

Work on the project did not begin within the time anticipated in the contract; indeed, the postaward kickoff meeting was not held until December 4, 2003. Jt. Stip. ¶ 23. Among the Coast Guard employees who attended the meeting were Lt. Harry Mautte from the Coast Guard Support Center, Kent Goodwin from the AR&SC, and several individuals from the FDCC LANT, including the contracting specialist, the construction project manager/contracting officer's technical representative, the design project manager, and a mechanical engineer. JX 35.1. Attending the meeting for plaintiff were plaintiff's project manager, Greg Herald, and representatives from two subcontractors. Id. None of plaintiff's designers attended the meeting. Id.; Tr. 2426 (Schmitt); see also Tr. 3107 (Broussard) (explaining that contractors generally bring their designers to postaward kickoff meetings).

During the meeting, Mr. Herald advised the Coast Guard of plaintiff's intent to submit the 100% design on January 10, 2004. Jt. Stip. ¶ 23. In addition, the Coast Guard informed plaintiff that it was willing to allow plaintiff to "fast track" the construction of the building "by accepting the foundation's design ahead of the design for the rest of the building"; plaintiff responded that this was its preferred course of action. Id.; accord id. ¶ 29; see also Tr. 2429-35 (Schmitt) (explaining that construction could begin once plaintiff had prepared an architectural floor plan, a structural design, a site plan, and a foundation plan), 2696 (explaining that the Coast Guard's fast-tracking suggestion was made in response to plaintiff's representation that it would be submitting a 100% design). At the conclusion of the meeting, at least some of the attendees–including the Coast Guard's mechanical engineer, John Fedei–walked the building site. JX 35.1-.2; Tr. 2786 (Fedei); see also Tr. 2799, 2816 (Fedei) (indicating that he also walked through the existing building containing the government-furnished equipment).

Mr. Herald provided the Coast Guard with a tentative project schedule on December 11, 2003. JX 38. Thereafter, on January 6, 2004, Mr. Herald submitted an RFI to the Coast Guard concerning a number of issues that needed to be addressed before plaintiff could finish designing the HVAC system in the hydraulic test lab. Jt. Stip. ¶ 24; JX 42. In particular, Mr. Herald requested specification sheets (also known as "cut sheets") for each piece of equipment to be installed in the hydraulic test lab, as well as information regarding the heat transference from the

equipment and the equipment's normal operating parameters.[7]  Jt. Stip. ¶ 24; JX 42.  The contracting officer's technical representative responded the following day:

> Specifications for the government furnished and installed equipment should be obtained by field investigation by K-CON and/or [its] designers . . . .[8]  Some information (including operating parameters) may be obtained from AR&SC (Kent Goodwin) or [Coast Guard Support Center] Facilities Staff (Lt. Harry Mautte).  In any case, K-CON is responsible for all necessary services to develop the design.

JX 44.2 (footnote added).  Mr. Herald replied, later that day, that he recognized plaintiff's "responsibility to investigate[ ]and develop[] the design" and that he would try and contact the suggested individuals for the information it needed.  Id.  Mr. Herald also received another response to its RFI from the Coast Guard that day, this time from Michael Schmitt, the Coast Guard's design project manager.  JX 43; JX 44.1.  Mr. Schmitt wrote:

> The RFP documents indicate what equipment is being government furnished and installed.  . . .  Obviously, operating times and durations must be obtained from the user (AR&SC).
>
> Even though K-CON had nothing to do with the design of the existing shop, at the pre-bid conference, we walked through the shop . . . and discussed and viewed the equipment to be moved to the new building.  We attempted to provide as much information in the RFP regarding existing equipment as possible for bidding purposes, however, we anticipated that fieldwork on K-CON's part would be required to complete the design.

JX 44.1; see also JX 5 (describing what occurred during the August 28, 2003 prebid conference and indicating that a representative from plaintiff was in attendance).

---

[7]  The terms "heat transference" and "heat load" are used throughout the trial record; both refer to the same concept–the amount of generated heat.

[8]  There was conflicting testimony elicited during trial regarding whether the heat transference information requested by plaintiff could be obtained during a site visit.  Compare Tr. 242 (Ramsey) (suggesting that in the absence of documentation, the only way to ascertain how much heat the equipment generated was to measure the heat generation while the equipment was being operated), and Tr. 5661-62, 2718 (Schmitt) (remarking that heat information–such as the size of the motors on the government-furnished equipment and how the equipment was being cooled–could be ascertained from a site visit), with Tr. 522 (Tempel) (asserting that heat loads could not be obtained from a site visit).

Mr. Herald provided the information he had obtained from the Coast Guard to the subcontractor that plaintiff hired to design the HVAC system, Epic Engineering, Inc. ("Epic").[9] JX 47; see also Tr. 510 (Tempel) (reflecting that Mr. Herald's RFI had originated from Epic).  In minutes from a January 8, 2004 project conference, Mr. Herald noted that "all of Epic[']s questions [had] been answered" and that the "[d]esign should be ready by" January 25, 2004.  JX 47.

Notwithstanding Mr. Herald's understanding, Epic needed additional information to complete the HVAC system design.  JX 57; accord Tr. 606 (Tempel) (disagreeing that all of Epic's questions had been answered).  Thus, on January 22, 2004, Mr. Herald sent a list of questions to the Coast Guard to obtain that information.  JX 57.1-.2.  Mr. Schmitt responded the following day, initially noting that the "questions [were] very similar in nature to those asked in [the] RFI . . . ."  JX 57.1.  He indicated that many of the questions–those that concerned "specifications/cut sheets"–could be answered by either examining the existing equipment that would be relocated to the new building (in other words, by performing a field investigation) or by requesting literature and data from Mr. Goodwin, and that another question could be answered by reviewing sheet A102.  Id.

Eventually, on February 3, 2004, one of Epic's principals, Aaron C. Tempel, a mechanical engineer, Tr. 480 (Tempel), sent an electronic-mail message to Mr. Goodwin requesting "cut sheets/specifications" and other information regarding the government-furnished equipment, but not information regarding the equipment's operating times and durations.  Id. at 845-46; JX 70.  Mr. Goodwin responded, on February 20, 2004, with some of the requested information, but noted that "[n]o cut sheets [were] available to [his] knowledge."  JX 70.1.  Based on this information, along with the information he had obtained from the contract specifications and Mr. Herald, Mr. Tempel made some assumptions and prepared a preliminary mechanical design that provided for two units, a 10-ton unit and a 5- or 7.5-ton unit.  Tr. 516-20 (Tempel); accord id. at 650-52 (affirming that the preliminary mechanical drawings did not reflect a 100% design).

In the meantime, on February 12, 2004, plaintiff provided the Coast Guard with a revised project schedule.  JX 71.  In a February 23, 2004 letter, one of the three Coast Guard contracting officers involved with this contract, Marion E. Hundley,[10] advised plaintiff that the schedule was

_____

[9]  Plaintiff also engaged Epic to design the building's electrical, plumbing, and fire alarm systems.  JX 47; JX 126.1; see also Tr. 483 (Tempel) (reflecting that Epic does "all" of plaintiff's "mechanical, electrical, plumbing, and fire alarm design for just about every building [it does] where there's not already an engineer[] of record on board").  There is no evidence in the trial record indicating that Mr. Herald contacted Mr. Goodwin or Lt. Mautte prior to providing Epic with the information he obtained from the Coast Guard.

[10]  The contracting officer identified in the contract was Cathy Broussard.  JX 1.26.  In December 2003, Ms. Broussard was promoted to be the chief of contracts at the FDCC LANT.

"disapproved" for various reasons, including the fact that several items were missing. Id. Ms. Hundley further noted that plaintiff had not yet submitted its 100% design despite indicating in its original schedule that it would do so by January 13, 2004. Id. She requested that plaintiff submit another revised schedule by March 4, 2004. Id.

Plaintiff sent its first set of design documents–architectural, HVAC, plumbing, electrical, fire alarm, site, and structural drawings–to the Coast Guard on February 23, 2004, for review and comment. JX 72; JX 701. On February 25, 2004, the Coast Guard's project manager, Steven Allen, discussed the submission–which the Coast Guard received the previous day–with plaintiff's new project manager, Luther Ramsey,[11] over the telephone. JX 75.1. Later that day, Mr. Allen followed up the telephone conversation with an electronic-mail message in which he provided Mr. Ramsey with "a partial list of concerns about the design submittal." JX 75. For example, with respect to the HVAC drawings, Mr. Allen noted that plaintiff did not include any calculations or supporting data for the HVAC system and that the HVAC floor plan was "unusual" and "vastly incomplete." JX 75.1; see also Tr. 529-30 (Tempel) (explaining that only preliminary HVAC calculations could be performed in the absence of heat transference information and that the floor plan "was as complete as it could possibly be based on the very limited and inconclusive information that [Mr. Tempel and plaintiff] had received"). Mr. Allen explained that the Coast Guard did not "feel that [the] submittal met the intent of the RFP documents" and that as a result, it "consider[ed the] submittal incomplete." JX 75.1; see also JX 77 (containing Mr. Schmitt's statement that "the design was close to being finished"); Tr. 224 (Ramsey) (acknowledging that the design submittal was incomplete). He suggested that plaintiff have its designers contact the relevant Coast Guard reviewers "to avoid [the Coast Guard] having to reject another submittal." JX 75.1; see also JX 79 (indicating that the Coast Guard reviewers had not been contacted by plaintiff's designers as of March 4, 2004); Tr. 843-44 (Tempel) (indicating that Mr. Tempel did not contact Mr. Fedei until July 2004), 2790-91 (Fedei) (noting that Mr. Fedei did not receive a telephone call in response to the Coast Guard's suggestion to plaintiff). Finally, Mr. Allen indicated that the Coast Guard was willing to assist plaintiff in avoiding "potential schedule slippages" by allowing plaintiff to "submit the foundation/structural

---

Tr. 3088-89 (Broussard). As a result of the promotion, Ms. Broussard became Ms. Hundley's supervisor. Id. at 3094. A third contracting officer, Victoria W. Worrell, filled the position vacated by Ms. Broussard. Id. Ms. Broussard remained involved in the Coast Guard's contract with plaintiff so that she could train the other contracting officers regarding Federal Supply Schedule contracts. Id. at 3092-93.

[11] Plaintiff fired its original project manager, Mr. Herald. JX 112.1; JX 113; Tr. 1385-86 (Combs). The evidence in the trial record reflects that Mr. Herald was responsible for some of the early delays in the project. See, e.g., JX 103 ("The original [project manager] is who caused the start-up of this project to fall on its face. . . . They are struggling under problems that their original [project manager] caused."); JX 112.1 ("K-CON's first [project manager] mismanaged the project and got it off on the wrong foot. . . . K-CON's original [project manager], who was fired for lack of performance, clearly mismanaged the project by [its] own admission.").

design in advance to allow that portion of the construction contract to proceed in advance of the interior building design."  JX 75.2; accord JX 79 (reiterating, in a March 4, 2004 electronic-mail message, the offer to allow plaintiff to "'fast-track' building foundation work"); JX 86.1 (reiterating, in a March 16, 2004 electronic-mail message, the offer to allow plaintiff to "'fast-track' building foundation work").

Mr. Ramsey prepared a new project schedule on February 29, 2004, and submitted it to the Coast Guard.  JX 532; Tr. 213, 215, 223 (Ramsey).  Then, on March 3, 2004, Mr. Ramsey traveled to Elizabeth City and viewed the equipment that the Coast Guard wanted installed in the new building.  Tr. 187, 191-93, 198-200 (Ramsey).  He observed that "two of the units . . . were still connected," but that "[t]he rest were unconnected and pushed away in corners [with] no evidence of how they were installed."  Id. at 191.  He further found that much of the equipment was "very old, very antiquated."  Id. at 187; accord id. at 192.  He was advised by Mr. Goodwin, who took him to view the equipment, id. at 210, that the Coast Guard did not have "any catalog[s], cut sheets, or any kind of maintenance manuals" for the equipment, id. at 192; accord id. at 210, 235, 264; see also id. at 271 (indicating that Mr. Ramsey did not recall whether he asked Mr. Goodwin for the equipment's operating schedules).  Mr. Ramsey forwarded the information that he gathered during his site visit to Epic.  Id. at 210.

That same day, plaintiff sent a letter to the Coast Guard requesting an extension of the contract completion date by 105 days–until September 30, 2004–explaining that its performance had been delayed for several reasons, including:

- The [Coast Guard] contract[] requirements differ materially from the standard GSA guidelines Design-Build requirements.  In complying with your engineering package we have discovered that full design is really what you are requiring.  This requires more time.  Example:  In design build we can traditionally start some site and foundation work at the same time that final building design calculations are being proofed.  Currently we have to hire surveyors[] and soil engineers to do pre-design work before the construction design can be started, then designs cannot be completed until the building structur[e] is designed.  It is a case of having all the answers in hand before a task can be viewed completed.

- Requests for information on owner furnished equipment have been incomplete.  We are currently scheduling a trip back to obtain this information.  This has caused mechanical and electrical design to be incomplete.

JX 78.1.  The Coast Guard responded to this letter the next day via electronic mail, JX 79, and followed up with a letter on March 23, 2004, JX 91.  In that letter, the Coast Guard indicated that plaintiff's request for additional time was not sufficiently justified.  JX 91.1.  The Coast Guard also reiterated that the 100% design that plaintiff submitted on February 23, 2004, was

incomplete, referring plaintiff to an enclosed list of comments, JX 91–the same comments that the Coast Guard sent to plaintiff on February 25, 2004, <u>compare</u> JX 75.1 (comments of February 25, 2004), <u>with</u> JX 91.2 (comments of March 23, 2004).

Throughout March 2004, plaintiff and Epic continued to gather information from the Coast Guard that they needed to design the building's HVAC system. <u>See, e.g.</u>, JX 90; JX 92; JX 94. In addition, on March 18, 2004, Mr. Tempel calculated thermal loads for the hydraulic test lab and determined that the room required a 7.5-ton unit. JX 89; Tr. 527 (Tempel); <u>see also</u> Tr. 807-08 (Tempel) (noting that the calculations were "improper" and "erroneous" because Mr. Tempel lacked the heat load information for the equipment to be placed in the hydraulic test lab). At the end of the month, plaintiff issued subcontracts to the contractors who had provided quotations and assisted in the design. JX 95. One of those contractors was Ward & Son, Inc., who had provided a quotation for the design and installation of the HVAC system. JX 109.1. In an April 1, 2004 letter, Jack Ward of Ward & Son, Inc. expressed concern regarding the effects that the delay in receiving the subcontract and the increased scope of work described in the subcontract would have on Ward & Son, Inc.'s ability to perform at the price it quoted almost seven months earlier. JX 109.1-.3; <u>see also</u> JX 142 (indicating, in a May 25, 2004 revised quotation, that Ward & Son, Inc. could install the HVAC system for $74,405). Of particular note, Mr. Ward advised:

> I was told that your mechanical engineer would redraw and check over my design and calculated loads. I was surprised when I received no new drawings and am being asked to sign off on drawing[s] and loads that I gave you as part of your subcontract [sic]. Does this mean that what I gave you is approved by your [mechanical engineer]? Or am I going to get a surprise with radical changes in the future? . . . In February, I spoke with Aaron Tempel, your project design [mechanical engineer], and I got the feeling from him that because of the existing water chiller that I may have over calculated the added cooling load when their test equipment is operating. At that time we talked about the fact that [the HVAC system for the hydraulic test lab] did not need to be a heat pump and could be a cooling only system. Whatever became of these two subject[s] of conversation?

JX 109.2; <u>cf.</u> JX 511 (reflecting that plaintiff cancelled its subcontract with Ward & Son, Inc. on July 27, 2005 due to the increased quotation).

Meanwhile, on March 31, 2004, plaintiff sent another letter to the Coast Guard to request an extension of the contract completion date by 105 days. JX 98. It enumerated several reasons for the delays it was encountering; in addition to the reasons set forth in its March 3, 2004 letter, plaintiff contended that the delays were attributable to the following issues:

- Design required more site investigation than originally estimated. Initially K Con, Inc tried to implement the design process with utilizing owner provided information and/or through a series of RFI type emails. This proved to be

-16-

unsatisfactory.  Our design budget was based on this approach and was value passed on to the owner in the bid price.

- Visiting and reviewing existing systems has not clarified, but to the contrary has shown there exists inoperable equipment, undersized systems and in general "not standard installations" that we may have to mimic.

- There was additional equipment not known at bid time that had to be reviewed and questioned as to status.

JX 98.2.  In a memorandum dated April 1, 2004, Mr. Allen recommended to the contracting office that the contract completion date be extended by 105 days:  forty-four days for the delay in conducting the postaward kickoff meeting, thirty-five days related to steel shortages, and twenty-six days to account for the additional time required to "coordinate/resolve [the] connection of Government relocated equipment."  JX 102.

Also on March 31, 2004, Mr. Schmitt advised Mr. Allen via electronic mail that he noticed that plaintiff's initial architectural and structural drawings reflected a building that was smaller than specified in the drawings included with the RFP; it was almost two feet shorter in both length and width.  JX 101.2; see also JX 1.14 (containing the relevant RFP drawing).  Mr. Allen forwarded Mr. Schmitt's observations to Mr. Ramsey on April 1, 2004, who responded that plaintiff's design conformed with the contract specifications setting forth the building dimensions and square footage.  JX 101.1-.2; see also JX 1.53 (containing the relevant specification section).  That same day, in an internal Coast Guard electronic-mail message, Mr. Schmitt wrote:

> Our RFP drawings clearly indicate a building that is 76'-11" x 61'-11", with structural frame dimensions (centerlines) of 75'-0" x 60'-0" (which is what I intended by the dimensions listed in the specifications).  This is a clear discrepancy, but one that should have been brought to our attention.  The Contractor's designers used our [computer-aided design d]rawings to develop their drawings.  In order for them to develop their drawings, they had to consciously reduce the building 1'-11" in each direction.  Since this was a conscious effort on their part, they should have brought it to our attention.  They did not.

JX 101.1; accord Tr. 2714-18, 2772-75 (Schmitt).

On April 5, 2004, plaintiff sent a third letter to the Coast Guard requesting an extension of the contract completion date.  JX 106.  In this letter, plaintiff requested an extension of 126 days:  forty-five days for the delay in conducting the postaward kickoff meeting, sixty days related to steel shortages, and twenty-one days to accommodate redesigning the building to add approximately two feet to the building's length and width.  Id.; Tr. 249, 252-53 (Ramsey)

(asserting that plaintiff's request did not relate to the HVAC system or the hydraulic test lab); see also Tr. 2722-24 (Schmitt) (acknowledging that changing the buildings' dimensions would require changing all of the drawings and the redoing the structural calculations). Four days later, Mr. Allen submitted to the contracting office a "request for proposal" to extend the contract completion date by 126 days:  forty-five days for the delay in conducting the postaward kickoff meeting, thirty-five days related to steel shortages, twenty-five days related to "[c]oordination issues in Dec-Feb timeframe," and twenty-one days to accommodate redesigning the building to add approximately two feet to the building's length and width. JX 530.4-.5.  The parties ultimately executed a bilateral contract modification, effective April 15, 2004, that extended the contract completion date by 126 days to October 21, 2004, without indicating the reason or reasons for the extension.[12] JX 3.3-.4; accord Tr. 3176 (Broussard).  By executing the modification, plaintiff released the Coast Guard "from any and all liability under [the] contract for further equitable adjustments attributable to such facts or circumstances giving rise to the proposal for adjustment, including all claims for impacts, delays, and disruptions." JX 3.4.

While plaintiff and the Coast Guard were negotiating the contract modification, Mr. Tempel, on or around April 1, 2004, sent plaintiff preliminary mechanical drawings and a document setting forth the information that he needed to finalize those drawings. JX 100; JX 703.  The drawings reflected, as proposed previously, the use of a 10-ton unit to condition the entire building and a 7.5-ton unit to provide supplemental conditioning for the hydraulic test lab. JX 703.13; Tr. 533 (Tempel); accord id. at 809 (explaining that the April 1, 2004 design was basically the same as the preliminary design, just more detailed).  The requested information included "component nameplate data" and "[c]omponent connection requirements" for various pieces of government-furnished equipment, including the equipment to be placed in the hydraulic test lab. JX 100.2.  Mr. Tempel recognized that the nameplate data and connection requirements would need to be obtained during a site visit. Id.

The Coast Guard received another 100% design submittal from plaintiff on April 5, 2004. JX 113; JX 115.1.  Four days later, before completing its review, the Coast Guard sent plaintiff via electronic mail some "initial comments that need[ed] to be addressed sooner rather than later" because some of the drawings did not conform to the contract specifications. JX 115.1.  For example, Mr. Fedei questioned whether the hydraulic test lab was receiving "excess cooling" given the amount of heat being removed by the chilled water system. Id.; JX 119.53.  In addition, plaintiff did not provide any "HVAC calculations" with its submission. JX 115.1; see also Tr. 2794-95 (Fedei) (indicating that there "was very little change" between this mechanical design and the previously submitted design, and specifically noting that plaintiff had not made any corrections or answered any of the Coast Guard's concerns).  And, the Coast Guard noted that the ceiling clearances in the hydraulic test lab would not accommodate the ducts proposed by plaintiff. JX 115.1; JX 119.53.

---

[12]  According to Mr. Ramsey, who negotiated the contract modification on plaintiff's behalf, the modification did not include an extension of time related to the HVAC system design issues. Tr. 471 (Ramsey).

-18-

Shortly thereafter, on April 13, 2004, the Coast Guard provided plaintiff with a complete set of marked-up drawings. JX 119. The Coast Guard's reviewers placed their names and telephone numbers on the drawings that they reviewed. JX 119.21, .32, .39, .51. The mechanical drawings, which were prepared by Epic, were marked up by Mr. Fedei. JX 119.51-.55; Tr. 827 (Tempel), 2797-98 (Fedei). In the letter accompanying the marked-up drawings, Ms. Hundley noted that the "comments [did] not constitute a change to [the] contract." JX 119.1. She further requested that plaintiff submit a revised project schedule reflecting the newly extended contract completion date. Id. That same date, Mr. Ramsey forwarded the Coast Guard's initial comments to plaintiff's designers, including Mr. Tempel. JX 120.1. Then, on April 19, 2004, Mr. Ramsey provided Mr. Tempel with Mr. Fedei's contact information. JX 125.1. Mr. Tempel did not immediately contact Mr. Fedei. See Tr. 843-44 (Tempel) (indicating that Mr. Tempel did not contact Mr. Fedei until July 2004), 2822 (Fedei) (same).

After additional prompting, JX 133.1, plaintiff sent the Coast Guard a revised project schedule on May 5, 2004, JX 135; JX 136. The Coast Guard deemed the schedule to be incomplete, and relayed this fact to plaintiff during a May 6, 2004 telephone conference. JX 133.1; JX 139. After the conference call, another of the three contracting officers involved with this contract, Cathy Broussard, sent plaintiff a letter warning that plaintiff's "failure to submit a proper progress schedule and failure to perform any work on site was endangering the performance of [the] contract," and that plaintiff had ten days in which to cure the deficiencies. JX 139. Plaintiff responded to the cure letter on May 16, 2004, describing its progress in various aspects of the project. JX 141. It explained that it was "refining [its] construction schedule with suppliers and subcontractors" and would submit the schedule on May 20, 2004. JX 141.2; see also JX 751 (containing a project schedule prepared by plaintiff on May 19, 2004, that projected that the design would be complete by June 23, 2004, and that all work would be complete by October 21, 2004). It further indicated that it had completed the layout of the building and was "coordinating" with the Coast Guard regarding the "the location of existing utilities." JX 141.2. In addition, plaintiff asserted that it planned "to start site work and installation of the building pad" on May 18, 2004, and that, "[o]nce the [f]oundation design [was] revised and approved," it was prepared to install the foundation. Id. But see Jt. Stip. ¶ 36 (reflecting that plaintiff did not install the building pad until August 19, 2004). Finally, it stated that it was "inspecting the existing equipment to be relocated . . . and . . . holding on site discussions with the base personnel to evaluate the impact of the[] planned move[]." JX 141.2.

On June 2, 2004, Mr. Tempel sent an electronic-mail message to Mr. Ramsey and Mr. Schmitt requesting additional information to complete the HVAC system design in light of the Coast Guard's April 9, 2004 initial comments. JX 144.1; see also Tr. 837-39 (Tempel) (explaining that he discussed the Coast Guard's comments with plaintiff before sending the electronic-mail message). In particular, Mr. Tempel requested "detailed cut sheets" of the equipment that would be placed in the hydraulic test lab so that he could "determine the equipment's temperature tolerances and the actual heat gain to the space." JX 144.1. He noted that once he obtained this information, he could "address the ductwork sizes and location[s]," and in the absence of such information, he made certain assumptions regarding the government-

furnished equipment.  Id.  Among Mr. Tempel's assumptions were that "[o]nly one piece of equipment [would] operate at one time," that the 75-horsepower motor would produce a specified amount of heat, and that "[t]he chilled water system [would] compensate for" some of the heat generated by the equipment.  Id.  Mr. Schmitt responded to Mr. Tempel on June 7, 2004, by forwarding a copy of the electronic-mail message that had been sent to Mr. Herald in response to similar questions several months earlier.  JX 147.1; see also JX 57 (containing the forwarded electronic-mail message, which was dated January 23, 2004); JX 70.1 (reflecting that Mr. Tempel had already been advised, on February 20, 2004, that no cut sheets were available for the government-furnished equipment); Tr. 192 (Ramsey) (reflecting that Mr. Ramsey had already been advised, on March 3, 2004, that no cut sheets were available for the government-furnished equipment).

    In the meantime, on June 3, 2004, Mr. Tempel sent revised drawings to Mr. Ramsey, but noted that further revisions might be necessary if his assumptions regarding the hydraulic test lab equipment were incorrect.  JX 145; JX 704; JX 705; see also Tr. 540-41 (Tempel) (indicating that there were no "significant changes" between the revised mechanical drawings and those Mr. Tempel prepared on April 1, 2004).  The following day, plaintiff resubmitted its 100% design drawings–including architectural, HVAC, plumbing, electrical, fire alarm, site, and structural drawings–to the Coast Guard.  JX 146.  The Coast Guard received the drawings on June 7, 2004.  Id.; JX 148.1.  Mr. Fedei reviewed the mechanical drawings and expressed his concerns to Mr. Schmitt and Mr. Allen regarding (1) some of the assumptions made by Mr. Tempel and (2) the evidence suggesting that a site visit to assess the existing equipment was not conducted.  JX 150.1.  In particular, Mr. Fedei indicated that Mr. Tempel incorrectly assumed that the 75-horsepower motor was operating at full capacity and efficiency for long periods of time, and that the chilled water system compensated for some of the heat generated by the motor.  Id.; Tr. 3037-38 (Fedei).

    As reflected in internal electronic-mail messages sent on June 9, 2004, the Coast Guard determined that plaintiff's most recent 100% design submittal was deficient and, therefore, unreviewable.  JX 151; JX 152.  The drawings were not easily readable, JX 148.1, plaintiff did not submit a foundation plan or foundation calculations, JX 151, and there were a number of issues with the HVAC system design, JX 152.1.  With respect to the latter problem, Mr. Fedei noted:

> From a mechanical standpoint it would appear that the HVAC treatment is deficient, as can be discerned from my e-mail of yesterday, but without calculations it is unsure of the extent.  The calculations were apparently not officially required by the spec[ifications].  The area of greatest concern is the Hydraulic test room, which, after looking at the engineer's provided assumptions, I feel may be significantly mistreated.  In addition, none of my previous comments were addressed at this submittal.  With the exception of [three items,] there was little, if anything, done to any other mechanical sheets since the last submittal.

Id.  The Coast Guard advised plaintiff via electronic mail that it needed "readable prints and a correct foundation plan."  JX 151.

Plaintiff submitted another set of 100% design drawings to the Coast Guard on June 10, 2004, consisting of the previously omitted foundation plan and more legible copies of the other drawings.  JX 156.  Mr. Schmitt instructed the Coast Guard reviewers to ascertain whether the drawings were sufficiently complete to allow for a review and, if so, to review the drawings for "'compliance with'" the RFP.  Id.  Mr. Schmitt collected the reviewers' comments and forwarded them to Mr. Allen.  JX 157.  He advised:

> The mechanical design has some significant comments that will require resolution and at least one maybe two more resubmittals will be required before the documents are useable for construction.  Please recommend in your letter of transmittal that K-CON's mechanical engineers contact John Fedei via telephone before they proceed to correct their design.

Id.

The Coast Guard forwarded its comments and a set of marked-up drawings to plaintiff on June 18, 2004.  JX 158.  With respect to the mechanical design, the comments mirrored those made by Mr. Fedei in his internal communications–that some of the assumptions that formed the basis of the design might not be correct, that it appeared that the designers did not conduct the recommended site visit, that the HVAC treatment was deficient, and that the hydraulic test lab appeared to be mistreated.  JX 158.4-.5.  In the letter accompanying the comments, Ms. Hundley heeded Mr. Schmitt's recommendation and informed plaintiff:  "The mechanical design has some significant comments that will require resolution.  Re-submittal of the mechanical design will be required before the documents are useable for construction.  Please ensure your mechanical engineer contacts [Mr. Fedei] before re-submitting the mechanical design."  JX 158.1.  Ms. Hundley also advised plaintiff that it could "proceed with the metal building and foundation construction" and then "[i]ncorporat[e] and correct[] the architectural, mechanical, and electrical drawings . . . while foundation construction is occurring."  Id.; see also JX 164 (clarifying, in a June 23, 2004 electronic-mail message, the June 18, 2004 letter to reflect that plaintiff could proceed with construction unless it took exception to the review comments and that the foundation drawings were required to "be sealed and signed by the designer of record"); cf. Tr. 221-22 (Ramsey) (explaining that "[n]one of the items beyond the mechanical rough-in could be installed until [plaintiff] had a mechanical design" and that the electrical, plumbing, and fire alarm systems could not be completed until the mechanical system was designed), 489-92 (Tempel) (remarking that the mechanical system has to be designed before the electrical system, and that the mechanical design could affect the architectural and structural designs).  Plaintiff forwarded the Coast Guard's letter and comments to Epic on June 21, 2004.  JX 159; see also JX 159.8-.13 (containing Mr. Tempel's notes regarding the Coast Guard's comments).

Work on the job site began on June 29, 2004, when plaintiff's site work subcontractor laid out the building and began excavation.  JX 4.36; JX 168.1; see also JX 169 (reflecting that the work had commenced before the submission of signed and sealed foundation drawings and that therefore, the work was being done at plaintiff's own risk).  In typical metal building construction projects, once excavation is completed, the foundation and slab are poured, the building's structural steel is erected, and the wall and roof panels are installed.  JX 532; Tr. 967-69 (Parker), 1274-75 (Combs), 2436-37 (Schmitt).  Then, the windows and doors are installed (or the openings covered) to make the building weather-tight.  Tr. 223 (Ramsey), 968-70 (Parker).  At this point, contractors can begin work on the interior of the building.  Tr. 967-70 (Parker); accord JX 532; Tr. 223 (Ramsey).  Generally, the HVAC system is installed first due to the large size of the equipment and the ductwork.  Tr. 492 (Tempel), 968-69 (Parker).  After the mechanical, electrical, plumbing, and fire alarm systems are roughed in, the walls can be completed.  JX 532; Tr. 1658-59 (Combs).  The ceilings are completed after the aforementioned systems are fully installed.  JX 532; accord Tr. 968-69 (Parker).  Finally, when the interior is complete, the contractor demobilizes.  JX 532.

Plaintiff "submitted sealed structural foundation drawings to the Coast Guard" on July 6, 2004.  Jt. Stip. ¶ 34.  On July 12, 2004, the Coast Guard accepted those drawings and allowed plaintiff to "proceed with construction."  JX 175.

One day later, plaintiff submitted an RFI to the Coast Guard based on correspondence from Mr. Tempel.  JX 179.  Mr. Tempel had written:

I have spoken with the Coast Guard's mechanical engineer John Fedei to discuss dealing with the heat loads generated from the hydraulic test equipment.  Based on this conversation there are two options that are acceptable to the Coast Guard:

1.  Exhaust the air utilizing hoods and fans to remove heat, and provide a conditioning unit to condition the make up air.  This option could potentially cost a considerable amount more to install and to operate.  It is also out of your original scope of work.

2.  Provide an air conditioning system that is approximately 30% larger than the one serving the existing equipment layout.  This system must also be sized to account for any differences in the new vers[u]s existing building envelope.  This will only partially condition the space, but will satisfy Mr. Fedei.

During conversations while conducting the research it has been brought to my attention that the hydraulic test equipment generates a considerable amount of mist within the room.  This hydraulic mist may be both an environmental and an explosive hazard and may require special design conditions for both the

-22-

mechanical and electrical systems.  It is imperative that this issue be resolved prior to completing the design of the mechanical system, and may require revisions to the electrical system as well.

JX 178.2; JX 179.3; <u>see also</u> Tr. 545-46 (Tempel) (noting that the first option was a different system that would require different equipment and that the second option was what had already been designed).  In light of Mr. Tempel's comments, plaintiff requested, in its RFI, direction on how to deal with the potentially hazardous conditions in its design.  JX 179.2.  Further, in the electronic-mail message containing the RFI, plaintiff noted that "[t]he expanding HVAC requirements [were] impacting [its] design and construction budgets."  JX 179.1.  It therefore requested a contract modification once the Coast Guard "decided which issues it wishe[d] to address and which to ignore."  <u>Id.</u>

Upon reviewing the RFI, Mr. Fedei took exception to Mr. Tempel's letter, writing the following in a July 13, 2004 electronic-mail message to Mr. Allen:

> First, [the relevant contract specification] indicates that K-CON is to provide HVAC to the facilities, and while it indicates the types of equipment that the user would like to see being used, [it] does not in any manner dictate how the spaces are to be treated.  It states that HVAC is to be provided in accordance with [specified] mechanical codes.  [Mr. Tempel's telephone call] yesterday was predicated on his requesting assistance in trying to resolve how to specifically treat the Hydraulic Test room (since he did not do a site visit).  We discussed what knowledge he had of the equipment, how he calculated his loads, and some of the possibilities of obtaining a reasonable treatment of the spaces since he had no real feel for any heat output, etc. of the existing hydraulic equipment, etc. . . .  At no time did I ever indicate that [the two options in his letter] were the only options acceptable . . . .  I was trying to help him resolve a situation which he was not prepared to handle, but was not directing how it was to be done.  The [relevant contract specification] clearly gives him the latitude to do it [with] other means, as long as it meets [the specified industry] standards.

JX 180.  Ultimately, a conference call was scheduled for July 20, 2004, for plaintiff and the Coast Guard to discuss the RFI.  JX 181.2; JX 183.

The conference call occurred as scheduled, after which plaintiff sent an electronic-mail message to the Coast Guard containing its summary of the participants' discussion.  JX 186.  It described the conversation regarding the heat load of the hydraulic test equipment as follows:

> During our phone conference we discussed the design of the HVAC system for room 106.  It is known our current and originally proposed and budgeted design will not work efficiently within this room.  Additional calculations were conducted on room 106 due to the amount of heat generated by

the 75hp motor and 25hp motor.  After conducting those calculations our mechanical engineering group submitted two options that may be acceptable to the Coast Guard.  As it was discussed both of those options are not inclusive of K-Con's original budgeted design nor our proposal based on the RFP documents received by the [Coast Guard].  It was discussed that K-Con needs an accurate operating schedule to correctly design the HVAC tonnage for room 106.  We were told a more accurate schedule would be provided by Monday the 26th of next week.  Once this information is received we will reevaluate the design and submit for final approval and/or a cost or no cost [change order].

We also discussed the amount of hydraulic fluid that is being improperly released from the existing equipment and creating a fine mist that is currently choking the existing HVAC system.  This information was provided to our mechanical engineer by on site personnel/operators.  K-Con is requesting that the existing test equipment is repaired prior to the install of the new equipment or a letter is received from contracting releasing K-Con and the HVAC manufacturer from any warranty claims to the hydraulic mist within room 106.

Id.; see also JX 178.2 (containing Mr. Tempel's handwritten note that the Coast Guard advised plaintiff during the conference call that it would not be required to make any adjustments related to the hydraulic mist); JX 188 (containing another participant's notes regarding the size of the HVAC system).  But see JX 44.1-.2 (reflecting that the Coast Guard advised plaintiff on January 7, 2004, to contact the AR&SC to obtain the government-furnished equipment's normal operating parameters).  Plaintiff also noted in its electronic-mail message that it had sent its 100% design package to the Coast Guard earlier that day.  JX 186; accord JX 191 (indicating that plaintiff sent the Coast Guard civil, architectural, structural, electrical, HVAC, plumbing, and fire alarm drawings, along with a fire sprinkler layout and plans for the prefabricated metal building); see also Tr. 869-70, 872 (Tempel) (indicating that the mechanical design was essentially the same as the prior mechanical designs), 872-75 (representing that at this point in time, Mr. Tempel did not believe that obtaining the operating schedule of the equipment to be placed in the hydraulic test lab would affect the design because (1) the Coast Guard had expressed its willingness to accept a heat pump and air handler unit that was 30% or 50% larger than the existing unit, and (2) everyone "understood that the conditions in the RFP couldn't be met").

After the conference call, Mr. Schmitt gathered the information related to the operating schedule of the equipment in the hydraulic test lab from Mr. Goodwin at the AR&SC.  JX 189; JX 202.  Mr. Schmitt explained to Mr. Goodwin that plaintiff "[had] been making some wrong assumptions and gathered some erroneous (we think) information regarding the hydraulic test lab equipment operating times."  JX 189.1.  Mr. Goodwin provided the requested information two days later.[13]  JX 202.1-.2.  In addition to noting the equipment's operating frequency and

---

[13]  Upon receiving the collected information, Mr. Schmitt remarked to Mr. Goodwin: "[I]t looks as though we will be having a problem trying to cool this room with reasonably sized

duration, Mr. Goodwin indicated that "[t]he HTS-25 [sic] and the HPTS-1000 run at the same time, about twice a month, @ a 2 hour duration."  JX 202.2.

The Coast Guard also reviewed plaintiff's most recent 100% design package–received on July 14 and July 21, 2004–and prepared a list of comments.  JX 205.2-.5.  Relevant to the hydraulic test lab's HVAC system, it noted:

- "Basically a repeat of the same concern that the HVAC coverage of the Hydraulic test lab needs to be re-assessed to determine more accurate heat dissipation loads and means of <u>efficiently</u> treating the area of concern."

- "Need a return line to AHU-2 from the hydraulic test room.  Due to heat, and possibly some slight odor build up in the room, would also recommend that the test room be under a slight negative pressure to help maintain comfort odors in the surrounding areas."

- "Any hydraulic misting occurring within the test room is a result of equipment problems (leaking hose or fittings, etc.) which is a maintenance problem that [the AR&SC] needs to address.  It is not an item of concern for the designer as it is not a normal condition that should be occurring during the test operations."

JX 205.3.  The Coast Guard forwarded its comments to plaintiff on July 23, 2004.  JX 205.1.  In the letter accompanying the comments, the third contracting officer involved with the contract, Victoria W. Worrell, noted that the Coast Guard had completed its review of plaintiff's 100% design "with the exception of the HVAC system."  <u>Id.</u>  She further stated:

> The HVAC system has some outstanding issues related to the hydraulic test lab that require resolution, and re-submittal of the mechanical design will be required before the documents are useable for construction.  We feel that the resolution of these issues is ultimately K-CON's responsibility, but we want to assist in every way we can to resolve the "real" design requirements.  Therefore, our mechanical reviewer, Mr. John Fedei, has contacted the building user to request information regarding the operating parameters of the various pieces of test equipment.  We expect that a meeting at the site or, at the very minimum, a conference call will be required to resolve these issues.

<u>Id.</u>; <u>see also</u> Tr. 2829 (Fedei) (remarking, with respect to the importance of a site visit, that "[i]t would have been beneficial for [everyone] to take a look at the equipment and discuss the

---

equipment."  JX 202.1.  However, Mr. Fedei disagreed, testifying during trial that he could design an HVAC system for the hydraulic test lab that used reasonable sized equipment.  Tr. 3045-46 (Fedei).

parameters . . . and work out [the] differences or . . . come up with a consensus [regarding] a pragmatic approach to the design of this project" and that it "would have given [Mr. Tempel] an opportunity to see the equipment firsthand . . . so he could see why his assumption was incorrect"). Then, after emphasizing that the Coast Guard's comments were not to be considered changes to the contract, Ms. Worrell indicated that once plaintiff had incorporated the Coast Guard's comments and submitted its final design, it could "proceed with all work other than that related to the HVAC system," and that once the design requirements of the HVAC system were resolved, the mechanical drawings could be incorporated into the final design. JX 205.1; accord Tr. 2738-40 (Schmitt) (indicating that plaintiff was permitted to do everything but install the HVAC system and that if there were any problems as a result allowing plaintiff to proceed in this manner, the Coast Guard would bear responsibility); see also Tr. 1320 (Combs) (noting that "things related to the HVAC system could be electrical, . . . architectural, [or] structural even").

On July 28, 2004, Mr. Schmitt forwarded the information that he received from Mr. Goodwin regarding the operating schedule of the equipment in the hydraulic test lab to plaintiff's new project manager, Butch Clayton.[14] JX 212. The following day, Mr. Clayton forwarded the information to Mr. Tempel, JX 260.1, and plaintiff and the Coast Guard agreed to conduct a conference call–to also include Mr. Tempel–on July 30, 2004, to discuss the HVAC system design, JX 212.1. The conference call was apparently rescheduled for August 2, 2004, JX 217.3, but on that date, Mr. Allen advised plaintiff that the Coast Guard would "need to defer [the] phone call . . . until another date, perhaps after the proposed mod[ification] is forwarded," JX 217.2. The proposed modification referenced by Mr. Allen related to the Coast Guard's decision to "'build-out' as much of the undeveloped space in the new [building] as [it could] within" its budget. JX 153.1. Indeed, on August 3, 2004, the Coast Guard requested that plaintiff "[p]rovide design and construction documents to expand building first floor build-out, add on elevator and add rooms on second floor . . . ." JX 219.1; accord JX 220; see also Tr. 2632 (Schmitt) (characterizing the proposed modification as requiring "considerable interior work" that included "HVAC work"). Plaintiff submitted its proposal to the Coast Guard on September 8, 2004. JX 244.2. The Coast Guard decided not to accept it, JX 244; JX 245; JX 246, and so informed plaintiff by telephone on September 9, 2004, JX 248. After the telephone call, plaintiff's president, Patrick Kiernan, sent an electronic-mail message to the Coast Guard reflecting plaintiff's ongoing frustration:

> I may add (as I have verbally and in writing previously), we have 50 or so projects going nationwide. Most of our projects are running quite smoothly with a partnership mentality among government-customer, K-Con and sub/suppliers. When a customer in that scenario asks for an RFP, the design/builder (and/or sub/suppliers) doesn't have to spend extra hours and days making sure they cover or exclude in writing all the 'snares'. Unfortunately, our short relationship with [the Coast Guard] involving [projects in Elizabeth City, St. Petersburg, Florida, and Port Huron, Michigan] has proven to be not only painful, but a far cry from

---

[14] Mr. Clayton replaced Mr. Ramsey on July 21, 2004. Tr. 268, 272, 431 (Ramsey).

profitable.  Since we and our sub/suppliers are "for profit" organizations in a free enterprise system, this relationship has been less than "win-win", therefore, a failure to date.

Id.; accord JX 93.1 (containing the following March 18, 2004 meeting agenda note by Mr. Allen: "Apparently, level of design greater than KCon 'used to'"); JX 315.1 (including the following complaint from Mr. Clayton in an October 13, 2004 electronic-mail message:  "[W]e are trying to work with you but the email below is an excellent example of a government caused delay.  If [the Coast Guard] would stop causing these types of delays and allow this project to be built as originally proposed 'Design/Build' the process would be much smoother.  You reference spec[ification] sections within your contract that are clearly pertaining to a bid/spec/build project and not a design build project."); Tr. 1271-72 (Combs) (stating that plaintiff's experience with contracting with the federal government has been "greatly successful," that plaintiff has had "just great relationships all over the country," and that plaintiff had only been assessed liquidated damages on four projects–the three Coast Guard projects and a project for the United States Navy); see also JX 369.1 (containing a November 30, 2004 remark from plaintiff that "[t]his is once again evidence of the [Coast Guard's] unjust[] tactics to only enrich themselves at the cost of others"); JX 374 (containing an electronic-mail exchange between plaintiff and the Coast Guard from November and December 2004 reflecting plaintiff's displeasure with how it was being treated by the Coast Guard and the Coast Guard's dissatisfaction with plaintiff's performance).

Meanwhile, plaintiff "installed the main floor concrete slab . . . on August 19, 2004," Jt. Stip. ¶ 36, and began to erect the building's steel structure on August 24, 2004, JX 4.92; JX 742. A bilateral contract modification, effective September 9, 2004, increased the contract price, for the final time, to $551,155.35.  JX 3.7-.8.

As of September 10, 2004, the issues with the hydraulic test lab's HVAC system had not been resolved.[15]  JX 253.1.  As a result, Mr. Schmitt advised Mr. Allen that the Coast Guard

---

[15]  Most of the evidence in the trial record suggests that the delay related to the proposed contract modification.  For example, in a September 10, 2004 electronic-mail message, Mr. Schmitt speculated that plaintiff was "waiting to see what happened with the build-out mod[ification] before [it] attempted to finish the design."  JX 253.1.  In another electronic-mail message on that same date, Mr. Fedei noted that the proposed contract modification would include funding for a field visit by plaintiff's mechanical engineer, and that "[a]pparently everyone [had] been waiting to see what was going to transpire with that proposal."  Id.  And, Eric Combs, plaintiff's chief operating officer, testified that the proposed contract modification would have affected many of the drawings and that it would not be a good idea to continue certain work when the customer "was asking you to price in another whole direction."  Tr. 1322-23 (Combs).  However, Mr. Fedei testified that while the proposed contract modification might have affected the drawings, the HVAC system for the hydraulic test lab "was a stand-alone system and could have been corrected or looked at further at this stage without stopping the

needed to "arrange a conference call" to consult with plaintiff regarding the operating schedule of the hydraulic test equipment and how to best condition the hydraulic test lab because without this information, plaintiff could not "finalize" its design.  Id.  Subsequently, in a September 13, 2004 electronic-mail message regarding setting up the conference call, Mr. Clayton included a comment regarding the HVAC system:  "The amount of tonnage currently designed is based on the [request for quotations].  Any additional tonnage or change in design . . . may result in additional cost and time which will require [a request for quotations] from contracting."  JX 259.1.  Later that same day, Mr. Clayton sent an electronic-mail message to Mr. Tempel requesting that Mr. Tempel review the equipment operating information previously supplied by the Coast Guard on July 28, 2004, verify his design, and provide "confirming loads" by the end of the week.  JX 260.1.

Also on September 13, 2004, plaintiff sent the Coast Guard another set of 100% design drawings, JX 255, which the Coast Guard received on September 16, 2004, JX 268.1.  Coast Guard personnel exchanged several electronic-mail messages regarding these drawings.  JX 268; JX 271.  Mr. Schmitt noted that "from an HVAC standpoint, the documents [did] not address[] previous concerns and comments."  JX 268.1; see also Tr. 883-84 (Tempel) (indicating that Mr. Tempel had not provided plaintiff with new drawings for this submittal).  And, Mr. Fedei wrote:

> The Mechanical 100% submittal is REJECTED.  I know that there are questions concerning the HVAC loading in the hydraulic room for which we are waiting the calculations . . . to help address our concerns, but none of the other issues that have been addressed in past reviews have been addressed on the 100% drawings to date.  I am not accepting any of the mechanical[] drawing efforts at this point. There are potential code violations, and notes of none [sic] responsibility, proper damper locations, etc. that need to be addressed.

JX 271.2.

Mr. Tempel responded to Mr. Clayton's request on September 20, 2004.  JX 276.  In his letter, he described his previous conversation with Mr. Fedei and the two options that were purportedly acceptable to the Coast Guard:  (1) "exhausting the air utilizing hoods and fans" and (2) "[p]rovid[ing] an air conditioning system that [was] approximately 30% larger than the one serving the existing equipment layout."  JX 276.2.  Mr. Tempel then wrote:

> We have been instructed to design utilizing the parameters defined by the scope of work, which require us to design around split system heat pumps.  The current design meets these parameters and complies with design option 2.  The

---

design process."  Id. at 3048-49 (Fedei); see also id. at 3131 (Broussard) (testifying that an RFP "does not stop work . . . on the contract . . . because nobody at the time this RFP is issued knows whether or not we're actually going to do something").

unit capacity we specified is actually 50% larger than the one serving the existing equipment layout, which coincides with a commercially available unit size.

I have recalculated the air conditioning loads to incorporate the most recent comments . . . .

. . . .

There is still a question regarding the operating schedule.  Please verify that only one piece of equipment operates at a time, never two or more.[16]

The worst-case design heat load remains equipment HS-25 with the 75 horsepower electric motor.[17]  It does not appear that the space can be sub-cooled enough to account for the heat generated by this piece of equipment.  We are aware that a 5-ton cooling capacity unit services the existing hydraulic test room, and there are no serious operational problems.  However, the building occupant complained that during operation the area gets hot.  Installing a 7.5-ton unit will provide more conditioning to the new space than is presently installed in the existing space, but will not satisfy the calculated heat load generated by the equipment.  Our calculations indicate that a 20-ton unit would be needed to fully condition the space.  However, as a practical matter we feel that a 7.5-ton unit will be acceptable since it provides 50% more cooling capacity than the existing facility has and since the building envelope's heat gain is insignificant.  This 7.5-ton unit will not provide comfort conditioning when the equipment operates, but maintaining comfortable conditions in the space may not be the best practical solution.

JX 276.2-.3 (footnotes added); see also Tr. 554-55, 557-58 (Tempel) (explaining that the calculations supporting the use of a 20-ton unit were based on (1) the worst-case scenario for the amount of heat that would be rejected into the room by the 75-horsepower motor and (2) the assumption that the chiller would not "compensate for any of the heat that was rejected"), 2839-40 (Fedei) (remarking that providing a 7.5-ton unit where a 20-ton unit is needed to adequately condition the space would result in "sky high" temperatures and "a lot of heat stress on the

---

[16]  The basis for this request is unclear; in the information that Mr. Clayton forwarded to Mr. Tempel, the Coast Guard indicated that two pieces of equipment–the HPTS-1000 and the HS-25–were operated simultaneously, twice per month for two hours at a time.  JX 276.5; see also Tr. 887 (Tempel) (indicating that Mr. Tempel was unsure why he made this request after receiving the information).

[17]  The Coast Guard indicated that this piece of equipment was operated "5 hours a day, two consecutive days, twice a month."  JX 275.5.

personnel working in" the space), 3077 (stating that it was incorrect to use the tonnage of the unit in the existing hydraulic test lab as a baseline because there was no way to know whether the existing unit was properly sized when it was installed).  Plaintiff forwarded Mr. Tempel's calculations to the Coast Guard the following day.  JX 277.

Coast Guard personnel reviewed the information and calculations provided by Mr. Tempel to determine how to proceed with respect to the HVAC system for the hydraulic test lab. JX 282.1; JX 289; JX 292.  Mr. Fedei provided his recommendation to his colleagues in an attachment to a September 27, 2004 electronic-mail message:

> The recommendation . . . would be to install two 5-ton units with one unit to handle the initial loading and the second to come on as needed to supplement.  It is also recommended that, since this is still much less cooling than calculations show is needed and that the equipment is essentially cooled by their own chilled water system, the distribution of the air should be concentrated in the areas of operator needs (center of the test lab) and be dissipated via high velocity down throw or slot diffusers to provide, in effect, evaporative cooling for the operators. [In essence a spot cooling system utilizing conditioned, in lieu of non-conditioned, air.]  Return/exhaust should be from over the backside of the equipment.  Pre-cooling could still help most scenarios and can be determined by the users as to when best utilized.

JX 289.3 (brackets in original).  In response to Mr. Fedei's message, Mr. Schmitt asked whether making such a recommendation would constitute taking responsibility for the design and whether the Coast Guard would be responsible for paying for the second unit.  JX 289.1.  He further commented:  "I would, as I am sure you would, love for us to put this issue to rest, and maybe the best way to do that is to 'tell them' what we will accept (want)."  Id.  Then, in a September 28, 2004 electronic-mail message, Mr. Schmitt suggested to Mr. Fedei that the Coast Guard allow plaintiff the option to install a 7.5 ton unit.  JX 292.

In the meantime, on September 20, 2004, plaintiff sent an updated project schedule to the Coast Guard indicating a completion date of December 8, 2004, forty-three days beyond the then-contract completion date of October 26, 2004.  JX 272.1, .6.  Ms. Broussard noted the discrepancy in a September 22, 2004 letter, but stated that it was in the Coast Guard's best interest to forbear from terminating the contract for default.  JX 280.  She further advised plaintiff that the Coast Guard intended to "assess[] liquidated damages in the amount of $551.00 per day, for every day beyond October 26, 2004 until all work is complete and beneficial occupancy has occurred."  Id.

On September 30, 2004, the Coast Guard sent plaintiff its review comments on the 100% design submittal it received on September 16, 2004.  JX 295.  In the letter accompanying the comments, Ms. Hundley wrote:

We do not find the proposed mechanical system for the Test Lab acceptable. Attached is a recommendation of how to provide proper space conditioning in the Hydraulic Lab.[18] In addition, attached are our previous and new review comments, plus marked-up drawings. Please return the review comments by noting action taken on the comments. Please resubmit a corrected design.

We do not consider the review comments to constitute a change to our contract.

JX 295.3 (footnote added). In the attached document, the Coast Guard noted that "[a]fter many discussions and submittals concerning the subject lab, its operations, and equipment heat loads, there [was] still an impasse as to a reasonable, effective, energy efficient way of treating the lab." JX 295.4. It therefore provided:

In an effort to preclude any further delays and to provide an effective, energy conscious system for the laboratory and its occupants[, the Coast Guard] requests the following design efforts and installation be accomplished:

- Provide an exhaust system routed from the top of the motor directly to the weather enshrouding the area above the motor as effectively as possible. In addition, provide a matching unconditioned supply system routed directly from the weather to the vicinity of the bottom of the motor. Provide motorized dampers to secure the ventilation systems when this piece of equipment is not being utilized with a disconnect switch labeled and mounted near the controls of this equipment.

- Provide either two split system heat pumps (initial estimate to be 5 ton units each) or a 7.5 ton split system to condition the lab, allowing for approximately 20% radiation and inefficiency in the ventilation system around the motor. If two units are used they shall be staged so that the second heat pump comes on only when the first unit is unable to satisfy the loads.

---

[18] Although Ms. Hundley characterized the contents of the attached document as a "recommendation," JX 295.3, the Coast Guard, in the attached document, provided that it was "request[ing]" that plaintiff "accomplish[]" the specified "design efforts and installation," JX 295.4. During trial, there was conflicting testimony regarding whether the Coast Guard presented plaintiff with a recommendation or a directive. Compare Tr. 3160, 3162 (Broussard) (indicating that the Coast Guard made a recommendation), with id. at 959 (Tempel) (indicating that Mr. Tempel considered the Coast Guard's proposal to be a "requirement" or "direction" rather than a "recommendation"), and id. at 1329 (Combs) ("It looks like they're laying out some directives . . . for treating the hydraulic lab design. . . . [T]hey were telling us how to design the HVAC system.").

- Air distribution is to be provided in the middle core of the lab where the occupants are expected to be working during operations. The distribution shall be installed utilizing fairly high velocity diffusers (such as slot diffusers or registers) that will concentrate the throw down in the vicinity of the workers (not on the equipment per se) with the return ducts over the backside of the equipment so as to draw the warmer air away from the occupants and back to the coil(s).

- Controls shall allow pre-cooling of the space prior to equipment operation at the discretion of the occupants.

Id.; cf. Tr. 561-63, 565-66 (Tempel) (indicating that the Coast Guard's suggested design did not comply with the requirements set forth in the contract specifications).

Mr. Clayton forwarded the Coast Guard's comments and recommendation to Mr. Tempel, and Mr. Tempel responded to Mr. Clayton on October 5, 2004. JX 298. Mr. Tempel advised Mr. Clayton that Epic would design the HVAC system as plaintiff directed. JX 298.1. He further indicated, in response to the second bulleted point of the Coast Guard's recommendation, that Epic's preference was to use two five-ton units and that it had previously recommended such an approach, but was "instructed to design to scope of work." JX 298.2. According to Mr. Tempel, adopting the Coast Guard's recommended approach would take two to four weeks, Tr. 893-94, 959 (Tempel), and the proposed system would not be Underwriters Laboratories-approved, id. at 559, 856.

Plaintiff eventually decided to design the HVAC system recommended by the Coast Guard. JX 329. On October 18, 2004, Mr. Clayton advised the Coast Guard that a new mechanical design was "underway" and would be delivered in four days. JX 327.1. However, he did not request a new design from Mr. Tempel until the following day. JX 329.1. Specifically, he requested that Mr. Tempel design an HVAC system for the hydraulic test lab that used two units, "[m]ost likely one being a 7 1/2 ton and the other a 5 ton," and stated that plaintiff would pass the increased cost on to the Coast Guard. Id.; see also JX 302 (indicating that Mr. Clayton advised the Coast Guard on October 6, 2004, that he would "submit the costs for the mechanical system upgrades to [the Coast Guard] by October 8, 2004").

Plaintiff did not provide a new mechanical design to the Coast Guard within the four days it promised. Indeed, on October 28, 2004, Mr. Tempel sent the following electronic-mail message to Mr. Clayton:

We are designing the HVAC system serving the hydraulic test lab utilizing one 5 ton split system heat pump[] and one 5 ton air conditioner. We are proceeding with the design utilizing linear slot diffusers as directed by the government. This will direct the air downward toward the occupants, however,

-32-

> air will also be directed over the equipment too.  There is no way to avoid this.  It
> is imperative that the government be aware that the air within the hydraulic test
> lab will be extremely drafty and may cause undesirable conditions.  Please let me
> know if you have any questions.

JX 342.2.  Mr. Clayton forwarded this message to the Coast Guard, JX 342, and Mr. Fedei
provided the following response:

> The whole idea of "spot cooling" is to put high velocity air in localities
> where the personnel are working, and it would not be effective cooling if it did not
> appear drafty.  Naturally some of the air will disperse over the equipment, and that
> is acceptable.  This e-mail does not address what the mechanical [engineer]
> intends to do to remove the heat from the 75-HP motor, and without the removal
> of this heat by separate venting, the 5 ton unit will not be effective in cooling the
> space or the occupants.

JX 342.1.  Mr. Tempel completed the new mechanical drawings on November 16, 2004.  JX
707.14-.19.  The design reflected in these drawings was not significantly changed thereafter.  Tr.
907 (Tempel).

While continuing to work on the new HVAC system design, plaintiff, on October 15,
2004, sent the Coast Guard an updated project schedule that indicated a revised contract
completion date of December 20, 2004.  JX 321; JX 324.  Approximately one month later, on
November 17, 2004, plaintiff began to install the building's wall panels and insulation.  JX
4.207; JX 742.  However, plaintiff's progress on the project continued to be hampered by a
number of issues; in a November 18, 2004 letter to plaintiff, Ms. Broussard wrote:

> You have . . . failed to submit the final design documents as required by [the
> relevant contract specification].  You are reminded that any mechanical, electrical,
> and architectural work that is completed prior to an approved design will be at
> your own risk.  Also you[r] recent daily reports have shown little or no
> construction activity.  Liquidated damages of $511.00 [sic] a day beyond the
> current contract completion date of October 26, 2004 will continue to be
> [assessed] until Government acceptance of the completed project.

JX 354; accord JX 373.1 (noting that plaintiff had not submitted the final design by November
30, 2004, and reiterating the consequences of proceeding with construction in the absence of a
final design and of working beyond the contract completion date).  Indeed, that same day, the
Coast Guard notified plaintiff that it had received plaintiff's invoice for the period ending
October 31, 2004, that it was authorized to make a progress payment to plaintiff, and that it was

withholding liquidated damages in the amount of $2555 from that payment for the five days of work performed beyond the October 25, 2004 contract completion date.[19]  JX 719.2, .4.

Ms. Broussard sent plaintiff another letter on December 1, 2004, in which she advised that plaintiff's failure to submit its final design "[might] be considered a material [breach] of the contract" and that the Coast Guard "[might] choose to Terminate for Default."  JX 377.2; see also JX 383.1 (indicating, in an internal electronic-mail message dated December 7, 2004, that the Coast Guard planned to discuss its options for terminating its contract with plaintiff for default).  Ms. Broussard forwarded a copy of this letter to the contracting officer for plaintiff's Federal Supply Schedule contract that same day.  JX 377.1; JX 720; see also JX 720.1-.2 (reflecting that on January 6, 2005, the GSA contracting officer referred Ms. Broussard to the then-current FAR subpart 8.4, Federal Supply Schedules, for guidance, and specifically quoted FAR 8.406-4, Termination for Cause, and FAR 8.406-6, Disputes[20]); JX 720.1 (indicating that

---

[19]  According to handwritten notations on the invoice, the amount of withheld liquidated damages was calculated by multiplying five days by $511.  JX 719.4.  It is unclear why the Coast Guard used a liquidated damages rate of $511 per day when the contract provided for a liquidated damages rate of $551 per day.  See JX 1.30.

[20]  The GSA contracting officer did not refer Ms. Broussard to the relevant portions of plaintiff's Federal Supply Schedule contract.  See JX 720.  Moreover, the version of FAR subpart 8.4 referenced by the GSA contracting officer was not in effect when plaintiff executed its Federal Supply Schedule contract in April 2001 or when the Coast Guard placed an order under plaintiff's Federal Supply Schedule contract in September 2003.  Indeed, at the time that plaintiff entered into the two contracts, FAR subpart 8.4 did not contain sections 8.406-4 or 8.406-6; those provisions were added when FAR subpart 8.4 was revised in July 2004.  Rather, the relevant sections in effect when plaintiff contracted with the GSA and the Coast Guard were FAR 8.405-5, Termination for Default, and FAR 8.405-7, Disputes.  The former section provided:

> (1)  An ordering office may terminate any one or more orders for default in accordance with Part 49, Termination of Contracts.  The schedule contracting office shall be notified of all cases where an ordering office has declared a Federal Supply Schedule contractor in default or fraud is suspected.

> (2)  Should the contractor claim that the failure was excusable, the ordering office shall promptly refer the matter to the schedule contracting office.  In the absence of a decision by the schedule contracting office (or by the head of the schedule contracting agency, on appeal) excusing the failure, the ordering office may charge the contractor with excess costs resulting from repurchase.

FAR 8.405-5(a) (Mar. 4, 1999).  And, the latter section provided–depending on which version was applicable–either that "[t]he ordering office shall refer all unresolved disputes under orders

Ms. Broussard forwarded prior correspondence, and would forward future correspondence, related to the Coast Guard's issues with plaintiff to the GSA contracting officer).

The Coast Guard received another set of 100% design documents, including an updated mechanical design, from plaintiff on December 2, 2004, JX 359; JX 387.5; JX 707; in plaintiff's November 22, 2004 transmittal letter, Mr. Clayton represented that the mechanical design was "not inclusive of [plaintiff's] proposal" and, if the design was accepted, plaintiff would provide the Coast Guard with its cost, JX 359.  Mr. Fedei reviewed the mechanical design and then forwarded his comments to Mr. Schmitt and Mr. Allen on December 8, 2004.  JX 387.  He indicated that most of his "major comments deal[t] with the hood systems" and that his comments might change if Mr. Allen determined during a site visit that the proposed design would work.  JX 387.1.  Mr. Schmitt also reviewed the mechanical design and provided comments.  JX 391.1.  He noted that he had discussed plaintiff's request for "additional compensation for hoods and exhausting of the lab equipment motors" with Mr. Fedei, and that Mr. Fedei opined that such compensation was not warranted because "[b]y removing the heat given off by the motors, [plaintiff was] able to reduce the HVAC equipment sizes," making it "a 'wash' or even a cost savings."  Id.  The Coast Guard's "preliminary review comments" were forwarded to plaintiff via electronic mail on December 9, 2004.  JX 388.1.  These comments included some required changes to the mechanical drawings.  JX 385.5-.7.

That same day, after a progress meeting, JX 389, Ms. Broussard sent plaintiff a show cause letter,[21] noting that plaintiff "failed to provide the final design documents within a time frame that would allow [it] to complete . . . construction [of the] Component Repair Shop . . . by the contract completion date" and "failed to provide adequate manpower to complete the construction by the completion date . . . ."  JX 390.  Consequently, Ms. Broussard stated, the Coast Guard was considering terminating the contract for default.  Id.  She advised plaintiff that it had ten days "to present, in writing, any facts bearing on" whether its "failure to perform arose out of causes beyond [its] control and without fault or negligence on [its] part."  Id.  Plaintiff received the show cause letter on December 15, 2004, and responded on December 22, 2004.  JX 402.1.  It asserted, as it had in the past, that the Coast Guard contract requirements differed materially from the standard GSA design-build requirements.  Id.  Specifically, it stated:

---

to the schedule contracting office for action under the Disputes clause of the contract," FAR 8.405-7 (Mar. 4, 1999), or that "the ordering office contracting officer" could issue final decisions on disputes or refer disputes to the "schedule contracting officer," FAR 8.405-7(a) (July 29, 2002).

    [21] A "show cause [letter] is normally considered a little more severe than a cure letter." Tr. 3135 (Broussard); accord id. ("Cure notices are used more frequently . . . to . . . get the contractor's attention whereas a show cause letter really is viewed as . . . severe, things are really not very good.").  It "is typically looked at as a step prior to actually executing a termination for default . . . ."  Id.

Proposal Phase

This project was originally proposed using standard GSA Design/Build guidelines and requirements. All information provided within our proposal was based on information obtained within the RFP . . . .

Design Phase

The [Coast Guard] contract requirements differ materially from the standard GSA Design-Build requirements and guidelines. In complying with your engineering package we discovered that full design is really what you were requiring. This required more time. . . . Design also required more site investigation than originally estimated. Initially K-Con, Inc tried to implement the design process with utilizing owner provided information and / or through a series of RFI type emails. This proved to be unsatisfactory. Our design budget was based on this approach and was value passed on to the owner in the bid price. Visiting and reviewing existing systems did not clarify our concern, but to the contrary showed there were existing inoperable equipment, undersized systems and in general "not standard installations" that we were and are asked to mimic. During our visits it was brought to our attention there was additional equipment not known at bid time that had to be reviewed and questioned as to status. Requests for this information on owner furnished equipment was incomplete. This caused mechanical and electrical designs to be delayed in addition the existing equipment is of the type and age that has no documentation. This forced us to submit new [RFIs and] create new designs which as a whole created confusion and frustration not only with [the Coast Guard] but with K-Con as well.

Construction Phase

The delays which have occurred within the construction phase are due to various reasons. Many of those reasons are beyond the control of K-Con. Obviously one of the reasons was due to design delays and problems which resulted in construction delays. Working with [the Coast Guard] we were able to overcome some issues but others were reoccurring due to lack of communication or just not being able to communicate and come to a mutual agreement that would benefit everyone involved. . . . K-Con is completely aware of the delays which have occurred and it is our full intent to complete this project within an agreed upon duration. In doing so it is critical that all parties involve[d] come to a mutual agreement to discuss all issues openly with our end user in mind. As stated above K-Con has a good working relationship with the US Coast Guard and it is our goal to maintain that relationship.

JX 402.1-.2.  Plaintiff also represented that its subcontractors would resume work on January 3, 2005.  JX 402.2.

Plaintiff's response to the show cause letter was not well received by the Coast Guard. For example, in internal electronic-mail messages dated January 3, 2005, Mr. Allen stated that plaintiff "still [did not] address when [it] intend[ed] to complete or provide [the] design," and the Coast Guard's project execution team leader wrote:

- All the delays and problems with this contractor originated with [its] failure to adhere to the contract requirements specifically as [they] relate[] to the Design-Build process.  K-Con has a distorted vision of the process which does not conform in any way, shape, or form to the construction industry standards for design-build contracts.

        . . . .

- K-Con would like all to believe (1) that there was miscommunication along the way (which caused the delays) and (2) that they have a good working relationship with the Coast Guard.  These two could not be any further from the truth.

JX 405.1.  Thus, that same day, Mr. Allen advised plaintiff that the Coast Guard considered the response "inadequate" and requested "a reasonable schedule of project completion."  JX 406. Plaintiff responded "that it would provide a revised schedule by January 6, 2005," and that it was its "full intent to complete all remaining work as quickly as possible for the benefit of [the] end user."  Id.; accord Jt. Stip. ¶ 42.

Meanwhile, on December 23, 2004, the Coast Guard notified plaintiff that it had received plaintiff's invoice for work performed through November 30, 2004, that it was authorized to make a progress payment to plaintiff, and that it was withholding liquidated damages in the amount of $7665 from that payment for the work performed beyond the contract completion date.[22]  JX 403.1, .3.

_____

[22]  Although the Coast Guard had not yet executed the contract modification that extended the contract completion date from October 26, 2004, to November 9, 2004, see JX 3.9-.10, it calculated the liquidated damages to be withheld as if it had executed the modification, JX 403.3. According to handwritten notations on the invoice, the Coast Guard determined that plaintiff should be assessed liquidated damages for twenty days in November 2004 (although performance was actually overdue for twenty-one days–November 10, 2004, through and including November 30, 2004), and then credited for the five days of liquidated damages that it had previously assessed for October 2004.  Id.  The Coast Guard therefore calculated the liquidated damages to be withheld by multiplying fifteen days by $511.  Id.  It is unclear why the Coast Guard used a liquidated damages rate of $511 per day when the contract provided for a liquidated damages rate

Plaintiff's subcontractors resumed work in January 2005.  JX 4.266-.272.  On January 2, 2005, the Coast Guard executed a bilateral contract modification, effective November 10, 2004, that extended the contract completion date, for a final time, to November 9, 2004.  JX 3.9-.10.  Three days later, plaintiff submitted a revised project schedule to the Coast Guard that reflected an anticipated completion date of April 26, 2005.  Jt. Stip. ¶ 43.  Then, on January 12, 2005, plaintiff and the Coast Guard held a progress meeting.  JX 417.  During the meeting, Mr. Clayton represented that plaintiff would submit another set of drawings to the Coast Guard by January 21, 2005, and would endeavor to "closely monitor" the schedule.  JX 417.4.  That same day, the Coast Guard sent plaintiff another forbearance letter indicating that liquidated damages would continue to be assessed at the rate of $551 per day "until all work [was] complete and beneficial occupancy . . . occurred."  JX 415.1.

Plaintiff finished installing the wall panels and insulation on January 12, 2005.  JX 424.1.  Five days later, it began preparations for installing the roof, JX 4.281, and started the electrical, mechanical, and plumbing rough-ins, JX 424.2.  However, despite Mr. Clayton's representation, plaintiff did not submit a revised set of drawings to the Coast Guard by January 21, 2005.  JX 421; JX 422.  In a January 24, 2005 electronic-mail message, Mr. Clayton explained to Mr. Allen that the drawings that plaintiff received from its architect were not complete, that it wanted to ensure that the drawings the Coast Guard received were "'perfect' in comparison" to prior submissions, and that the Coast Guard "'should'" receive the drawings by January 28, 2005.  JX 421.  But see JX 433.1 (indicating that the delay was caused by three mechanical, electrical, and plumbing "items that were not addressed," and changing the anticipated delivery date to February 10, 2005); JX 437.2-.4 (reflecting that plaintiff did not send the Coast Guard's December 8, 2005 comments to Mr. Tempel to incorporate into the design until February 8, 2005).  Despite this response, the Coast Guard sent a letter to plaintiff on January 26, 2005, expressing its concern that the schedule was not being met, requesting a plan for getting "the project back on schedule" and a revised schedule, and reminding plaintiff that liquidated damages were being assessed.  JX 422.

On February 10, 2005, the Coast Guard notified plaintiff that it was rejecting the invoice that it had received from plaintiff the previous day for work completed through January 31, 2005, JX 438, explaining:

> The Government began deducting liquidated damages from the contract price in the amount of $511.00 a day starting November 10, 2004 and continuing through January 31, 2005 (82 days).[23]  As a result, you have been assessed $41,902.00 as

of $551 per day.  See JX 1.30.

[23]  The Coast Guard again misstated the daily liquidated damages rate; it was $551 and not $511.  See JX 1.30.  The Coast Guard also miscalculated the number of days; there are eighty-three days from and including November 10, 2004, to and including January 31, 2005.

damages for the delay in completing our contract.  The amount of liquidated
damages withheld to date exceed[s] the total amount due.

JX 438.1 (footnote added).

    In the meantime, on February 2, 2005, Ms. Hundley issued a second show cause letter to
plaintiff, remarking that plaintiff had "failed to," among other things, "provide the final design
documents, complete the roof installation . . . in the timeframe noted on [its] progress schedule,"
and "provide adequate manpower to complete the work by the date shown on [its] latest progress
schedule," JX 426, in other words, by April 26, 2005, Jt. Stip. ¶ 43.  Consequently, Ms. Hundley
stated, the Coast Guard was considering terminating the contract for default.  JX 426.  She
advised plaintiff that it had ten days "to present, in writing, any facts bearing on" whether its
"failure to perform arose out of causes beyond [its] control and without fault or negligence on
[its] part."  Id.

    Plaintiff responded to this show cause letter on February 7, 2005, JX 433, explaining why
it had been unable to install the roof and averring that it would deliver "90%" design documents
by February 10, 2005.  JX 433.1; JX 435.1.  The Coast Guard was dissatisfied with this response;
among its critiques were the following:

- Design:  We have accepted in practice allowing contractor to "fast-track"
    certain aspects of the design.  The structural foundation and metal building
    drawings are approved and we have cop[ies] of signed and sealed drawings
    . . . .  If contractor were to submit signed and sealed drawings for civil work
    we would accept them also.  To date we have received pre-final design
    submittals for the other disciplines including civil.  What we don't have are
    signed and sealed drawings.  Dates of submission of the design drawings keep
    slipping.  I have little confidence his 10 Feb date will be met.

- Our contract was a design-build contract from inception.  [The] requirement
    was that the final drawings . . . be signed and sealed.

JX 443.4.  The Coast Guard began "pursuing 'termination for default' proceedings against
KCON."  JX 443.2-.3; accord JX 439.1, .6; JX 440.1-.2.

    As the Coast Guard suspected, plaintiff missed its self-imposed February 10, 2005
deadline and did not deliver the design documents–which were treated by the Coast Guard as the
"100%" design and not the final design–to the Coast Guard until February 18, 2005.[24]  JX 445.1.

_____

[24]  This delay appears to have been caused, in part, by plaintiff's failure to promptly
forward the Coast Guard's December 8, 2005 comments to Mr. Tempel.  When plaintiff finally
did so, on February 8, 2005, it requested that Mr. Tempel revise the mechanical, electrical, and
plumbing drawings in accordance with the Coast Guard's comments in two days, if possible.  JX

That same day, Ms. Hundley sent a letter to Coast Guard headquarters requesting approval to terminate the Coast Guard's contract with plaintiff for default.  JX 444.1; see also JX 475 (containing a March 10, 2005 letter from Ms. Broussard to Coast Guard headquarters supplementing the request).

While the request for contract termination was pending, Ms. Hundley, on February 25, 2005, forwarded to plaintiff the Coast Guard's comments on the most recent mechanical design submission.  JX 450.1-.2.  Three comments concerned the design of hydraulic test lab:

> 1.  Room 106 (Hydraulic Lab):  Contract requires the ceiling height to be 10 feet above finished floor . . . .  It is unacceptable that the proposed HVAC ducting dimensions and related accessories such as insulation and duct hangers will not fit above the ceiling.  . . .

> 2.  We also note that the 1500 lb rated hoist in room 106 is not noted or included in the drawing set.  Structural details are required to ensure that this weight can be safely carried.  Hoist supports will affect proposed routing of ducts noted in paragraph 1.

> . . . .

> 7.  Note 2 on Drawing M001, "Design Assumption" is not correct.  You are responsible for integrity of new piping, valves, installation and testing to ensure that the existing Government furnished equipment operates correctly.

Id.  Ms. Hundley reiterated that the Coast Guard's comments were not changes to the contract.  JX 450.2.  She also explained that aside from the identified comments, the Coast Guard "[took] no exceptions to [the] proposed design" and, thus, plaintiff could proceed with the work, provided that the comments were addressed and that signed and sealed drawings were provided to the Coast Guard.  Id.; see also Tr. 2627 (Schmitt) (explaining that this letter allowed plaintiff to proceed with all work upon the submission of signed and sealed drawings).  Plaintiff forwarded the Coast Guard's comments to Mr. Tempel upon receipt.  JX 450.3-.5.

That same day–February 25, 2005–plaintiff sent the Coast Guard three letters seeking time extensions and a fourth letter seeking a contract price increase.  See JX 451; JX 452; JX 454; JX 455.  In the first letter, plaintiff requested a noncompensable time extension of thirty

───────────────────

437.2.  Mr. Tempel indicated that such a deadline was not possible due to Epic's workload, and stated that the earliest it could begin the work requested by plaintiff was February 15, 2005.  JX 437.1.  During trial, Mr. Tempel speculated that plaintiff may not have forwarded the Coast Guard's comments to him upon receipt because the "comments [were] pretty minimal" and could "be handled in a set of as-built drawings, as is typically done in a design-build."  Tr. 912 (Tempel).

days due to the Coast Guard's alleged improper review of its design drawings.  JX 451.1.
Specifically, Mr. Clayton wrote:

> This letter serves as our request for time extension due to [the Coast Guard]
> improperly reviewing design drawings per [specification section 01160, paragraph
> 2.2.3].  On (5) different occasions K-Con Inc. submitted drawings for approval
> which were returned neither approved, disapproved or approved as noted.  We
> received design comments that made "recommendations" not clearly stating
> approved, disapproved and why[,] or approved as noted.  [The Coast Guard]
> contracted K-Con Inc. to develop the design based on the specifications provided
> and submit for approval.  It was not our intent to submit our drawings so that
> personnel at [the Coast Guard] could make recommendations, not contract
> required approvals, disapprovals or approvals as noted.  It was only when I
> directly asked Steve Allen to approve, approve as noted or disapprove with reason
> per spec[ifications] did we finally get a proper review approved as noted with
> comments.

Id.; see also Tr. 2679 (Schmitt) (stating that the Coast Guard could respond to a design in three
ways:  "One is total approval, the [second] is approved as noted, and the [third] is rejection."),
3168-69 (Broussard) (agreeing that the Coast Guard would approve or reject plaintiff's design
depending on whether the design met the contract requirements, and that the Coast Guard could
approve plaintiff's design with comments).  In the second letter, plaintiff sought a
noncompensable time extension of thirty days to account for job site disturbances and its inability
to contract with local trades, both purportedly caused by comments made by the Coast Guard's
inspector.  JX 452.  Then, in its third letter, plaintiff requested a noncompensable time extension
of twenty-seven days "due to rain, snow and/or temperatures below 40 degrees," contending that
the precipitation in particular was "above average for the area."  JX 454.  The fourth letter
provided, in its entirety:  "This letter serves as our request for cost modification in the amount of
$50,325.00 for extended overhead due to delays outlined in our request for time extension letters
dated 25 February 2005."  JX 455.1.  An exhibit attached to that letter contained a table breaking
out the components of the extended overhead that plaintiff was requesting for the eighty-seven
days of alleged delay, as follows:

| Item | Unit Type | Quantity | Unit Cost | Total |
|---|---|---|---|---|
| Project manager design and site visit | Week | 8 | $2250.00 | $18,000.00 |
| Vehicle | Month | 2.5 | $937.50 | $2343.75 |
| Gas | Month | 0.5 | $487.50 | $243.75 |
| Per diem | Day | 10 | $100.00 | $1000.00 |

| Site superintendent | Week | 16 | $1000.00 | $16,000.00 |
|---|---|---|---|---|
| Vehicle | Month | 2.5 | $750.00 | $1875.00 |
| Gas | Month | 2.5 | $390.00 | $975.00 |
| Per diem | Day | 87 | $100.00 | $8700.00 |
| Contractor's field office | Month | 2.5 | $175.00 | $437.50 |
| Temporary toilet | Month | 2.5 | $300.00 | $750.00 |
| Total | | | | $50,325.00 |

JX 455.2.  Plaintiff did not submit any documentation to support the cost of each component.  Id.

On March 8, 2005, Ms. Hundley denied the three time extension requests.  See JX 470; JX 472; JX 473.  With respect to plaintiff's request for a weather-related time extension, Ms. Hundley explained that plaintiff "failed to submit relevant Daily Logs showing how work in progress was impacted and how the identified controlling work was delayed by the unusually severe weather," information that was required by the contract.  JX 473.1; see also JX 1.41 (containing the relevant contract specification, which provided:  "The contractor may request an excusable delay caused by unusually severe weather conditions by providing the contracting officer written notice within 10 days of the delay.  The notice shall:  (1) identify, through relevant Daily Logs, the work in progress that controls the overall completion of the contract; (2) indicate how the identified controlling work was delayed by the unusually severe weather; and, (3) provide the statistical weather data from the National Weather Service that indicates the weather experienced at the construction site was unusually severe.").  Next, regarding plaintiff's request for a time extension related to the actions of the Coast Guard inspector, Ms. Hundley stated that plaintiff failed to submit evidence substantiating its allegations.  JX 472.  Finally, with respect to the request concerning the Coast Guard's review of plaintiff's design drawings, Ms. Hundley explained:

> As required by paragraph 2.2.3 Review Comments Resolution, section 01160 of the contract, the Government provided comments regarding the submitted documents.  In every case the Government responded within the allotted time durations indicated in paragraph 2.2.2.1 Duration of Reviews, section 01160.  The Government is not obligated to note "approval or disapproval" until the "final design" is submitted.  In our reviews, we have the right to make recommendations or suggestions on the design.  That same paragraph obligated you to respond within 14 calendar days after receipt of comments on each design submittal to discuss by telephone and resolve design review comments.  You have continually failed to respond to our review comments in the required time, especially regarding our concerns or

recommendations on the mechanical design.  Your failure to address these issues
is not due to Government inaction.

Your progress schedule of January 5, 2005 indicated that the final design
would be submitted by January 21, 2005 and was actually received on February
18, 2005, which was 28 days late.  The Government responded with our review
comments on February 25, 2005.  Your failure to submit the design by your own
scheduled milestones was not due to Government inaction.

JX 470.1.  A Coast Guard contracting officer never responded to plaintiff's request for a contract
price adjustment.

Ms. Hundley sent plaintiff another letter the following day to express the Coast Guard's
concern that plaintiff was not meeting the deadlines set forth in its January 5, 2005 project
schedule.  JX 474.1.  She attached to her letter "a current discrepancy list of known problems that
[had to be] corrected prior to building acceptance by the Government."  Id.  The list contained
seven items: (1) construction of an incorrectly sized front entrance door opening, (2) inadequate
roof insulation, (3) exposing the interior of the unfinished building to the weather, (4) a missing
silt fence, (5) improperly tilted window sills, (6) lack of flashing for the roof of the electrical
room, and (7) a discrepancy with louver sizes.  JX 474.2; see also Tr. 1309 (Combs) (stating that
he did not consider any of these problems to be "a major show stopper").

Ultimately, on March 17, 2005, the Coast Guard sent a Notice of Termination for Default
to plaintiff and a copy of the notice to plaintiff's surety, First Sealord Surety, Inc. ("First
Sealord").  JX 481.1-.4.  In the notice, Ms. Hundley first described the various cure letters,
forbearance letters, and show cause letters that the Coast Guard had sent to plaintiff, and then
noted that as of the date of the notice, plaintiff had "failed to install the roofing and remove the
rejected insulation."  JX 481.1-.2; see also Tr. 1658 (Combs) (noting that upon contract
termination, two roof panels were not installed and the building was a "shell with no windows
and no doors, [with] some interior studs and some roughed-in plumbing").  She then wrote:

We have determined that it is no longer in the best interest of the Government to
forbear termination for default for your failure to complete within the established
completion date. . . .  [Y]our performance in the forbearance period continually
fell well behind any completion schedule you had submitted.  Your continued
failure to make progress has made it clear that it is no longer in the best interest of
the Government to forbear termination for default.  In accordance with contract
clause FAR 52.249-10, Termination for Default (Fixed-Price Construction) (APR
1984), you are hereby notified that this contract is terminated for default for
failure to make progress and failure to prosecute the work with the diligence that
will insure its completion within the time specified in the contract including any
extensions.  Therefore, your right to proceed with work under this contract is
terminated AS OF THIS DATE.  The Government may cause the contract to be

-43-

> completed by others in accordance with the above clause and you will be held
> liable for any increased costs occasioned thereby.  These costs will include
> liquidated damages in the amount specified in the contract that will accrue from
> the current contract completion date to actual completion of work.  The
> Government reserves all rights and remedies provided by law or under the
> contract in addition to charging excess costs occasioned by completion of the
> defaulted contract.

JX 481.3.  In closing, Ms. Hundley indicated that the notice was "a final decision of the
Contracting Officer" and described plaintiff's right to appeal the default termination to a board of
contract appeals or the United States Court of Federal Claims ("Court of Federal Claims").  Id.

Rather than immediately appealing, plaintiff sent the Coast Guard a letter on March 18,
2005, challenging the propriety of the default termination and requesting that the Coast Guard
rescind its notice.  JX 484.3.  In particular, citing FAR 52.249-10(b), which precludes the
termination of a contract for default if the contractor was not responsible for the delay in contract
performance, plaintiff enumerated several areas of contract performance–including the design
and construction of the HVAC system for the hydraulic test lab–where it encountered delays for
which it was not responsible, referring the Coast Guard to its previous correspondence describing
those delays.  Id.  Of particular note, plaintiff wrote:

> 2.  We proposed this project as Design/Build but [the Coast Guard] forced K-Con
> Inc. into a performance Bid/Spec Build Contract.  Please reference letters dated 03
> March 2004, 31 March 2004, 05 April 2004, 22 December 2004, 07 February
> 2005 and 25 February 2005.

> 3.  Additional HVAC engineering and work[] for Hydraulic Test room
> acknowledge[d] by [the Coast Guard] as additional to our scope of work.  Please
> reference RFI # 6 dated 13 July 2004 and email dated 20 July 2004 referencing
> our RFI # 6 phone conference.

Id.  In a March 21, 2005 letter, Ms. Broussard rejected plaintiff's claims of excusable delay and
denied plaintiff's request for the rescission of the default termination.  JX 487.  Then, on March
29, 2005, the Coast Guard notified plaintiff that it was rejecting the invoice that it had received
from plaintiff earlier in the month for work completed through February 28, 2005, JX 492,
explaining:

> The Government began deducting liquidated damages from the contract price in
> the amount of $511.00 [sic] a day starting November 10, 2004 and continuing
> through February 28, 2005 (111 days).  As a result, you have been assessed
> $56,721.00 as damages for the delay in completing our contract.  The amount of
> liquidated damages withheld to date exceed[s] the total amount due.

-44-

JX 492.1.  More specifically, according to handwritten notations on the invoice and its attachment, the Coast Guard determined that plaintiff was due $305,034.39 through February 28, 2005, that it had already paid plaintiff $287,551.39, and that therefore the balance due to plaintiff was $17,483.00.  JX 492.2-.3; accord JX 3.11; JX 493.16.  However, because the assessed liquidated damages exceeded the amount due to plaintiff, the Coast Guard did not pay the $17,483 balance to plaintiff.  JX 492.1-.2.

### C.  Work by First Sealord

Meanwhile, on March 18, 2005, First Sealord advised the Coast Guard that it was "considering taking over the project" and keeping plaintiff as its subcontractor.  JX 485.1; accord JX 726.1.  Subsequently, on March 24, 2005, the Coast Guard conducted a meeting with First Sealord's project manager, Jim Payne, and several representatives from plaintiff to discuss what work remained to be completed and what the Coast Guard required from First Sealord, such as a new project schedule and an action plan.  JX 489; JX 490.1-.2; JX 491; see also JX 489.2-.5 (containing the Coast Guard's March 22, 2005 audit of the building's condition and what work remained to be completed).

The Coast Guard received a letter directly from plaintiff on March 29, 2005, containing an action plan and a two-week forecast.  JX 495.1.  First Sealord then sent the Coast Guard an action plan and a two-week forecast on April 22, 2005, which, given the file name, may have been the same document prepared by plaintiff.  JX 494.2.  On April 28, 2005, Ms. Broussard sent a letter to First Sealord responding to plaintiff's submission and detailing the submission's deficiencies.  JX 495.1-.2.  In concluding the letter, Ms. Broussard wrote:

> The Government believes several of the proposed solutions and/or requests contained in K-Con's plan continue to reflect K-Con's inability to provide adequate quality control over the project.  Examples include a request for the Government to identify non compliant work, requests for additional money to complete requirements included in the original contract, plans to proceed with work without adequate designs, etc.  Based on the information provided in K-Con's letter, we continue to be very concerned that this project can be successfully completed.  We see no proposed improvement and/or change in the quality control measures and management practices of K-Con.

> Lastly, you are reminded that liquidated damages are continuing to accrue from the 10 November 2004 [sic] completion date at a rate of $551.00 per day.  . . . [I]t is in everyone's best interest to have this project completed as soon as possible.  Once the Take-Over Agreement has been executed, and the above items have been submitted work may begin.

JX 495.1-.2; cf. JX 725 (indicating that Mr. Allen had an informal conversation with Mr. Payne on May 5, 2005, expressing concern that enough time had not been allotted to finish the project).

Plaintiff assigned a new superintendent, Tom Parker, to the project, and he began work on the job site on May 23, 2005.  JX 4.422-.423; accord Tr. 970 (Parker).  On May 25, 2005, Ms. Broussard sent another letter to First Sealord in which she noted that First Sealord's "failure to start work" was "prohibiting the customer from moving into a complete and useable facility."  JX 497.  She "directed" First Sealord "to begin on site construction activities" by the following day and stated that if First Sealord failed to do so, the Coast Guard would reprocure the contract.  Id.

First Sealord did begin work as directed, but work did not proceed smoothly.  For example, there were issues with First Sealord's correction and submission of the final design documents.  In a June 15, 2005 letter,[25] Ms. Hundley advised First Sealord that it could omit certain items associated with the hydraulic test lab from the mechanical and electrical drawings, including two supply fans, two exhaust fans, and the chilled water line.[26]  JX 729.1.  She then noted that the Coast Guard "consider[ed] the overall design incomplete" but was "willing to allow the work to continue with the understanding being that all such work [was] at [First Sealord's] own risk and [did] not imply acceptance of any deviance from the contract documents."  JX 729.1-.2.

That same day, but before receiving Ms. Hundley's letter, Mr. Payne sent Mr. Allen an electronic-mail message indicating his understanding that there would be changes to the HVAC system, such as the elimination of two supply fans, two exhaust fans, and the chilled water line, but noting that until First Sealord received formal notification of the changes from the Coast Guard, its designers would proceed with revising the drawings as if no changes were forthcoming.  JX 731.2.  He further noted that "[t]he proposed changes could also affect the overall HVAC design as the air quantities would change."  Id.  The next day, Mr. Allen confirmed the changes, and Mr. Payne accordingly indicated that First Sealord's designers would cease making certain changes to the design.  JX 731.1.  Mr. Payne reiterated that the Coast Guard's changes, particularly the omission of two supply and two exhaust fans, would "have an impact [on] other components of the previously designed HVAC system."  Id.  Mr. Allen forwarded Mr. Payne's message to Mr. Schmitt and Mr. Fedei.  JX 733.  Mr. Fedei responded

---

[25]  The letter was originally dated June 9, 2005.  JX 728.1.  However, the relevant Coast Guard officials had not signed off on the letter until at least June 14, 2005.  JX 728.2.

[26]  The Coast Guard may have directed these omissions to accommodate the placement of different equipment in the hydraulic test lab.  See JX 727.  In a May 18, 2005 memorandum, Mr. Allen indicated that the AR&SC had ordered a new HTS test stand that was "dimensionally larger than the old test stand" and "require[d] greater heat dissipation and larger electrical service."  JX 727.2; see also PX 260.1-.2 (reflecting that a Coast Guard employee had advised Mr. Payne at the end of May 2005 that there might be "changes in the equipment in the Hydraulic Test Room" and "that the two roof exhaust fans may be eliminated").  Consequently, he recommended that "the requirement that KCON hook-up any equipment in the [hydraulic test lab] be deleted" and that "KCON [be required] to terminate and valve-off chilled water piping from the [hydraulic test lab] ac unit [sic] after it enters the [hydraulic test lab]."  JX 727.2.

that the HVAC system should not be redesigned, and expressed concern that the original designer of the HVAC system–Epic–was "working on this again."  Id.

The Coast Guard received a set of drawings from First Sealord on June 20, 2005.  JX 499.1; see also JX 708 (containing electrical, mechanical, fire alarm, and plumbing system drawings from Epic dated June 16, 2005).  Upon reviewing the drawings, the Coast Guard determined that they were a reprint of a July 2004 submission, and did not include subsequently approved changes.  JX 499.1.  Mr. Allen forwarded his concerns to Mr. Payne, id., who indicated, in a June 23, 2005 electronic-mail message, that the drawings "were intended to be a complete set that incorporated comments from" Ms. Hundley's February 25, 2005 letter, JX 734.1.  In a June 27, 2005 electronic-mail message, Mr. Allen advised Mr. Payne that First Sealord should not "be concerned with the equipment or loads going into the Hydraulic Lab," that "[t]he HVAC equipment and ducting is to be installed as drawn (for the Feb 2005 [drawings], not July 2004)," and that First Sealord must "'finish' the drawings . . . ."  Id.  Mr. Allen also noted that the Coast Guard was concerned that the daily reports reflected that "little or no work [was] being performed" on the job site.  Id.

During a July 5, 2005 meeting, First Sealord and the Coast Guard agreed to the following schedule for proceeding:

1. New drawings (design) would be submitted on or about Friday July 8, 2005

2. [The Coast Guard] to review (approve) within 2 weeks

3. Construction schedule will be submitted after approval of design

4. Anticipate 60 to 90 days after design submittal – construction completion

JX 500.1.  However, First Sealord did not meet the deadline for submitting new drawings; rather, Mr. Clayton sent revised mechanical drawings to the Coast Guard on July 15, 2005, JX 738; see also JX 709 (containing electrical and mechanical system drawings from Epic dated July 14, 2005); JX 710 (containing electrical system drawings from Epic dated July 15, 2005), and First Sealord sent a complete set of drawings to the Coast Guard on July 19, 2005, JX 739.1.

The ongoing design and construction issues soured the Coast Guard on First Sealord's ability to complete the project.  JX 500.  In a July 19, 2005 letter to First Sealord, Ms. Hundley wrote:

During the initial takeover meeting . . . of March 24, 2005, we discussed several actions critical to completion of the project.  They included completing the final design, . . . correction of outstanding deficiencies and implementing a take-over agreement.

-47-

You did not start any work of any type until May 25, 2005, almost eight weeks after the meeting.  Your initial efforts . . . to partially install the passageway between the new and existing buildings [suffered from defective workmanship].  Further you have failed to provide the final design documents as promised on several occasions . . . .  We have also noted during onsite inspections and review of daily logs that adequate manpower has not been put in place to successfully complete the building's construction or correct the many deficiencies previously noted in our construction audit.  You have failed to provide a construction schedule for us to monitor your progress.  No take-over agreement has been signed and agreed to as of this date.

      . . . .

As of the date of this letter, the complete final design has yet to be fully submitted . . . and what we have partially received does not include agreed to changes to the design.  Our inspector has informed us that [certain work is being done without approved final drawings].  These actions, taken in light of the continuing history of poor quality control on this project by K Con, your take-over contractor, are ill advised and poorly planned.  As a result the Government has lost confidence in your ability to properly manage this project and successfully deliver a quality facility in a reasonable time.

We agreed with your proposal to use K-Con as the takeover contractor.  However, four months after the default (which should have been ample time to complete the work) little meaningful progress has been made.

JX 500.1-.2; see also JX 498 (reflecting that the Coast Guard forwarded a signed takeover agreement to First Sealord on June 13, 2005, for plaintiff's execution).  In light of these issues, Ms. Hundley advised that she had "determined it [was] no longer in the Government[']s best interest to allow First Sealord Surety to continue work" and accordingly "directed" First Sealord to "immediately cease all work and direct all contractors, employees and material men to vacate the site." JX 500.2.  Ms. Hundley further stated that it was the Coast Guard's intent to "re-procure the remaining work," charge "any excess costs" to plaintiff and First Sealord, and continue to assess liquidated damages "until the project [was] substantially complete." Id.  At this point in time, First Sealord had not completed the roof, JX 4.509, and pursuant to the project schedule submitted by plaintiff on January 5, 2005, it would take an additional ninety-seven days, until April 26, 2005, to complete the building once the roof was installed, Jt. Stip. ¶ 43; JX 415.1, .3.

First Sealord responded to Ms. Hundley's letter on July 21, 2005.[27]  JX 739.1.  Ms. Hundley addressed First Sealord's comments in an August 11, 2005 letter:

---

[27] First Sealord's letter is not a part of the trial record.

Your submission of the latest version of the final drawings was late.  Since award of this contract in September 2003, we have received six separate "final" submissions.  . . .  In each case, the drawings did not comply with the contract terms.  Critical details remained incomplete as of 5 July 2005, a full 21 months after contract award.  [W]e expected the drawings by Friday, July 8, 2005[, but they] were not shipped until July 19, 2005.

. . . .

HVAC:  We provided definitive direction on deleting the exhaust fans.  These deletions requested by the Government did not materially affect the overall mechanical design or HVAC duct sizing.  We maintain that your mechanical design could have been sufficiently completed without awaiting issuance of the formal change.  It is noted that your subcontractors started installation of circular duct work although rectangular ducts have consistently been shown on your submissions and no review comments were ever made altering this choice.  As you should be aware, such substitutions have a potential adverse affect on the design and would have negated acceptance of your mechanical design.  This would have resulted in further delays and confusion at the job site had you continued and would have been indicative of the continuing quality control problems on this project.  . . .

. . . .

We questioned the proposed completion date of late September based on this rate of progress observed to date.

Construction occurring without drawings:  This situation continued to occur.  . . .

We had no confidence that a quality building could have been erected by September 2005 for the reasons addressed above.

Concerning the letter of agreement regarding completion of this contract, we note that you never signed this letter.  In light of the repeated failures of this project to progress, the continued missed milestones, the lack of quality control, and the degree of rework constantly encountered, the Government had reasonable cause and right to terminate and re-procure.

JX 739.2-.3.

### D. Reprocurement

After it directed First Sealord to stop work, the Coast Guard "solicited bids to complete the construction" of the component repair shop. JX 501. The specifications included with the solicitation "call[ed] for the complete removal of the metal roofing, metal wall sheets and all associated insulation." Id. In a September 7, 2005 letter, plaintiff advised the Coast Guard that it was aware of the solicitation, and opined that the complete removal of the roof, walls, and insulation was not required. Id. Plaintiff then stated that if the Coast Guard intended to hold plaintiff and First Sealord liable for such work, it would like the opportunity to inspect the condition of the building when the work was performed. Id. The Coast Guard rejected plaintiff's request in a September 13, 2005 letter. JX 502.

As noted above, at the time of the default termination, the Coast Guard had paid $287,551.39 to plaintiff. JX 3.11. In two contract modifications, executed by the Coast Guard on October 27, 2005, and October 28, 2005, the Coast Guard indicated its intent to use the unpaid balance of the contract–$263,603.96–to fund the reprocurement of the project, and reiterated that it reserved its right to claim any costs incurred in excess of the unpaid balance from plaintiff. JX 3.11-.15. It also reiterated that it reserved its right to recover liquidated damages, which would accrue until the building was substantially complete. JX 3.11, .14.

Had the Coast Guard decided to hire a contractor only to complete the work left unfinished by plaintiff, it would have been able to get a contractor on site within thirty to forty-five days, Tr. 3149 (Broussard), and the contractor would have been able to begin work within fifteen to thirty days, id. at 3150. However, because the AR&SC's requirements had changed, id. at 3147-48, the Coast Guard decided to increase the scope of work of the reprocurement contract, Jt. Stip. ¶ 45; cf. Tr. 3147-49 (Broussard) (explaining that because the new contractor would be performing additional work, the Coast Guard decided not to charge plaintiff for reprocurement costs), 3211-13 (indicating that the government-furnished equipment identified in the reprocurement contract was the same as the government-furnished equipment identified in plaintiff's contract). This decision delayed the award of the reprocurement contract. See generally Tr. 3147-49 (Broussard) (implying that a reprocurement contract would have been awarded more quickly had the Coast Guard not increased the scope of work).

On November 7, 2005, the Coast Guard entered into an agreement with Viteri Construction Management Incorporated ("Viteri") to complete the building. JX 506. The initial contract price was $721,431, and the initial completion date was March 19, 2006. JX 506.2. Through bilateral contract modifications, the contract price was ultimately increased to $824,610.[28] JX 508. The Coast Guard determined that Viteri substantially completed the

---

[28] The trial record lacks any evidence regarding whether the March 19, 2006 contract completion date was extended. However, evidence submitted with plaintiff's motion for partial summary judgment on the issue of liquidated damages reflects that the fourth bilateral contract modification executed by Viteri and the Coast Guard extended the contract completion date to

building as of September 20, 2006.  JX 507.1.  The hydraulic test lab in the completed building differed from what plaintiff had been asked to design; it contained all new equipment and different ductwork.  Tr. 1334-36 (Combs); see also JX 727.1-.2 (containing an internal electronic-mail message dated May 18, 2005, in which the Coast Guard recommended a plan for "building completion taking into account the impact of the new test equipment," which was "dimensionally larger than the old test stand, [and] require[d] greater heat dissipation and larger electrical service").

## II.  PROCEDURAL HISTORY

Plaintiff filed suit in this court on August 25, 2005, seeking to convert the default termination into a termination for the government's convenience and the remission of liquidated damages.  Defendant filed an answer, in which it asserted five affirmative defenses, and counterclaim.  In its counterclaim, defendant alleged that the Coast Guard had withheld approximately $10,220 from payments to plaintiff as liquidated damages, and sought the balance of liquidated damages as measured from the contract completion date to the date that the building was completed, plus interest as provided by law.  In its answer to the counterclaim, plaintiff asserted three affirmative defenses:  breach of contract; failure to mitigate damages; and waiver, estoppel, and laches.

After plaintiff filed this suit, which was assigned to the undersigned, it filed three other suits in this court in which it alleged that the Coast Guard breached contracts for the design and construction of prefabricated metal buildings.  See K-Con Bldg. Sys., Inc. v. United States, No. 05-981C (filed Sept. 12, 2005); K-Con Bldg. Sys., Inc. v. United States, No. 05-1054C (filed Sept. 30, 2005); K-Con Bldg. Sys., Inc. v. United States, No. 06-865C (filed Dec. 18, 2006).  These other suits concerned buildings in St. Petersburg, Florida, Port Huron, Michigan, and Honolulu, Hawaii.  The St. Petersburg and Port Huron cases were eventually reassigned to the undersigned.  The Honolulu case remained with the originally assigned judge, and was settled by the parties in July 2007.

Upon the close of discovery in this case, plaintiff moved for partial summary judgment on the issue of liquidated damages, arguing first that the rate of liquidated damages specified in its contract with the Coast Guard constituted an unenforceable penalty, and second, in the alternative, that it was entitled to the remission of liquidated damages due to excusable delay.  The court denied plaintiff's motion in a January 24, 2011 Opinion and Order, concluding that the liquidated damages rate was not an unenforceable penalty, and that plaintiff had not established an excusable delay that would lead to the remission of some or all of the assessed liquidated damages.  See K-Con Bldg. Sys., Inc., 97 Fed. Cl. at 41.  Thus, in December 2011, the court held a two-week trial.  During its case-in-chief, plaintiff presented the testimony of Mr. Reitmeier,

---

August 26, 2006.  See App. to Pl.'s Mot. for Partial Summ. J. 196, cited in K-Con Bldg. Sys, Inc. v. United States, 97 Fed. Cl. 4, 48 (2011).  Viteri and the Coast Guard executed five bilateral contract modifications.  JX 508.

Mr. Ramsey, Mr. Tempel, Mr. Parker, Eric Combs (its chief operating officer), and two expert witnesses–Stanley Yeskowski, an insulation expert, and Eric Unger, a scheduling expert.[29] Defendant, during its case-in-chief, presented the testimony of Richard Anderson (the contracting officer's representative), Henry Ames (the FDCC LANT's director of construction in 2004), Mr. Schmitt, Mr. Fedei, Ms. Broussard, and two expert witnesses–Jeffrey Peters, an insulation expert, and John McGrath, a scheduling expert.[30]  Plaintiff presented the testimony of one rebuttal witness–Mr. Kiernan.

On the sixth day of trial, counsel for defendant discovered that the Coast Guard possessed three boxes of documents relevant to the case that had not been identified or produced to plaintiff during discovery.  Then, before plaintiff had an opportunity to review most of the documents, one of defendant's witnesses–Mr. Anderson–caused the documents to be destroyed.  After trial, plaintiff moved to sanction defendant for this conduct.  In an August 30, 2012 Opinion and Order, the court granted plaintiff's motion and imposed three sanctions:  (1) defendant was precluded from using the undisclosed documents as evidence, (2) the trial testimony of Mr. Anderson was stricken from the record, and (3) defendant was required to reimburse plaintiff for the costs that plaintiff incurred in pursuing sanctions.  K-Con Bldg. Sys., Inc. v. United States, 106 Fed. Cl. 652, 668 (2012).

Meanwhile, the court issued a summary judgment ruling in the Port Huron case in August 2011, K-Con Bldg. Sys., Inc. v. United States, 100 Fed. Cl. 8 (2011), and a summary judgment ruling in the St. Petersburg case in November 2012, K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. 571 (2012).  After the court issued the latter decision, the parties engaged in settlement discussions in all three cases through the court's alternative dispute resolution program.  Those discussions revealed several issues that required resolution prior to any settlement, leading the parties to file the relevant motions in each case.  In this case, plaintiff filed a motion to dismiss and a motion for leave to amend its complaint.  The court ruled on those motions in a February 26, 2014 Opinion and Order.[31]  See K-Con Bldg. Sys., Inc., 114 Fed. Cl. at 722.

---

[29]  The court qualified Mr. Yeskowski and Mr. Unger as experts.  Tr. 1005, 1814.

[30]  The court qualified Mr. Peters and Mr. McGrath as experts.  Tr. 2327, 3235.

[31]  In the St. Petersburg case, the parties filed cross-motions for summary judgment.  The court denied both motions in an April 7, 2014 Opinion and Order.  K-Con Bldg. Sys., Inc. v. United States, 115 Fed. Cl. 558 (2014).  The parties ultimately filed a joint stipulation of dismissal.  In the Port Huron case, defendant filed a motion to dismiss and a motion for summary judgment.  The court granted those motions in a January 28, 2014 Opinion and Order and entered judgment against plaintiff on its claims.  K-Con Bldg. Sys., Inc. v. United States, 114 Fed. Cl. 595 (2014), aff'd, 778 F.3d 1000 (Fed. Cir. 2015).  Plaintiff appealed that ruling to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), which affirmed this court's judgment.  K-Con Bldg. Sys., Inc., 778 F.3d at 1000.

In its motion to dismiss, which the court recharacterized as a motion for summary judgment, plaintiff sought to invalidate the Coast Guard's termination of its contract for default, arguing that under the terms of the Federal Supply Schedule contract, the Coast Guard could not terminate the contract without first referring plaintiff's allegations of excusable dely to the GSA. Id. at 728-29.  Defendant agreed that the Coast Guard was required to refer allegations of excusable delay to the GSA, but contended that plaintiff made no such allegations.  Id. at 730-32. The court found that plaintiff's letters dated December 22, 2004, and February 7, 2005, sent in response to the Coast Guard's show cause letters, as well as the three letters that plaintiff sent to the Coast Guard on February 25, 2005, requesting time extensions, contained allegations of excusable delay.  Id. at 730-31.  Accordingly, the court declared the Coast Guard's default termination invalid and concluded that it lacked jurisdiction to entertain any claims premised solely on the default termination.  Id. at 732.  The court further held that it possessed jurisdiction to entertain plaintiff's claim for the remission of liquidated damages to the extent that the claim was premised on the excusable delays alleged in the three February 25, 2005 letters, as well as defendant's counterclaim for unpaid liquidated damages.  Id. at 732-33.  Therefore, the court granted in part and denied in part plaintiff's motion.  Id. at 733, 735-36.

In its motion for leave to amend its complaint, plaintiff sought to allege a claim based on its February 25, 2005 letter to the Coast Guard requesting a $50,325 price increase for extended overhead resulting from the excusable delays it alleged in its other February 25, 2005 letters.  Id. at 734.  The court initially noted that an amendment was not necessary for it to rule on an unpleaded issue if the issue was tried by the consent of the parties.  Id.  It then concluded that defendant's consent to try the issue of plaintiff's entitlement to extended overhead should be implied.  Id. at 734-35.  The court therefore granted plaintiff's motion.  Id. at 736.

After the court issued its decision on plaintiff's combined motion, the parties filed amended pleadings.  Plaintiff added a claim for $50,325 in extended overhead to its complaint; defendant amended its counterclaim to allege that the total amount of accrued liquidated damages was $374,680 (representing 680 days at $551 per day), that the Coast Guard had withheld $17,483 from payments to plaintiff for liquidated damages, and that plaintiff owed the Coast Guard the balance–$357,197–plus interest, costs, and fees to the extent permitted by law; and plaintiff added a large number of affirmative defenses in response to defendant's amended counterclaim, including the defense of excusable delay.  The parties then engaged in posttrial briefing, filing opening posttrial briefs on June 26, 2015, and posttrial response briefs on August 6, 2015.

On the same day that the parties filed their posttrial response briefs, plaintiff (1) submitted a certified claim to the GSA contracting officer requesting a "decision terminating the contract for convenience and directing that K-Con proceed to recover any costs under the termination for convenience clause,"[32] Reply Ex. 1-2, and (2) filed a motion to stay a ruling in

---

[32]  Given the relief sought by plaintiff, it is unclear why it submitted its claim to the GSA contracting officer and not the Coast Guard contracting officer; its Federal Supply Schedule

this case pending a decision on the certified claim.  Defendant opposed plaintiff's motion.
Ultimately, the motion became moot when plaintiff, on October 8, 2015, moved for leave to
amend its complaint for a second time to assert claims premised on its August 6, 2015 certified
claim, which the GSA contracting officer had not ruled on within the sixty days provided by
statute.  Defendant opposes this motion.

All remaining issues in this case are now fully briefed.  The court deems closing
argument unnecessary.

### III.  PLAINTIFF'S MOTION FOR LEAVE TO AMEND ITS COMPLAINT

The court first addresses plaintiff's motion for leave to amend its complaint to allege
claims that (1) its contract with the Coast Guard should be terminated for the convenience of the
government and (2) it is entitled to costs associated with the termination for convenience.[33]
Specifically, plaintiff contends:

> [T]he primary issue at trial was whether the termination for default by the Coast
> Guard was improper and the termination should be converted to a termination for
> convenience.  At that time, the Court lacked jurisdiction because there was no
> valid final decision.  Now, the Court has jurisdiction over the matter because there
> is a valid claim that the task order should be terminated for convenience, and the
> claim was deemed denied.  In the interest of justice, both parties should now be
> allowed to present their claims and defenses on whether the task order should be
> terminated for convenience.

Mot. to Amend 1-2; see also Reply Ex. 1-2 (containing plaintiff's request for termination for
convenience costs).

Under RCFC 15(b), the court may permit the posttrial amendment of pleadings in two
circumstances:

> (1)  Based on an Objection at Trial.  If, at trial, a party objects that evidence is not
> within the issues raised in the pleadings, the court may permit the pleadings to be
> amended.  . . .

> (2)  For Issues Tried by Consent.  When an issue not raised by the pleadings is

---

contract does not contain any provision preventing an ordering agency, such as the Coast Guard,
from terminating a task order for the government's convenience.

[33]  Although plaintiff did not attach to its motion its proposed amended complaint, the
court was able to ascertain plaintiff's proposed claims from the contents of plaintiff's motion and
certified claim.

tried by the parties' express or implied consent, it must be treated in all respects as
if raised in the pleadings.

On its face, RCFC 15(b) is concerned with allowing the parties to amend their pleadings to
conform with what occurred during trial. However, the events that form the basis of plaintiff's
motion–the court's February 26, 2014 Opinion and Order, plaintiff's August 6, 2015 certified
claim, and the GSA contracting officer's subsequent failure to rule on plaintiff's claim–occurred
after trial. Accordingly, RCFC 15(b) is inapplicable here.

Rather, the proper basis for plaintiff's motion is RCFC 15(d). See Prasco, LLC v.
Medicis Pharm. Corp., 537 F.3d 1329, 1337 (Fed. Cir. 2008). That rule provides: "On motion
and reasonable notice, the court may, on just terms, permit a party to serve a supplemental
pleading setting out any transaction, occurrence, or event that happened after the date of the
pleading to be supplemented." RCFC 15(d). It "plainly permits supplemental amendments to
cover events happening after suit . . . . Such amendments are well within the basic aim of the
rules to make pleadings a means to achieve an orderly and fair administration of justice." Griffin
v. Cty. Sch. Bd., 377 U.S. 218, 227 (1964). Courts have "broad discretion" to allow a
supplemental pleading. Fed. R. Civ. P. 15(d) advisory committee's note to 1963 amendment;
accord United States ex rel. Gadbois v. PharMerica Corp., 809 F.3d 1, 7 (1st Cir. 2015)
(remarking on the "breadth of the discretion inherent in Rule 15(d)" that results from the fact that
the rule "contains no standards at all to guide the district court's analysis"). In exercising this
discretion, "courts customarily have treated requests to supplement under Rule 15(d) liberally."
Gadbois, 809 F.3d at 7; accord New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 28-29 (4th Cir.
1963). Nevertheless, motions to supplement a pleading are not granted "automatically":

> For one thing, it is implicit in the logic of Rule 15(d) that a motion to supplement
> may be denied where the referenced events occurred before the filing of the
> original complaint. For another thing, leave to supplement may be withheld when
> the request would "unduly delay resolution of the case." In the last analysis, a
> district court faced with a Rule 15(d) motion must weigh the totality of the
> circumstances, just as it would under Rule 15(a). Idiosyncratic factors–say, the
> futility of supplementation, prejudice to the opposing party, and unreasonable
> delay in attempting to supplement–may suffice to ground a denial of a Rule 15(d)
> motion. Everything depends on context.

Gadbois, 809 F.3d at 7 (footnote and citations omitted) (quoting Hall v. CIA, 437 F.3d 94, 101
(D.C. Cir. 2006)); accord Quaratino v. Tiffany & Co., 71 F.3d 58, 66 (2d Cir. 1995) ("Absent
undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the
proposed pleading, or futility, [a Rule 15(d)] motion should be freely granted." (citing Foman v.
Davis, 371 U.S. 178, 182 (1962)).

Defendant argues that supplementation is improper for two reasons:  supplementation would be futile, and it would be prejudiced by plaintiff's undue delay in asserting its new claim.[34]

A claim is futile if it could not survive a motion to dismiss.  See, e.g., BEG Invs., LLC v. Alberti, 85 F. Supp. 3d 13, 24 (D.D.C. 2015) ("As is the case when a plaintiff seeks leave to amend a complaint, . . . a court may deny a motion to file a supplemental complaint as futile 'if the proposed claim[s] would not survive a motion to dismiss.'" (quoting Hettinga v. United States, 677 F.3d 471, 480 (D.C. Cir. 2012))); see also Marchena v. United States, 128 Fed. Cl. 326, 330 (2016) ("A proposed amendment is futile if it would not survive a motion to dismiss."). According to defendant, supplementation would be futile in two respects:  (1) plaintiff's August 6, 2015 certified claim was untimely, and (2) there is no factual basis for plaintiff to request that its contract with the Coast Guard be terminated for the convenience of the government.  In response, plaintiff focuses on the former argument, contending that its certified claim was timely.

Both plaintiff's Federal Supply Schedule contract and the Coast Guard's order under that contract were governed by the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601-613 (2000).[35]  See FAR 52.233-1, cited in JX 1.37; JX 2.9.  Under the CDA, contractors are required to present monetary claims to the contracting officer for a decision.  41 U.S.C. § 605(a); FAR 52.233-1, cited in JX 1.37.  Because plaintiff intends to seek termination for convenience costs in its supplemental complaint, it was required to submit a claim for such costs to the contracting officer.  See Armour of Am. v. United States, 69 Fed. Cl. 587, 592 (2006) ("There is no evidence before the Court to show that Plaintiff requested monetary damages of a sum certain, and there was no final decision by the contracting officer on a claim for convenience termination monetary damages.  In the absence of a final decision by the contracting officer on monetary damages, this Court lacks jurisdiction of this aspect of the claim."); see also Deponte Invs., Inc. v. United States, 54 Fed. Cl. 112, 116 (2002) ("[A] decision to terminate a contract for default is separate and distinct from a decision on any claims by a contractor for termination costs or damages.").  Furthermore, plaintiff was required to submit its claim to the contracting officer "within 6 years after the accrual of the claim."  41 U.S.C. § 605(a); accord FAR 52.233-1(d)(1), cited in JX 1.37. Under the FAR:

---

[34]  Defendant actually argues that the filing of a second amended complaint would be futile.  However, because plaintiff's motion for leave to amend its complaint should have been brought under RCFC 15(d), the court characterizes defendant's argument as an argument against supplementation.

[35]  All citations to the CDA are to the version of the statute in effect on the date that the Coast Guard placed its order with plaintiff under plaintiff's Federal Supply Schedule contract. Congress has since recodified title forty-one of the United States Code, revising and renumbering the provisions of the CDA.  See Pub. L. No. 111-350, §§ 7101-7109, 124 Stat. 3677, 3816-26 (2011).

"Accrual of a claim" means the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known.  For liability to be fixed, some injury must have occurred.  However, monetary damages need not have been incurred.

FAR 33.201.

The Coast Guard improperly terminated plaintiff's contract for default on March 17, 2005, by failing to refer plaintiff's claims of excusable delay to the GSA contracting officer in accordance with the express terms of plaintiff's Federal Supply Schedule contract.  After the improper default termination, plaintiff's surety, First Sealord, took over contract performance, with plaintiff as its subcontractor.  The Coast Guard directed First Sealord and plaintiff to cease contract performance on July 19, 2005.  On or before September 7, 2005, plaintiff became aware of a solicitation to reprocure the project, and, on October 27, 2005, and October 28, 2005, the Coast Guard executed two contract modifications indicating that it would use the unpaid balance of its contract with plaintiff to fund the project's reprocurement.  These facts reflect that as of October 28, 2005, plaintiff knew that it was no longer performing work under the contract, that another contractor would complete the project, and that it would not be paid the contract balance.  In other words, plaintiff's termination for convenience claim accrued by October 28, 2005, because as of that date, all events fixing the Coast Guard's alleged liability for improper termination had occurred, plaintiff knew that these events had occurred, and plaintiff had suffered a monetary injury.  However, plaintiff did not submit its certified claim to the GSA contracting officer until August 6, 2015, almost ten years later.  Accordingly, pursuant to both contracts and the CDA, plaintiff's certified claim was untimely.  Because the submission of a valid claim–one that satisfies all relevant procedural and substantive requirements–is a prerequisite to this court's exercise of jurisdiction, K-Con Bldg. Sys., Inc., 114 Fed. Cl. at 602, it would be futile for plaintiff to file its proposed supplemental complaint.

Plaintiff's contention that its termination for convenience claim accrued no earlier than 2013 is unavailing.[36]  Plaintiff first argues that because the court invalidated the Coast Guard's

_____

[36]  Plaintiff does not argue that the limitations period for presenting a claim to the contracting officer should be equitably tolled in its case.  See Arctic Slope Native Ass'n v. Sebelius, 583 F.3d 785, 798 (Fed. Cir. 2009) (holding that the six-year limitations period in 41 U.S.C. § 605(a) can be equitably tolled).  Had plaintiff advanced that argument, the court would have rejected it.  "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005), quoted in Holland v. Florida, 560 U.S. 631, 649 (2010).  "[T]he diligence prong . . . covers those affairs within the litigant's control; the extraordinary-circumstances prong, by contrast, is meant to cover matters outside its control."  Menominee Indian Tribe v. United States, 136 S. Ct. 750, 756 (2016).  In this case, plaintiff alleges that it could not have filed a claim with a contracting officer until 2013, when it discovered that the Coast Guard contracting officer lacked the authority to

default termination of its contract with plaintiff, that contract remains in force and can be ended only if (1) plaintiff's contract work is "completed and accepted," (2) the contract is terminated pursuant to the Default clause, or (3) the contract is terminated pursuant to the Termination for Convenience of the Government clause. Because none of those events has occurred, plaintiff contends, it could not have submitted a claim to a contracting officer under the Disputes clause.[37] However, plaintiff knew or should have known, in 2005, that it would not be completing the contract work and that the Coast Guard had not complied with the applicable contract provisions. Moreover, the decision that plaintiff cites in support of its contention that its contract with the Coast Guard remains in force–BearingPoint–is distinguishable. In BearingPoint, as in this case, the contracting agency was required to refer default termination decisions to the GSA contracting officer if the contractor alleged excusable delay. 77 Fed. Cl. at 190, 194-95. Nevertheless, the contracting agency terminated its contracts (a blanket purchase agreement and a task order) with the contractor for default in September and October 2005 despite the contractor's allegation of excusable delay. Id. at 191. The contractor filed a claim with the contracting officer in July 2006, and a complaint in the Court of Federal Claims in September 2006. Id. Seven months later, in April 2007, the court "conclude[d] that the default terminations were 'jurisdictionally invalid,' and [should] be treated as legal nullities." Id. at 195. It therefore held: "[T]here are no terminations properly before the Court, and the Court is without jurisdiction to review the merits of this case. The [blanket purchase agreement] and [the task order] therefore still exist and remain in effect." Id. However, there was no evidence, as there is in this case, that the contracting agency had retained another contractor to complete the work covered by the blanket purchase agreement and the task order, or that such work had been completed. Indeed, the time between the default terminations and the court's decision invalidating the default terminations–less than two years–is significantly less than the time that elapsed in this case–almost nine years.

---

terminate its contract with plaintiff for default. However, the Federal Supply Schedule contract under which the Coast Guard placed its order incorporated a provision indicating that if plaintiff alleged excusable delay, only the GSA contracting officer could terminate the task order for default. See Pl.'s App. SJ0014. Plaintiff's knowledge of this provision was not outside of its control, and therefore cannot constitute an extraordinary circumstance justifying equitable tolling. Failure to satisfy the extraordinary-circumstances prong is fatal to an equitable tolling argument. See Menominee Indian Tribe, 136 S. Ct. at 756 (remarking that a litigant needs to satisfy both the diligence prong and the extraordinary-circumstances prong); accord id. at 757 n.5 ("Because we hold that there were no extraordinary circumstances, we need not decide whether the [plaintiff] was diligently pursuing its rights."); cf. Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) ("Federal courts have typically extended equitable relief only sparingly.").

[37] Although plaintiff does not specify the Disputes clause to which it refers, the court notes that plaintiff's Federal Supply Schedule and Coast Guard contracts both incorporate by reference FAR 52.233-1, Disputes. See JX 1.37; JX 2.9.

Plaintiff next argues that because neither party was aware of the jurisdictional issue caused by the improper default termination until 2013, all of the events necessary to fix the Coast Guard's liability did not occur, and plaintiff's claim for termination for convenience did not accrue, until that time.  Plaintiff is mistaken.  As the court held above, plaintiff's claim for termination for convenience accrued by October 28, 2005, because by that date, all events fixing the Coast Guard's alleged liability for improper termination had occurred, plaintiff knew that these events had occurred, and plaintiff had suffered a monetary injury.  The fact that neither party realized that plaintiff's Federal Supply Schedule contract required the Coast Guard to refer the default termination decision to the GSA contracting officer due to plaintiff's allegations of excusable delay is of no moment.  "Both parties to a contract are charged with knowledge of its terms.  Neither the contractor nor the government can avoid its legal responsibilities by asserting ignorance."  Maxima Corp. v. United States, 847 F.2d 1549, 1556 (Fed. Cir. 1988); accord Upton v. Tribilcock, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained.  If this were permitted, contracts would not be worth the paper on which they are written.  But such is not the law.  A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission.").  Plaintiff should have known in 2005, when the Coast Guard terminated the contract for default, that the Coast Guard's action was contrary to the terms of its Federal Supply Schedule contract.

Finally, plaintiff argues that its claim for termination for convenience did not accrue until the GSA and the Coast Guard complied, or refused to comply, with the Default clause incorporated in plaintiff's Federal Supply Schedule contract.  As noted above, that clause provided:

> Any ordering office may, with respect to any one or more orders placed by it under the contract, exercise the same right of termination . . . , except that when failure to deliver articles or services is alleged by the Contractor to be excusable, the determination of whether the failure is excusable shall be made only by the Contracting Officer of the General Services Administration, to whom such allegation shall be referred by the ordering office and from whose determination appeal may be taken as provided in the clause of this contract entitled "Disputes."

Pl.'s App. SJ0014 (incorporating by reference Federal Supply Schedule contract clause I-FSS-249-B, Default (May 2000)).  In support of its contention that its claim did not accrue until the contracting agencies properly rendered a decision on its claims of excusable delay, plaintiff relies on Brighton Village Associates v. United States, 52 F.3d 1056 (Fed. Cir. 1995), and Nager Electric Co. v. United States, 368 F.2d 847 (Ct. Cl. 1966).  However, the issue addressed by the Federal Circuit in Brighton Village Associates and the United States Court of Claims ("Court of Claims") in Nager Electric Co. is different from the issue presented in this case.

Brighton Village Associates concerned a Housing Assistance Payments contract between the plaintiff and the United States Department of Housing and Urban Development ("HUD") that

required HUD to adjust contract rents on an annual basis.  52 F.3d at 1058.  HUD did not make rent adjustments for a number of years, including from 1981 to 1984.  Id.  Beginning in 1989, the plaintiff presented claims to HUD for retroactive rent adjustments, but HUD rejected those claims.  Id.  In 1991, the plaintiff filed suit in the Court of Federal Claims alleging that HUD had breached the Housing Assistance Payments contract by failing to make annual rent adjustments.  Id.  The court dismissed the plaintiff's claims for 1981 to 1984 as time-barred.  Id.  On appeal, the plaintiff contended that its "repeated administrative challenges to HUD's policies . . . postpone[d] accrual of its claims."  Id. at 1060.  In rejecting this contention, the Federal Circuit distinguished between claims that arise under a contract provision and pure breach-of-contract claims:

> A claim that "arises under" a contract receives different treatment under the statute of limitations than does a claim that alleges a "pure breach."  A "pure breach" claim accrues when a plaintiff has done all he must do to establish his entitlement to payment and the defendant does not pay.  A claim "arising under" a mandatory dispute resolution provision of a contract, however, does not accrue "until the duly-invoked decision of the administrative or arbitral board or tribunal."

Id. (citation omitted) (quoting Nager Elec. Co., 368 F.2d at 854).  Plaintiff's claims for retroactive rent adjustments, the Federal Circuit held, were pure breach-of-contract claims that accrued upon HUD's failure to make the adjustments.  Id.

Nager Electric Co., in turn, concerned a contract to construct a facility for the Atomic Energy Commission ("Commission").  368 F.2d at 850.  The Commission terminated several items of work in July and August 1958 under the contract's default termination provision, and the remaining work was completed and accepted in October 1958.  Id.  The plaintiffs submitted a number of claims under the contract's disputes clause, including a claim challenging the default terminations.  Id.  The Commission's hearing officer declined to address the default termination claim, noting that the plaintiffs had characterized the claim as one for breach of contract, a type of claim that was beyond its jurisdiction.  Id.  The Commission resolved the remaining claims in April 1964.  Id.  The plaintiffs filed suit in the Court of Claims in October 1964 alleging, among other things, that the default terminations were improper.  Id.  The government argued that this claim was untimely, contending that

> in Government contract cases the claim arises, and the limitations period starts, no later than the completion of the work[,] regardless of the pendency of administrative proceedings under the Disputes clause and regardless of whether the claim in suit is for a "breach" or arises "under" the contract within the coverage of the Disputes clause.

Id. at 851 (footnote omitted).  The court ultimately rejected the government's position, remarking:

> In the case of an item required by the contract to be submitted to a[n] administrative tribunal, . . . the contractor has no right to demand an[y] money on this "claim" until the administrative procedure is finished . . . , and there can be no judicially cogniz[a]ble injury, no violation of the contract, no claim for court relief, until the [administrative tribunal] has acted or had a chance to act.

Id. at 858-59 (citations omitted).  It therefore held that the plaintiffs' default-termination claim was not time-barred.  Id. at 865-66.

Importantly, the issue addressed by the Federal Circuit in Brighton Village Associates and the Court of Claims in Nager Electric Co. was the accrual of a claim for purposes of filing suit in the Court of Federal Claims.  52 F.3d at 1060; 368 F.2d at 854.  The courts were not concerned with the accrual of a claim for purposes of seeking an administrative decision, which is the issue in this case.  Accordingly, plaintiff's reliance on their decisions is unwarranted.  Accord 41 U.S.C. § 605(a) ("Each claim by a contractor against the government relating to a contract . . . shall be submitted [to the contracting officer] within 6 years after the accrual of the claim.").

In sum, because it would be futile for plaintiff to pursue a claim for termination for convenience in this court, the court denies plaintiff's motion for leave to amend its complaint.[38]

## IV.  ENTITLEMENT TO LIQUIDATED AND DELAY DAMAGES

Having disposed of the threshold procedural issue, the court must address the three substantive disputes that remain after the court's resolution of plaintiff's posttrial motion to dismiss:  (1) whether plaintiff is entitled to the remission of liquidated damages due to excusable delay, (2) whether plaintiff is entitled to delay damages related to the drawing review process, and (3) the amount of liquidated damages to which defendant is entitled.

Pursuant to the Liquidated Damages clause in plaintiff's contract with the Coast Guard, if plaintiff did not complete performance by the contract completion date, it was required to pay the Coast Guard liquidated damages of $551 per day until work was completed or accepted, even if its contract was terminated.  The Coast Guard began to assess liquidated damages on November 10, 2004–the day after the contract completion date.  Because the Coast Guard did not accept the building from Viteri as substantially complete until September 20, 2006, defendant asserted in its amended counterclaim that plaintiff was liable for 680 days of liquidated damages.  During trial, however, defendant revised its claim for liquidated damages to account for the fact that Viteri's reprocurement contract included work that was not part of plaintiff's contract.  It now contends that plaintiff should be assessed 394 days of liquidated damages, broken down as follows:  (1)

---

[38]  The court's conclusion that allowing plaintiff to file a supplemental complaint would be futile constitutes sufficient grounds to deny plaintiff's motion.  Therefore, the court need not address defendant's alternative ground for opposing plaintiff's motion–that it would be prejudiced by plaintiff's undue delay in asserting its new claim.

252 days for the time between the contract completion date, November 9, 2004, and the date that the Coast Guard directed First Sealord to cease work, July 19, 2005; (2) forty-five days for the time between the date that the Coast Guard directed First Sealord to cease work, July 19, 2005, and the date that a reprocurement contractor could get on site and begin work; and (3) ninety-seven days for the time that it would have taken a reprocurement contractor to complete the building after the installation of the roof had the scope of work of the reprocurement contract not been increased.

Plaintiff, in turn, seeks the remission of liquidated damages on two grounds. First, it affirmatively contends that it was not responsible for at least some of the delay that prevented it from finishing the project by the contract completion date. Second, in defense to defendant's counterclaim for liquidated damages, it argues that it should not be held liable for liquidated damages that accrued after March 17, 2005, the date that the Coast Guard improperly terminated the contract for default. Plaintiff further seeks delay damages for the extended overhead costs it incurred due to the purported Coast Guard-caused delays.

Because plaintiff's entitlement to the remission of liquidated damages and the payment of delay damages depends upon whether it can establish that the Coast Guard was responsible for delaying the completion of the project, the court begins its analysis by examining plaintiff's claims of excusable delay.

## A. Excusable Delay Standard

Under the express terms of its contract with plaintiff, the Coast Guard could not assess damages against plaintiff for failing to timely complete work under the contract if "[t]he delay in completing the work [arose] from unforeseeable causes," such as "acts of the Government" or "unusually severe weather," that were "beyond the control and without the fault or negligence of" plaintiff. FAR 52.249-10(b)(1), cited in JX 1.38. Plaintiff was required to provide the contracting officer, "within 10 days from the beginning of any delay," written notice of the cause of the delay. FAR 52.249-10(b)(2), cited in JX 1.38. Moreover, to result in an excusable delay, "the unforeseeable cause must delay the overall contract completion; i.e., it must affect the critical path of performance." Sauer Inc. v. Danzig, 224 F.3d 1340, 1345 (Fed. Cir. 2000). Plaintiff, as the party seeking the remission of liquidated damages on account of excusable delay, bears the burden of proving both that the unforeseeable cause delayed the critical path of performance, id., and "the extent of the excusable delay to which it is entitled," id. at 1347.

## B. The Coast Guard Waived the Contractual Notice Requirement

Plaintiff presented its claims of excusable delay to the Coast Guard in three February 25, 2005 letters. Defendant contends, as a preliminary matter, that the contents of these letters suggest that plaintiff did not comply with the contractual requirement to provide the Coast Guard with written notice of the cause of the delays within ten days of the commencement of the delays. Specifically, with respect to plaintiff's claim regarding the Coast Guard's review of its design

drawings, defendant notes that plaintiff "appears to complain about events predating February 15, 2005," when it requested, in its February 25, 2005 letter, a time extension for the Coast Guard's alleged improper review of its design drawings.  Def.'s Posttrial Br. 7.  And, with respect to all three claims, defendant avers that plaintiff has never identified the particular days in which it experienced delay and that the specified delays appear to overlap.

Although defendant accurately recites the contractual requirement that plaintiff provide the Coast Guard contracting officer with notice of an alleged delay within ten days of incurring the delay,[39] the court declines to apply the requirement as strictly as defendant implies is necessary.  Indeed, binding precedent suggests that courts should apply a contract's notice clauses with a certain measure of flexibility.  See, e.g., Hoel-Steffen Constr. Co. v. United States, 456 F.2d 760, 767-68 (Ct. Cl. 1972) ("To adopt [a] severe and narrow application of the notice requirements, . . . would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the Government is quite aware of the operative facts."); Copco Steel & Eng'g Co. v. United States, 341 F.2d 590, 598 (Ct. Cl. 1965) ("Lack of strict compliance with many kinds of contract requirements concerning writings and notifications have frequently been held to be of no consequence where the conduct of the parties have made it clear that formal adherence would serve no useful purpose or that the parties have in fact waived it."); Thompson v. United States, 91 Ct. Cl. 166, 179 (1940) ("Under the terms of the contract, the plaintiffs had 10 days in which to assert a claim . . . .  They did not assert such a claim within the time limit but after some months had elapsed they filed with the contracting officer a letter asking for additional compensation.  This request would have been barred and out of time had not the contracting officer entertained it, passed upon it, denied it, and informed plaintiffs that they could appeal to the Secretary of the Interior."); cf. Nager Elec. Co., 368 F.2d at 864 ("[T]he various substantive contractual clauses which lead to equitable adjustments or comparable relief under the contract . . . usually have built-in time limits, and where no specific period is established in the contract the contractor cannot delay unreasonably.  Neither this court nor the administrative tribunals have had any great difficulty in handling belated claims by contractors under the various contract-adjustment articles." (footnote and citation omitted)).  In this case, the contracting officer–Ms. Hundley–did not reject plaintiff's requests for time extensions due to a failure to submit the requests within the ten days prescribed by the contract.  See JX 470; JX 472; JX 473.  Rather, she denied the requests based on their merits.  Id.  By addressing the merits of plaintiff's requests, Ms. Hundley effectively waived the ten-day notice requirement.  Accord Copco Steel & Eng'g, 341 F.2d at 598; Thompson, 91 Ct. Cl. at 179.  Accordingly, plaintiff was permitted to challenge the rejection of all three claims in this court.

---

[39]  Plaintiff mistakenly suggests that the relevant contract clause is the excusable delays provision in its Federal Supply Schedule contract.  However, plaintiff's contract with the Coast Guard clearly indicates that if plaintiff experiences a delay, it should advise the Coast Guard contracting officer of the delay within ten days.

### C. Plaintiff Abandoned Its Request for a Time Extension Related to the Actions of the Coast Guard Inspector

Notwithstanding its ability to do so, plaintiff did not pursue its time extension request related to the actions of the Coast Guard inspector during or after trial.  Although the trial record contains documentary evidence regarding this claim, see, e.g., JX 439; JX 440; JX 452, plaintiff's scheduling expert did not opine on the effect of the Coast Guard inspector's actions on plaintiff's ability to complete the project, see JX 515; JX 515A; Tr. 1805-920 (Unger), and plaintiff did not address the claim in its pretrial memorandum, its opening posttrial brief, or its responsive posttrial brief.  In other words, plaintiff abandoned the claim.  See RCFC App. A ¶ 14(a)(2) (requiring a pretrial memorandum to include "a statement of the issues of fact and law to be resolved by the court," and providing that "[t]he issues should be set forth in sufficient detail to enable the court to resolve the case in its entirety by addressing each of the issues listed"); Thermalon Indus., Ltd. v. United States, 51 Fed. Cl. 464, 470 n.3 (2002) ("Plaintiff has abandoned its claim for consequential damages, . . . making no mention of them in its post-trial brief."); see also Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1382 (Fed. Cir. 2002) (agreeing that a claim that was addressed in a posttrial brief had not been abandoned).  Therefore, the court need not address it.

### D. Plaintiff Has Not Established the Existence of a Delay That Was Beyond Its Control

In the other two time extension requests that it presented to the contracting officer, plaintiff sought credit for thirty days of excusable delay related to the Coast Guard's purported improper review of its drawings,[40] and twenty-seven days of excusable delay related to unusually

---

[40]  In its opening posttrial brief, plaintiff suggests that it is entitled to 217 days of excusable delay (from July 23, 2004, to February 25, 2005) related to the Coast Guard's purported improper review of plaintiff's drawings.  As a general rule, the Court of Federal Claims possesses jurisdiction to entertain contractor claims pursuant to the CDA if the claims "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery."  Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003).  Although defendant does not argue that the 217 days of excusable delay described by plaintiff constitutes relief that is different from the thirty days of excusable delay that plaintiff requested from the Coast Guard's contracting officer, the court is obligated to ensure that it possesses jurisdiction to entertain the claims before it.  See PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1241 (Fed. Cir. 2002) ("Jurisdiction is a threshold issue, and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." (citations omitted)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").  Nevertheless, the court need not decide whether it possesses jurisdiction to entertain a request for more than thirty days of excusable delay because, as explained below, plaintiff has not established that the Coast Guard improperly reviewed its design or that the alleged design review issues that purportedly caused the delay affected the critical path of performance.

severe weather.  As noted above, for plaintiff to recover on its claims of excusable delay, it must establish (1) that any delay was the result of an unforeseen cause beyond its control and without its fault, (2) that the delay affected work on the critical path of performance, and (3) the extent of the delay.  In its opening posttrial brief, plaintiff indicated that the evidence elicited at trial established that the alleged weather-related delays did not affect the critical path of performance under its conception of the project's critical path.  Accordingly, it discontinued its pursuit of a separate weather-related time extension and focused solely on its request for a time extension related to the Coast Guard's purported improper review of its drawings.

Plaintiff contends in its posttrial briefing that the Coast Guard's review of its drawings was improper because (1) the Coast Guard's comments on the submitted drawings were couched as recommendations and did not reflect whether the drawings were approved, disapproved, or approved as noted; (2) the Coast Guard did not provide comments on some of its drawings within the time specified in the contract; (3) the Coast Guard did not approve plaintiff's drawings even though its design was in full compliance with the RFP; (4) the Coast Guard should have issued a change order related to the allegedly changed requirements for the HVAC system in the hydraulic test lab; (5) the Coast Guard failed to provide plaintiff with the information that it needed to complete the HVAC system design; and (6) the Coast Guard should have known that repeatedly providing comments on the drawings would delay plaintiff's ability to begin construction.  Problematically, plaintiff did not raise the latter five contentions in the February 25, 2005 letter setting forth its improper design review claim.

Under the CDA, the Court of Federal Claims only possesses jurisdiction over a claim if the contractor has previously presented the same claim to the contracting officer.  Scott Timber Co., 333 F.3d at 1365; see also id. (noting that claims are the same if they "arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery").  Consequently, if the contractor expands the scope of an existing claim in the Court of Federal Claims, the court cannot entertain it.  See Simulation Tech., LLC v. United States, 103 Fed. Cl. 105, 108 (2012) ("[I]f the complaint sets forth a new claim or a claim whose scope differs from what was previously presented to the contracting officer, this Court will not have jurisdiction over it."); accord Santa Fe Eng'rs, Inc. v. United States, 818 F.2d 856, 858 (Fed. Cir. 1987) ("On appeal to the [board of contract appeals] or in a direct access action in the Claims Court, a contractor may increase the amount of his claim, but may not raise any new claims not presented and certified to the contracting officer."); see also id. at 858-60 (holding that where the claim presented to the contracting officer involved the effects of three change orders, the contractor could not assert a claim before the board of contract appeals based on "the collective nature of all changes or the multiplicity of change orders or design difficulties unrelated to those three particular change orders on which its original claim was grounded" because such a claim "was entirely new and had never been presented to the contracting officer"); Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987) (holding that a contractor must give the contracting officer "a clear and unequivocal statement" that provides "adequate notice of the basis and amount of the claim").

Although plaintiff presented its claim for a thirty-day excusable delay to the contracting officer, the sole basis of that claim was the Coast Guard's failure to approve, reject, or approve as noted the 100% design drawings.  Plaintiff did not advise the contracting officer that its request for a thirty-day excusable delay was based on the timing of the Coast Guard's review comments, a contention that its 100% design complied with contractual requirements, the Coast Guard's failure to issue a change order,[41] the Coast Guard's failure to provide plaintiff information necessary to complete the design, or the Coast Guard's knowledge that providing review comments would delay construction.  In other words, the contracting officer did not have any notice that plaintiff's claim was based on these contentions.  Consequently, in raising these contentions for the first time in this court, plaintiff has impermissibly broadened the scope of its claim.  The court therefore lacks the authority to address them.

With respect to plaintiff's remaining contention–that the Coast Guard's comments on the submitted drawings were couched as recommendations and did not reflect whether the drawings were approved, disapproved, or approved as noted–the court agrees with defendant that the Coast Guard's review of plaintiff's drawings was in full compliance with contractual requirements.  Pursuant to the provisions of the contract pertaining to the design submission, review, and approval process, the Coast Guard, after reviewing a design submittal, was required to provide plaintiff with "comments" on the submittal and to advise plaintiff if it considered the submittal to be "unacceptable."  JX 1.79-.80.  Then, plaintiff was required to "resolve" or "acceptably address" the comments and provide a corrected submittal to the Coast Guard for review.  Id.  The Coast Guard interpreted the contract to allow it to approve a design, reject a design, or approve a design with comments.[42]

---

[41]  There is a separate basis for the court to conclude that it lacks jurisdiction to entertain plaintiff's claim that the Coast Guard should have issued a change order related to the allegedly changed requirements for the HVAC system in the hydraulic test lab:  plaintiff did not present this claim to the Coast Guard's contracting officer as required by the contract's Changes clause. See FAR 52.243-4 (requiring a contractor to provide written notice to the contracting officer that it considered a request to be a change order), cited in JX 1.38; see also K-Con Bldg. Sys., Inc., 778 F.3d at 1010 ("Timely written notice differentiates requests the contractor views as outside the contract from those it deems contemplated by the contract.  And it gives the government timely notice of what amounts it might be on the hook for, so that it will not be surprised by money claims later, as well as an opportunity to address demands for more money when it might yet avoid them." (citation omitted)).

[42]  The Coast Guard's interpretation is consistent with the provisions of the contract pertaining to design review.  Because plaintiff was contractually required to resolve or address all of the Coast Guard's comments and then resubmit its design to reflect the changes it made, any comments made by the Coast Guard necessarily must have constituted either a rejection of the design or an approval of the design as noted.

As summarized in the table below, the Coast Guard satisfied the contractual requirements regarding the content of its comments:  it (1) rejected plaintiff's February 24, 2004 design as incomplete; (2) rejected at least some of plaintiff's April 5, 2004 design as noncompliant with the contract specifications; (3) rejected plaintiff's June 7, 2004 design as incomplete; (4) rejected the portion of plaintiff's June 10, 2004 design that concerned the HVAC system for the hydraulic test lab and approved, with comments, the portion of plaintiff's June 10, 2004 design that concerned the foundation and the erection of the metal building; (5) rejected the portion of plaintiff's July 2004 design that concerned the HVAC system and approved, with comments, the remainder of plaintiff's July 2004 design; (6) rejected plaintiff's September 16, 2004 HVAC system design; (7) implicitly rejected plaintiff's December 2, 2004 mechanical design; and (8) approved, with comments, plaintiff's February 18, 2005 design.  By characterizing the Coast Guard's comments as "recommendations," plaintiff glosses over two important points.  First, plaintiff fails to recognize that some of the Coast Guard's comments highlighted plaintiff's noncompliance with contractual requirements; thus, rather than just being recommendations, they constituted rejections of plaintiff's design.  Second, plaintiff does not account for the contractual requirements that it resolve or address all comments and resubmit corrected drawings; such requirements indicate that the Coast Guard would not approve a drawing until all of the comments were resolved.  In short, plaintiff cannot establish that the Coast Guard caused a delay–of any length–by improperly reviewing its drawings.

**Summary of Design Submittals and Responses**

| Plaintiff's Submittals | | Coast Guard's Responses | |
|---|---|---|---|
| Date | Description | Date | Description |
| 2/24/2004 | Architectural, HVAC, plumbing, electrical, fire alarm, site, and structural drawings | 2/25/2004 | Electronic-mail message indicating that the submittal was incomplete |
| | | 3/23/2004 | Letter containing the same comments that were provided on 2/25/2004 |
| 4/5/2004 | 100% design | 4/9/2004 | Electronic-mail message containing initial comments regarding issues that needed to be addressed promptly due to nonconformance with the contract specifications |
| | | 4/13/2004 | Complete set of marked-up drawings |

| 6/7/2004 | Architectural, HVAC, plumbing, electrical, fire alarm, site, and structural drawings | No later than 6/9/2004 | Electronic-mail message indicating that the submittal was incomplete |
|---|---|---|---|
| 6/10/2004 | Architectural, HVAC, plumbing, electrical, fire alarm, site, structural, and foundation drawings | 6/18/2004 | Complete set of marked-up drawings; letter (1) containing comments, (2) indicating that the HVAC system design for the hydraulic test lab was deficient and would require resubmission, and (3) permitting plaintiff to proceed with "metal building and foundation construction" and then "incorporat[e] and correct[] the architectural, mechanical, and electrical drawings . . . while foundation construction is occurring" |
| | | 6/23/2004 | Electronic-mail message clarifying that plaintiff could begin construction so long as it did not take any exceptions to the review comments and submitted signed and sealed foundation drawings |
| 7/14/2004 and 7/21/2004 | 100% design | 7/23/2004 | Letter (1) containing comments (including comments on the HVAC system design); (2) indicating that the Coast Guard had completed its review of plaintiff's submittal except for the HVAC system design, which would need to be resubmitted; and (3) stating that once plaintiff incorporated the comments and submitted a final design, it could proceed with all work except for the work related to the HVAC system |

| 9/16/2004 | 100% design that did not include an updated HVAC system design | 9/30/2004 | Marked-up drawings; letter (1) containing comments, (2) stating that the HVAC system design for the hydraulic test lab was unacceptable, and (3) including a recommendation for an acceptable HVAC system design |
|---|---|---|---|
| 12/2/2004 | 100% design that included an updated HVAC system design | 12/9/2004 | Electronic-mail message containing preliminary comments that included some required changes to the mechanical drawings |
| 2/18/2005 | 100% design | 2/25/2005 | Letter containing comments and indicating that if plaintiff did not take exception to the comments, it could proceed with construction so long as signed and sealed drawings were submitted |

**E.  Plaintiff Has Not Established That any Delay Affected Work on the Critical Path of Performance**

Although plaintiff's failure to establish that the Coast Guard delayed its performance of the contract by improperly reviewing its drawings is fatal to its claims arising from that contention (in other words, its claims for the remission of liquidated damages and the payment of delay damages), the court notes that plaintiff's claims would fail for a second reason:  its inability to establish that the purported Coast Guard-caused delays affected the critical path of performance.[43]  The Court of Claims explained the critical path concept in the following manner:

[T]he critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work.  (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone

---

[43]  Because the court concludes that plaintiff has not established that the Coast Guard caused a delay or that the delay allegedly caused by the Coast Guard affected the critical path of performance, it need not address whether plaintiff has established the extent of the alleged delay. See Sauer Inc., 224 F.3d at 1345, 1347 (indicating that plaintiff must prove the existence of a delay from an unforeseeable cause, that the delay was on the critical path of performance, and the extent of the delay).

conduits are installed.)  The data is then analyzed, usually by computer, to
determine the most efficient schedule for the entire project.  Many subprojects
may be performed at any time within a given period without any effect on the
completion of the entire project.  However, some items of work are given no
leeway and must be performed on schedule; otherwise, the entire project will be
delayed.  These latter items of work are on the "critical path."  A delay, or
acceleration, of work along the critical path will affect the entire project.

Haney v. United States, 676 F.2d 584, 595 (Ct. Cl. 1982); accord Wilner v. United States, 24
F.3d 1397, 1399 n.5 (Fed. Cir. 1994) (en banc) ("A 'critical path' is a way of grouping
interrelated activities in a construction project.  A delay to an activity that is on the 'critical path'
usually results in a corresponding delay to the completion of the project."); Tr. 1811 (Unger)
("[T]he critical path . . . is the longest path of activities through the project."), 3243 (McGrath)
("[T]he critical path is the longest chain of interrelated events that determined the project's
completion . . . .").  If the contractor and the government cause concurrent delays that affect the
critical path of performance, neither party can recover delay-related damages unless the delays
can be apportioned between the parties.  See Blinderman Constr. Co. v. United States, 695 F.2d
552, 559 (Fed. Cir. 1982) (noting, in circumstances where a contractor is seeking damages for the
government's delay, that "courts will deny recovery where the delays are 'concurrent or
intertwined' and the contractor has not met its burden of separating its delays from those
chargeable to the Government"); Coath & Goss, Inc. v. United States, 101 Ct. Cl. 702, 715
(1944) (holding that in the event of concurrent delay, neither the contractor nor the government
"can recover damage, unless there is in the proof a clear apportionment of the delay and the
expense attributable to each party"); see also Tr. 1824 (Unger) ("[C]oncurrent critical delay . . . is
two events occurring at the same time that affect the critical path."), 3558 (McGrath) ("A
concurrent delay . . . is when you have two or more independent delays that are both [causing a]
critical milestone to be delayed at the same time.").  During trial, the parties presented competing
visions of what events fell on the critical path of performance, and supported their positions with
the reports and testimony of scheduling experts.

### 1.  Plaintiff's Position

According to plaintiff, the contract specifications defined the critical path of performance.
DX 515A at 5; Tr. 1823 (Unger).  In particular, plaintiff's scheduling expert, Mr. Unger,
explained that based on the contract, the critical path of performance started with the contract
award and continued through the postaward kickoff meeting, the design of the building, the
approval of the design, and the building's construction.  DX 515A at 5; Tr. 1823 (Unger).  Mr.
Unger conducted a "critical path windows analysis" to determine what activities affected the
critical path of performance.[44]  DX 515A at 5-7.  He divided the project into three windows:  (1)

---

[44]  According to Mr. Unger, "[a] windows approach takes the baseline schedule and . . .
takes certain updates after that and progresses that [schedule] at various points in time.  You
compare the two windows to see what the impact . . . was."  Tr. 1842 (Unger); accord id. at 1824

from the award of the contract to the postaward kickoff meeting, (2) from the postaward kickoff meeting to the start of construction, and (3) from the start of construction to the default termination. Id. Mr. Unger concluded that "[a]t the start of construction, the critical path [ran] through the conclusion of the HVAC Design," id. at 6, and that at the time of the default termination, "[t]he critical path . . . continue[d] to run through the completion of HVAC and final design," id. at 7. See generally Tr. 1850-53, 1919 (Unger) (opining that the critical path of performance ran through the HVAC system design). He further concluded that the delays in constructing the building were concurrent with the delays related to the HVAC system design, but that the construction delays did not delay the overall completion of the project; in other words, they did not affect the critical path of performance. Id. at 1850-51.

## 2. Defendant's Position

Defendant, in contrast, asserts that the critical path of performance in this case should be ascertained by examining what actually occurred on the project. Id. at 3238-40, 3589-90 (McGrath); DX 513.5; see also Tr. 3574-76 (McGrath) (criticizing the prospective model used by Mr. Unger, which reflected "that design is critical . . . looking forward," but did not indicate "what was critical from [a certain] point backwards" or "what actually happened and why"). Based on "actual data on the prosecution of work from both the as-built schedule and all available contemporaneous records including correspondence, periodic schedule updates, and daily reports," DX 513.5, defendant's scheduling expert, Mr. McGrath, concluded that the critical path of performance started with the contract award and continued through plaintiff's submission of the first complete 100% design, work on the foundation, erection of the structural steel, and wall panel installation, DX 513.8-.14; Tr. 3437, 3456-57, 3465, 3468-69, 3483, 3491, 3511, 3538 (McGrath). In reaching his conclusion, Mr. McGrath analyzed the project using windows "delineated by actual milestones or significant events/activities in the as-built schedule . . . ." DX 513.5. The five windows he utilized were: (1) from the award of the contract to the submission of the first complete 100% design, (2) from the submission of the first complete 100% design to the beginning of work on the foundation, (3) from the beginning of work on the foundation to beginning of structural steel erection, (4) from the beginning of structural steel

---

("[Y]ou have a baseline schedule . . . and you look at the progress schedule after that and you compare the critical path through progressions of time or windows to that baseline schedule."). Defendant's scheduling expert, Mr. McGrath, defined a windows analysis in the following manner:

> The actual project is broken up into key critical periods of time, windows. And each window allows you to evaluate the causes for delays during that period of time, so you're . . . , number one, [not] double-counting those delays in a later period of time, and number two, segregating the actual root causes of the delays to the critical events that they're impacting.

Id. at 3244 (McGrath).

-71-

erection to the beginning of wall panel installation, and (5) from the beginning of wall panel installation to the termination for default.[45]   DX 513.8-.14; Tr. 3410-538 (McGrath).

According to Mr. McGrath, the design of the HVAC system was not on the critical path of performance because the HVAC system could not be installed until the building was enclosed, and when the Coast Guard terminated the contract for default, plaintiff had not completed the installation of the building's walls and roof.  See Tr. 3516-17 (McGrath) (explaining that mechanical equipment is installed after the building is enclosed), 3538 (explaining that the failure to complete the roof and wall panel installation prevented plaintiff from "performing all of the follow-on work that would have been required to finish the building"), 3549-50 (explaining that so long as enough of the design is complete for construction to be occurring, the design does not affect the critical path); see also id. at 3560-61 (noting that even though plaintiff needed to finish both roof installation and HVAC system design prior to beginning work inside the building, delays to those activities were "[n]ot necessarily" concurrent:  "Just because they're both necessary predecessors for the succeeding activity does not make them both critical.  The critical delay is the one that's causing the milestone to be moved back . . . .").  Indeed, Mr. McGrath testified that had the Coast Guard approved plaintiff's HVAC system design prior to terminating the contract for default, the anticipated completion date of the building would not have been affected because plaintiff was not prepared, at the time of the default termination, to commence the installation of the HVAC system.  See id. at 3449 (explaining that "if you hypothetically moved a critical milestone, the project's duration will also move with it," but "[i]f you hypothetically move a noncritical milestone or adjust a noncritical delay, the project duration doesn't move"), 3597-98 ("Had mechanical drawings been approved earlier, K-Con would have been able to put in place some of that work sooner than they did.  That would not have . . . had any impact on the actual critical path of the job prior to termination."), 3636 ("If you can magically make the HVAC design complete on September 30[, 2004], the project condition at termination would be exactly the same.").

### 3.  Analysis

The parties present diametrically opposed descriptions of the critical path of performance–plaintiff submits that the critical path of performance should be based on an as-planned, forward-looking schedule, and defendant contends that the critical path of performance should be based on an as-built, backward-looking schedule.  The court agrees with defendant that the proper way to determine what activities were on the critical path of performance in this case is to examine what actually occurred during contract performance.  There are two reasons for this conclusion.  First, a critical path schedule that relies solely on the schedule set forth in the contract specifications does not account for any subsequent changes to the schedule authorized by the contracting agency.  In this case, the Coast Guard authorized plaintiff to proceed with construction before it completed the design.  Second, the use of a contractually based critical path

---

[45] In his expert report, Mr. McGrath combined the third and fourth windows into a single window.  See DX 513.11-.13.

schedule does not reflect that plaintiff did not actually perform in accordance with the schedule set forth in the contract specifications.  Rather, plaintiff accepted the Coast Guard's fast-tracking offer and began construction before completing the design.  In short, the approach advanced by plaintiff and its expert, Mr. Unger, does not fully reflect the reality of what occurred on the project.

Defendant's approach, on the other hand, fully reflects that reality.  Plaintiff was still working on parts of the design when the Coast Guard authorized it to begin construction pursuant to the "sealed structural foundation drawings."  Jt. Stip. ¶ 34.  As construction progressed, plaintiff continued to work on the design.  Indeed, plaintiff never reached a point, prior to being terminated for default, where it could not proceed with construction due to the lack of a design.  Consequently, it was construction, and not the design, that was controlling work on the project at the time that plaintiff submitted its claim for excusable delay.  Thus, if the Coast Guard had caused a delay by improperly reviewing plaintiff's drawings, the delay is noncompensable because it did not affect the critical path of performance.

## F. Defendant Has Established a Prima Facie Case for Liquidated Damages

Because plaintiff has not established that the Coast Guard should remit any liquidated damages due to excusable delay, the court turns to defendant's counterclaim for unrecouped liquidated damages.  As noted above, plaintiff was contractually required to pay the Coast Guard liquidated damages of $551 per day until work was "completed or accepted" and remained liable for liquidated damages even if the Coast Guard "terminate[d its] right to proceed."  JX 1.30.  In its amended counterclaim, defendant asserted that plaintiff was liable for 680 days of liquidated damages–from the day after the contract completion date to the day that the Coast Guard accepted the building from Viteri.  However, during trial, defendant revised its claim for liquidated damages to account for the fact that Viteri's reprocurement contract included work that was not part of plaintiff's contract.  Thus, defendant now seeks 394 days of liquidated damages, which it breaks down into three periods.

First, defendant requests liquidated damages for the 252 days between the contract completion date, November 9, 2004, and the date that the Coast Guard directed First Sealord to cease work, July 19, 2005.  There is no dispute that the building was not completed or that the Coast Guard had not accepted the building as of July 19, 2005.  Defendant has therefore established its entitlement to liquidated damages for this time period.

Second, defendant requests liquidated damages for the forty-five days between the date that the Coast Guard directed First Sealord to cease work, July 19, 2005, and the date that a reprocurement contractor could get on site and begin work.  Defendant elicited the testimony of Ms. Broussard at trial to establish that it would take thirty to forty-five days to get a contractor on site to complete the work left unfinished by plaintiff and another fifteen to thirty days for that contractor to begin work once on site.  Plaintiff did not dispute this testimony.  Moreover, there can be no question that the building would not have been completed or accepted while the Coast

Guard was in the process of retaining a reprocurement contractor.  Accordingly, defendant has established its entitlement to an additional forty-five days of liquidated damages.

Finally, defendant requests liquidated damages for the ninety-seven days that it would have taken a reprocurement contractor to complete the building after installation of the roof had the scope of work of the reprocurement contract not been increased.  Defendant bases this request on plaintiff's own time estimates; in its January 5, 2005 project schedule, plaintiff projected that it would finish the roof on January 19, 2005, and complete the building on April 26, 2005–a period of ninety-seven days.  Plaintiff did not present any evidence disputing that it planned to complete the building, once the roof was installed, in ninety-seven days.  Accordingly, defendant has established its entitlement to an additional ninety-seven days of liquidated damages.

In sum, defendant has established a prima facie case to recover 394 days of liquidated damages from plaintiff.  Thus, in the absence of any valid affirmative defenses, plaintiff is liable for $217,094 in liquidated damages, minus the $17,483 in liquidated damages previously withheld by the Coast Guard.

### G.  Plaintiff Does Not Have any Valid Defenses to the Coast Guard's Assessment of Liquidated Damages After the Default Termination

Plaintiff's final contention is that it is entitled to the remission of liquidated damages that were assessed after the Coast Guard improperly terminated the contract for default.[46] Specifically, plaintiff argues that it has several common law defenses to the Coast Guard's assessment of these liquidated damages:[47]

> The Coast Guard interfered with and prevented K-Con from completing the work. By changing the design after the termination, the Coast Guard waived and is estopped from assessing future liquidated damages.  The delays caused by the Coast Guard's changes to the design cannot be segregated from the work K-Con would have completed.  Further, the Coast Guard's prior breach of the agreement by the improper termination precludes the recovery of liquidated damages.

---

[46]  There were 128 days between the contract completion date and the improper default termination (in other words, from and including November 10, 2004, to and including March 17, 2005).  Thus, plaintiff seeks the remission of 266 days (out of the 394 days established by defendant) of liquidated damages.

[47]  Although plaintiff set forth a large number of affirmative defenses in its answer to defendant's amended counterclaim, it only addresses a subset of those defenses in its posttrial briefing.  Plaintiff has therefore abandoned the remaining defenses.  See Rosco, Inc., 304 F.3d at 1382; Thermalon Indus., Ltd., 51 Fed. Cl. at 470 n.3.

Pl.'s Posttrial Br. 38.  As plaintiff correctly notes, a contractor may assert a common law defense to a government CDA claim (such as a claim for liquidated damages) without first presenting the defense to the contracting officer so long as the defense could not be characterized as request for contract modification.[48]  See M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1331 (Fed. Cir. 2010) ("[A] contractor seeking an adjustment of contract terms must meet the jurisdictional requirements and procedural prerequisites of the CDA, whether asserting the claim against the government as an affirmative claim or as a defense to a government action."); see also Laguna Constr. Co. v. Carter, 828 F.3d 1364, 1368 (Fed. Cir. 2016) ("[T]he government's defense [of fraud] plainly does not seek the payment of money or the adjustment or interpretation of contract terms."); Securiforce Int'l Am., LLC v. United States, 125 Fed. Cl. 749, 776 (2016) ("To defend against an agency's termination for cause decision, a contractor may assert that the government committed a material breach of contract prior to the termination.  . . .  [A] contractor can appeal a contracting officer's termination for cause decision in this court and assert breach of contract as a defense to that termination without first submitting a breach of contract claim to a contracting officer and receiving a final decision."); Palafox Street Assocs., L.P. v. United States, 122 Fed. Cl. 18, 32 (2015) (holding that the "plaintiff's estoppel, waiver, laches, and statute of limitations 'claims' [were] more accurately characterized as affirmative defenses"); Total Eng'g, Inc. v. United States, 120 Fed. Cl. 10, 15-16 (2015) (concluding that the contractor, in asserting a defense of defective specifications, was not seeking the modification of contract because "a favorable resolution of [the contractor's] defense would not result in any separate contract adjustment or monetary relief to [the contractor]"); TPL, Inc. v. United States, 118 Fed. Cl. 434, 441-45 (2014) (holding that the plaintiff's affirmative defenses of breach of contract, impossibility/impracticability of performance, mutual mistake of fact, and unconscionability amounted to claims for contract modification that should have been presented to the contracting officer); Sikorsky Aircraft Corp. v. United States, 102 Fed. Cl. 38, 48 n.14 (2011) (contrasting

---

[48]   In its opening posttrial brief, plaintiff appears to suggest that it is entitled to assert a defense of excusable delay to the Coast Guard's post-default-termination assessment of liquidated damages because (1) its claim for excusable delay would fall under its Federal Supply Schedule contract's excusable delays provision, (2) its Federal Supply Schedule contract's excusable delays provision does not require the contracting officer to extend the contract completion date upon a finding of excusable delay, and (3) because no time extension is required under its Federal Supply Schedule contract's excusable delays provision, it was not required to present a claim for excusable delay to the contracting officer before asserting an excusable delay defense in this court.  Plaintiff is mistaken.  Any claim that the Coast Guard was causing a delay in plaintiff's performance of the contract was required to be presented to the Coast Guard's contracting officer in the first instance, see FAR 52.249-10, cited in JX 1.38; the GSA contracting officer would only consider such a claim if the Coast Guard sought to terminate its contract with plaintiff for default notwithstanding the claim, see Pl.'s App. SJ0014.  Indeed, plaintiff's Federal Supply Schedule contract lacks any provision allowing the GSA contracting officer to consider a claim of ordering agency-caused delay in the first instance.  See generally id. at SJ0001-90.  In short, plaintiff's contract with the Coast Guard is the controlling contract for the purposes of evaluating the propriety of plaintiff's excusable-delay defense.

"counterclaim defenses that seek contract modification" and "affirmative defenses [that] are traditional common law defenses that are independent of the means by which a party seeks equitable adjustment to a government contract"); id. at 47-48 (holding that it could exercise jurisdiction over the contractor's affirmative defenses of accord and satisfaction, waiver, laches, and statute of limitations). However, the affirmative defenses asserted by plaintiff either fall beyond the court's jurisdiction or lack merit.

Plaintiff's first defense–that "the Coast Guard interfered with and prevented [it] from completing the work"–amounts to a claim of excusable delay. Pursuant to binding precedent, even if a contractor is merely seeking the remission of liquidated damages, it may not assert a defense of excusable delay in this court if it did not first present the excusable delay claim to the contracting officer. M. Maropakis Carpentry, Inc., 609 F.3d at 1331-32. As noted above, the court has rejected the only claim of excusable delay that plaintiff presented to the contracting officer. To the extent that plaintiff is asserting an additional claim of excusable delay, the court lacks the authority to entertain it.

Plaintiff's second and third defenses–that "[b]y changing the design after the termination, the Coast Guard waived and is estopped from assessing future liquidated damages" and that "delays caused by the Coast Guard's changes to the design cannot be segregated from the work K-Con would have completed"–are moot in light of defendant's revised demand for liquidated damages. In its opening posttrial brief, defendant expressly limits the amount of liquidated damages it is seeking from plaintiff to account for the fact that Viteri's reprocurement contract included work that was not part of plaintiff's contract. To eliminate the effect of the changed design, defendant determined the number of days that it would have taken plaintiff to complete the building based on plaintiff's own project schedule, and then substituted that amount of time for the number of days that it actually took Viteri to complete the building. In other words, defendant has segregated any delays that might have resulted from the Coast Guard's design changes from the time it would have taken plaintiff to complete the project. Consequently, any liquidated damages that the court awards to defendant would exclude liquidated damages attributable to the Coast Guard's design changes.

Plaintiff's fourth and final defense–that "the Coast Guard's prior breach of the agreement by the improper termination precludes the recovery of liquidated damages"–is without merit. Under the doctrine of prior material breach, "when a party to a contract is sued for breach, it may defend on the ground that there existed a legal excuse for its nonperformance at the time of the alleged breach." Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1380 (Fed. Cir. 2004); accord Coll. Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact."). The doctrine

is based on the principle that where performances are to be exchanged under an exchange of promises, each party is entitled to the assurance that he will not be

called upon to perform his remaining duties of performance with respect to the expected exchange if there has already been an uncured material failure of performance by the other party.

Restatement (Second) of Contracts § 237 cmt. b (Am. Law Inst. 1981), quoted in Barron Bancshares, Inc., 366 F.3d at 1380-81. The Coast Guard's failure to refer plaintiff's allegations of excusable delay to the GSA contracting officer prior to terminating the contract for default constituted a breach of contract. However, under the express terms of the Liquidated Damages clause, so long as the building was not completed or accepted, plaintiff was liable for liquidated damages regardless of whether its contract had been terminated. In other words, the Coast Guard's erroneous default termination had no effect on plaintiff's liability for liquidated damages. Thus, to the extent that the doctrine of prior material breach applies to the circumstances of this case, plaintiff has not established that the Coast Guard's improper default termination precludes its assessment of liquidated damages.[49]

Due to the absence of any valid affirmative defenses, plaintiff must pay the liquidated damages established by defendant.

## V. CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiff's motion for leave to amend its complaint and concludes that plaintiff is not entitled to the remission of liquidated damages or the payment of delay damages arising from the Coast Guard's review of its design drawings. The court therefore **DISMISSES** plaintiff's amended complaint **WITH PREJUDICE**. In addition, the court concludes that defendant has established its entitlement to liquidated damages under its amended counterclaim. Accordingly, plaintiff shall pay defendant liquidated damages in the amount of $199,611 (total assessed liquidated damages of $217,094 less liquidated damages previously withheld by the Coast Guard of $17,483). Each party shall bear its own costs. The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[49] It also bears noting that plaintiff, not defendant, was the first party to breach the contract by failing to complete the building by the contract completion date. It was this breach that triggered the Coast Guard's invocation of the Liquidated Damages clause.